

IN THE DISTRICT COURT OF APPEAL, FIFTH DISTRICT
STATE OF FLORIDA

JAQUEZ SHAKIM ROLAND,      )
                           )
        Appellant,         )
                           )
vs.                        )        DCA CASE NO. 5D13-2881
                           )
STATE OF FLORIDA,          )
                           )
        Appellee.          )
_____ )


**APPEAL FROM THE CIRCUIT COURT
IN AND FOR FLAGLER COUNTY, FLORIDA**


<u>**INITIAL BRIEF OF APPELLANT**</u>


JAMES S. PURDY
PUBLIC DEFENDER
SEVENTH JUDICIAL CIRCUIT

EDWARD J. WEISS
ASSISTANT PUBLIC DEFENDER
FLORIDA BAR NO. 0163902
444 Seabreeze Boulevard, Suite 210
Daytona Beach, Florida 32118
(386) 254-3758
weiss.ed@pd7.org

COUNSEL FOR APPELLANT

## **<u>TABLE OF CONTENTS</u>**

<u>PAGE NO.</u>

| | |
|---|---|
| TABLE OF CONTENTS | i |
| TABLE OF CITATIONS | ii |
| PRELIMINARY STATEMENT | 1 |
| STATEMENT OF THE CASE | 2 |
| STATEMENT OF THE FACTS | 5 |
| SUMMARY OF THE ARGUMENT | 12 |
| ARGUMENT | 13 |
|      WHETHER THE TRIAL COURT COMMITTED ANY ERRORS? | |
| CONCLUSION | 18 |
| CERTIFICATE OF FONT | 19 |
| CERTIFICATE OF SERVICE | 19 |

# TABLE OF CITATIONS

CASES CITED:                                                    PAGE NO.

*Anders v. California*
386 U.S. 738 (1967)                                              11, 12

*Brewer v. State*
413 So. 2d 1217 (Fla. 5th DCA 1982)                                 15

*Caso v. State*
524 So. 2d 422 (Fla. 1988)                                          12

*Codie v. State*
313 So. 2d 754 (Fla. 1975)                                          15

*Dale v. State*
703 So. 2d 1045 (Fla. 1997)                                         16

*Day v. State*
105 So. 3d 1284 (Fla. 2nd DCA 2013)                                 14

*Delhall v. State*
95 So. 3d 134 (Fla. 2012)                                           13

*England v. State*
940 So. 2d 389 (Fla. 2006)                                          15

*Gartner v. State*
118 So. 3d 273 (Fla. 5th DCA 2013)                                  16

*Grant v. State*
390 So. 2d 341 (Fla. 1980)                                      *passim*

*Ibar v. State*
938 So. 2d 451 (Fla. 2006)                                          13

ii

*Jackson v. State*
419 So. 2d 394 (Fla. 4th DCA 1982)                        15

*K.C. v. State*
49 So. 3d 841 (Fla. 4th DCA 2010)                         16

*Lynch v. State*
293 So. 2d 44 (Fla. 1974)                                 15

*Reed v. State*
944 so. 2d 503 (Fla. 5th DCA 2006)                        13

*Rimmer v. State*
825 So. 2d 304 (Fla. 2002)                                13

*Russell v. State*
844 So. 2d 725 (Fla. 5th DCA 2003)                        15

*State v. Benton*
567 So. 2d 1067 (Fla. 2nd DCA 1990)                       14

*State v. Causey*
503 So. 2d 321 (Fla. 1987)                                11

*State v. Cordia*
564 So. 2d 601 (Fla. 2nd DCA 1990)                        14

*State v. Kindle*
782 So. 2d 971 (Fla. 5th DCA 2001)                        12


OTHER AUTHORITIES CITED:

Section 90.952, Florida Statutes (2012)                   14
Section 90.954, Florida Statutes (2012)                   14

## PRELIMINARY STATEMENTS

Appellant was the Defendant and Appellee was the Prosecution in the

Felony Division of the Circuit Court, Seventh Judicial Circuit, in and for Flagler

County, Florida.  In the Brief, the appellee will be referred to as "the State" and the

appellant will be referred to as he appears before this Honorable Court of Appeal.

In the brief the following symbols will be used:

"R"                    - Refers to the Record on Appeal.

"TT"                   - Refers to the transcript for Trial held on June 21, 2013..

"Suppress"             - Refers to the transcript for the Motion to Suppress Hearing
                         held on January 22, 2013.

"Limine"               - Refers to the transcript for the Motion in Limine Hearing
                         held on May 16, 2013.

"Sent"                 - Refers to the transcript for the Sentencing Hearing held on
                         July 12, 2013 in Volume II of the Record on Appeal

"Supp"                 - Refers to the Supplemental Record on Appeal containing the
                         Motion to Correct

## STATEMENT OF THE CASE

Jaquez Roland, Appellant, was charged by an Amended Information in the Circuit Court of Flagler County, Florida, with Robbery with a Weapon, Grand Theft, False Imprisonment, and Battery. (Vol. I, R 31).

Trial counsel filed a motion to suppress the out of court identifications done by Patty Smith. (Vol. I, R 27-28). Trial counsel argued police employed an improper and suggestive procedure in by showing one photo line-up after Smith had watched the video of the Burger King surveillance. *Id.* A hearing on the motion was held. (Vol. VI, Suppress 1-175). Trial counsel relied on *Grant v. State*, 390 So. 2d 341 (Fla. 1980) to support the argument. (Vol. VI, Suppress 13, 140). The trial court denied the motion finding there was no indication of undue suggestiveness to Patty Smith. (Vol. VI, Suppress 170-173). The trial court noted there was no demonstration that Smith's identification of the video was unreliable. (Vol. VI, Suppress 170).

Trial counsel also filed a motion in limine to prevent any witness from testifying about what they saw on the Burger King surveillance video and prevent Smith from expressing her opinion as to who was on the video. (Vol. I, R 33-34). Trial counsel, relying on Section 90.954, Florida Statutes (2012), argued the video was the best evidence. *Id.* A hearing on the matter was held. (Vol. VII, Limine 1-

2

23).  The State informed the trial court that police were unsuccessful in obtaining

the video due to Burger King's system overwriting it.  (Vol. VII, Limine 16-17).

Trial counsel argued police had several days to obtain the video and failed to do

so.  (Vol. VII, Limine 18).  She argued that resulted in spoilation of the video.  *Id.*

The trial court disagreed and denied the motion.  (Vol. VII, Limine 19).

A trial on the charges was held on May 22 and 23, 2013.  Trial counsel

objected each time someone testified about what they saw on the video during

trial.  (Vol. III, TT 122, 149, 179; Vol. IV, TT 216).  The trial court overruled each

objection.  *Id.*  At the conclusion of the State's case, trial counsel moved for a

judgment of acquittal.  (Vol. IV, TT 292).  Trial counsel argued there was no

evidence the gun was a deadly weapon and there was no subjective evidence as to

the value of items taken.  (Vol. IV, TT 292-293).  The trial court denied the

motion.  (Vol. IV, TT 298).

The jury returned verdicts of guilty as charged on each offense.  (Vol. I, R

39-42; Vol. V, TT 401).  Roland was adjudicated guilty on all offenses and

sentenced to 30 years prison for robbery with a weapon, as a prison releasee

reoffender, 5 years prison for grand theft, 5 years prison for false imprisonment,

and time served for battery.[1]  (Vol. II, Sent 37-38).

A Notice of Appeal was timely filed and the Office of the Public Defender was appointed.  (Vol. I, R 108, 117).

---

[1]The trial court granted a motion to correct which removed a prison releasee reoffender designation from the offense of false imprisonment.  (Supp. 4-6, 45).

## STATEMENT OF THE FACTS

Rebecca Crowley was working at Sharps Discount Liquors, which was located in a plaza behind a Burger King, on October 30, 2011 when she was robbed at gunpoint. (Vol. II, TT 32-33). Crowley opened the store at 10:00 a.m. and had one customer prior to the robbery. (Vol. II, TT 34).

Approximately twenty minutes after opening, a tall black male wearing dark jeans, a back pack, gloves, and a motorcycle helmet with its visor up walked in. (Vol. II, TT 34-35). He appeared to be talking on the phone with someone. (Vol. II, TT 34). He asked her for a specific brand of vodka. (Vol. II, TT 36). Crowley thought he meant gin since the store did not carry that vodka. *Id.* She told him where he could find the gin. *Id.* The man came back and said he could not locate it. *Id.* Crowley walked out from behind the counter and brought the man to the gin. *Id.* The man grabbed a bottle of the gin. *Id.* Crowley began walking back to the counter when the man grabbed her by the hair and stuck a gun in her side. (Vol. II, TT 37).

The man dragged her behind the counter and demanded she open the register and safe. *Id.* She told him she could not open the register without a sale and did not have the codes for the safe. *Id.* Crowley saw one of the regular customers, Thomas Bowser, approaching the store. *Id.* She told the man of the

5

customer and told him to just leave out the back doors. *Id.* The man dragged Crowley to the front door and locked. (Vol. II, TT 38). He then dragged her back behind the counter. *Id.*

Bowser approached the store and saw the open sign lit up. (Vol. II, TT 65). He tried to open the door but found it was locked. *Id.* He looked into the store through the front window and saw Crowley being dragged by her hair behind the counter. (Vol. II, TT 65-66). He called 911. (Vol. II, TT 67). He then ran to the back of the store to see if the man was going to exit the back. *Id.* He saw a unoccupied car parked in the roadway behind the store. (Vol. II, TT 68). Bowser ran back and forth between the front and back of the store. *Id.*

There were two different safes behind the register. (Vol. II, TT 38). Crowley did not have access to the top one, but did have access to the bottom one which was used for a change drawer. *Id.* The bottom safe had originally been hidden; however, it was exposed when Crowley returned behind the counter. (Vol. II, TT 38-39). The bottom safe usually had $500 in it and the man took all the paper money out of it. (Vol. II, TT 39). He also took all the cash out of the cash register. *Id.* It was later determined that close to $1000 in cash was missing. (Vol. II, TT 95).

6

Once the safe and register were emptied, the man took Crowley to the back room where he tied her hands behind her back and bound her legs. (Vol. II, TT 42). He asked her if there was any money in the back. *Id.* She said there was not. *Id.* Crowley could hear the man going through her manager's desk. *Id.* Crowley next heard the back door slam shut. (Vol. II, TT 45).

She took the bindings off her hands and hopped to the back door to lock it. *Id.* The back door eventually leads to the woods behind the store. *Id.* Crowley then hopped to the front door, unlocked it, and let Bowser in. (Vol. II, TT 46, 58). Crowley was unaware if anything else had been taken from the store. *Id.*

Bowser was at the front of the store when Crowley opened the door. (Vol. II, TT 70). Bowser never saw anyone leave out the back door in one of his trips behind the store. (Vol. II, TT 67). On one of the trips, he did see the car that had been parked slowly driving away with one person in the car. (Vol. II, TT 68). Bowser gave a description of the car to law enforcement. (Vol. II, TT 69).

Some time around 10:30 a.m. a black male entered the Burger King. (Vol. III, TT 116). He appeared nervous and was sweating profusely. (Vol. II, TT 99; Vol. III, TT 116, 119). He was wearing a t shirt and dark pants when he entered. (Vol. III, TT 116). He entered through the door by the drive through which is rarely used by customers. (Vol. III, TT 116-117). The man immediately went into

7

the bathroom and stayed in there for approximately fifteen minutes. (Vol. III, TT 117-118). He was no longer wearing the pants when he came out of the bathroom. (Vol. III, TT 118). He was now only wearing shorts. *Id.*

The man paced back and forth for a few minutes before asking if he could use the phone. (Vol. III, TT 118-119). The manager gave the man the phone. (Vol. III, TT 119). He sat down in the dining area and tried to dial the phone. (Vol. III, TT 119-120). He had issues getting the phone to dial and needed assistance. (Vol. III, TT 120). He eventually returned the phone and asked if Patty Smith[2] was working. *Id.* He was told she was not. (Vol. III, TT 120-121). The man sat back down in the dining area. (Vol. III, TT 121). The man never ordered any food. (Vol. II, TT 102).

Jacob Rodriguez, an employee at Burger King, saw the man sitting in the dining area. (Vol. III, TT 155). Rodriguez went into the bathroom area to clean out the bathrooms. *Id.* He first went into the ladies' room. *Id.* He finished cleaning the ladies' room and went to clean the men's room. (Vol. III, TT 155-156). However, the man asked if he could use the bathroom first. (Vol. III, TT 156). Rodriguez said okay. *Id.* The man then called Rodriguez into the bathroom

---

[2]Smith testified she never worked on Sundays and had no idea why anyone would have been asking for her on that day. (Vol. IV, TT 215).

and asked him for his money. *Id.* Rodriguez left and informed his manager. (Vol. III, TT 157). Eventually the man left the Burger King with two other people. (Vol. III, TT 162). Later that day, a black pair of pants were found beneath the garbage bag in the ladies' room. (Vol. III, TT 123-124).

Police responded to Sharps and contacted Crowley. (Vol. II, TT 73; Vol. III, TT 148, 167). Police were unable to find a car that matched the description given by Bowser. (Vol. II, TT 73). Police searched the area, including the dumpsters, and located several items along the wood line behind Sharps. (Vol. II, TT 74; Vol. III, TT 195; Vol. VI, Suppress 21). Police found the backpack, jacket, gloves, and gun that the man used. (Vol. II, TT 53-55, 76-80). The gun[3] turned out to be a CO2 cartridge bb gun. (Vol. II, TT 81). Police also located two desktop computer towers that were taken from Sharps. (Vol. III, TT 175). The gloves and jacket were sent off to the Florida Department of Law Enforcement (FDLE) for DNA testing. (Vol. III, TT 190).

A customer from Burger King approached police while they were at Sharps and informed them of the nervous man in the Burger King. (Vol. II, TT 100; Vol. III, TT 176; Vol. VI, Suppress 22). Police later went to the Burger King and

---

[3]The gun was made of polymer and metal. (Vol. IV, TT 239). It was testified it could cause serous bodily injury if used to bludgeon someone or if a bb was shot into someone's eye. (Vol. IV, TT 237-239).

reviewed the surveillance video. (Vol. III, TT 121, 148-149, 178-179; Vol. VI, Suppress 22). They explained what they saw on the video. (Vol. III, TT 149, 179-180; Vol. VI, Suppress 22). Due to some miscommunication, a copy of the video was not recovered prior to the security system overwriting the video from that day. (Vol. III, TT 131-132, 150, 181).

Smith was contacted and asked to come to work and speak with the police. (Vol. IV, TT 214; Vol. VI, Suppress 90). Smith was informed that the person who asked for her might have robbed Sharps. (Vol. VI, Suppress 90, 102). She declined. (Vol. III, TT 214-215; Vol. VI, Suppress 90). She did not know what was going on and did not want to get involved. (Vol. VI, Suppress 90-91).

Smith returned to work on her next scheduled day. (Vol. IV, TT 125; Vol. IV, TT 215-216; Vol. VI, Suppress 26, 91). Her manager asked her to watch the video and she did. *Id.* She immediately recognized the man at Burger King as "Quez." (Vol. III, TT 130; Vol. IV, TT 216; Vol. VI, Suppress 91). Police arrived over an hour later and spoke with Smith for the first time. (Vol. IV, TT 219; Vol. VI, Suppress 26, 91). Further investigation led to the discovery that Quez was Roland. (Vol. III, TT 183). Smith was asked to view a line-up to see if she could identify the person in the video. (Vol. III, TT 183; Vol. IV, TT 219, 232; Vol. VI, Suppress 26, 92). Corporal Allen described the process he conducted when he

10

gave Smith the line-up.  (Vol. III, TT 233).  She selected Roland in the line-up.
(Vol. IV, TT 220; Vol. VI, Suppress 96).  Roland was Smith's neighbor's
boyfriend.  (Vol. IV, TT 217; Vol. VI, Suppress 27, 89).

Buccal swabs were taken from Roland and submitted to FDLE for
comparison to the jacket and gloves worn by the man from Sharps.  (Vol. III, TT
186, 189).  The jacket and each glove had a mixture of DNA.  (Vol. IV, TT 266).
However, each one shared a common major contributor.  (Vol. IV, TT 267).
Roland's DNA was a match to the major contributor.  (Vol. IV, TT 269).  The
frequency of the DNA profile was one in 920 quadrillion Caucasians, one in 36
quintillion African Americans, and one in 3.8 quintillion Southeastern Hispanics.
(Vol. IV, TT 270).

## SUMMARY OF ARGUMENT

This brief is submitted in partial fulfillment of the requirements of *Anders v. California*, 386 U.S. 738 (1967).  Pursuant to *Anders* an appellate court must examine the record on appeal to the extent necessary to discover any errors apparent on the face of the record.  Should the court in its independent review find an issue to be arguable on the merits, counsel should be directed to file supplemental briefs addressing such issue for the benefit of the court.  *State v. Causey*, 503 So. 2d 321 (Fla. 1987).

## **ARGUMENT**

WHETHER THE TRIAL COURT COMMITTED
ANY ERRORS?

This brief is submitted in partial fulfillment of the requirements of *Anders v. California*, 386 U.S. 738 (1967), in which the Supreme Court held that, where appointed counsel moves to withdraw on the grounds that appeal is wholly frivolous, the Motion to Withdraw should be accompanied by a "brief referring to anything in the record that might arguably support the appeal." The Court in *Anders* also held "this requirement would not force appointed counsel to brief his case against his client..." *Anders, supra* at 745.

### A) **Whether the trial court erred in denying the motion to suppress?**

When reviewing an order from a motion to suppress evidence, the standard for reviewing findings of fact is whether there is competent substantial evidence to support the findings. *Caso v. State*, 524 So. 2d 422 (Fla. 1988). The appellate court must construe all the evidence, and the reasonable inferences therefrom, in a manner most favorable for sustaining the trial court's ruling. The application of the law to the established facts can be reviewed de novo. *State v. Kindle*, 782 So.2d 971 (Fla. 5th DCA 2001).

> The test for suppression of an out-of-court identification
> is two-fold: (1) whether the police used an unnecessarily

13

> suggestive procedure to obtain the out-of-court
> identification; and (2) if so, considering all the
> circumstances, whether the suggestive procedure gave
> rise to a substantial likelihood of irreparable
> misidentification.

*Rimmer v. State*, 825 So. 2d 304, 316 (Fla. 2002) (citations omitted). "If the procedures used by the police in obtaining the out-of-court identification were not unnecessarily suggestive, however, the court need not consider the second part of the test." *Id.*

Police were not involved in the procedure in which Smith identified Roland off the video. There was no argument made that police employed suggestive techniques when showing Smith the line-up. Corporal Allen testified as to the procedure he utilized. (Vol. III, TT 233).

*Reed v. State*, 944 so. 2d 503 (Fla. 5th DCA 2006) may be instructive.

## B) Whether the trial court erred in allowing evidence that Patty Smith identified Roland from the video when she was not an eye witness?

"[A] trial judge's ruling on the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion." *Ibar v. State*, 938 So. 2d 451, 462 (Fla. 2006). "The trial judge's discretion is limited, however, by the rules of evidence and by the principles of stare decisis." *Delhall v. State*, 95 So. 3d 134, 155 (Fla. 2012) (citation omitted).

14

Pursuant to Section 90.701, Florida Statutes (2012), a witness to a crime can generally render an opinion as to the identity of the perpetrator. *State v. Cordia*, 564 So. 2d 601, 601-602 (Fla. 2nd DCA 1990) (citations omitted). This concept can be extended to people who have not witnessed the crime but have personal knowledge of the individual being identified. *Id.*, at 602.

*State v. Benton*, 567 So. 2d 1067 (Fla. 2nd DCA 1990) and *Day v. State*, 105 So. 3d 1284 (Fla. 2nd DCA 2013) may be instructive.

**C) Whether the trial court erred in allowing witnesses to testify as to what they observed on the video when the video was not placed into evidence?**

Section 90.952, Florida Statutes (2012) states "[e]xcept as otherwise provided statute, an original writing, recording, or photograph is required to prove the contents of the writing recording, or photograph." This is known as the best evidence rule. Exceptions to the best evidence rule are found within Section 90.954, Florida Statutes (2012). One such exception, unless the proponent does so in bad faith, is when the original is lost or destroyed. Section 90.954(1), Florida Statutes (2012).

In the instant case, there was no dispute that the original video tape was no longer available, that it was recorded over by the system Burger King utilized, and that police had unsuccessfully attempted to get a copy of the video before it was

15

overwritten.

*England v. State*, 940 So. 2d 389 (Fla. 2006) and *Russell v. State*, 844 So.

2d 725 (Fla. 5th DCA 2003) may be instructive.

## D) Whether the trial court erred in denying Roland's motion for judgment of acquittal?

It is well established that the test for granting a motion for judgment of

acquittal is a strict one in that the trial court must not grant a motion unless there is

no legally sufficient evidence on which the trier of fact may base a verdict of guilt.

*Brewer v. State*, 413 So. 2d 1217 (Fla. 5th DCA 1982), *Jackson v. State*, 419 So.

2d 394 (Fla. 4th DCA 1982). In evaluating a motion for judgment of acquittal, all

facts introduced into evidence are considered admitted, and the trial court must

draw every conclusion and inference therefrom in favor of the State. *Codie v.

State*, 313 So. 2d 754 (Fla. 1975). In *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974),

the court held:

> The courts should not grant a motion for judgment of
> acquittal unless the evidence is such that no view which
> the jury may lawfully take of it favorable to the opposite
> party can be sustained under the law. Where there is
> room for a difference of opinion between reasonable men
> as to the proof or facts from which an ultimate fact is
> sought to be established, or where there is room for such
> differences as to the inferences which might be drawn
> from conceded facts, the court should submit the case to
> the jury for their finding, as it is their conclusion, in such

16

cases, that should prevail and not primarily the views of
the judge ... [citations omitted].

Trial counsel moved for judgment of acquittal for robbery with a weapon

and grand theft.  As to the grand theft, trial counsel argued there was no subjective

evidence as to the value of items taken.  There was testimony that the money from

the cash drawer in the register and the lower safe was taken.  Further, there was

testimony that the store was nearly $1000 short that day as a result of the robbery.

As to the robbery, trial counsel argued there was insufficient evidence that

the BB gun was a deadly weapon.  The gun was entered into evidence for the jury

to see.  Although there was no evidence as to whether it was operable or loaded at

the time of the offense, Corporal Allen testified the manner in which it works and

that it could cause great bodily harm if shot into someone's eye or used as a

bludgeon.

The Florida Supreme Court has held "whether a BB or pellet gun is a deadly

weapon-i.e., whether it is 'likely to produce death or great bodily injury'-is a

factual question to be answered by the jury in each case".  *Dale v. State*, 703 So.

2d 1045, 1047 (Fla. 1997).

*Gartner v. State*, 118 So. 3d 273 (Fla. 5th DCA 2013) and *K.C. v. State*, 49

So. 3d 841 (Fla. 4th DCA 2010) may be instructive.

## CONCLUSION

BASED UPON the foregoing cases, authorities and policies, the

undersigned counsel requests permission to withdraw as counsel for the Appellant.

Further, counsel requests this Court to allow Appellant, *pro se* or through other

counsel, sufficient time to submit a brief on points Mr. Roland might  deem

appropriate.

If this Court finds reversible error in this appeal, counsel requests this

application be withdrawn, and an opportunity be granted to file another brief for

Appellant.

Respectfully submitted,

JAMES S. PURDY
PUBLIC DEFENDER
SEVENTH JUDICIAL CIRCUIT


EDWARD J. WEISS
ASSISTANT PUBLIC DEFENDER
Florida Bar No. 0163902
444 Seabreeze Boulevard, Suite 210
Daytona Beach, Florida 32118
(386) 254-3758
weiss.ed@pd7.org

COUNSEL FOR APPELLANT

## CERTIFICATE OF FONT

I HEREBY CERTIFY that the font used in this brief is 14 point proportionally spaced Times New Roman.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically delivered by email to the Office of the Attorney General, Daytona Beach, Florida; and mailed to Mr. Jaquez Shakim Roland, DC#L03988, Central Florida Reception Center - East, 7000 H.C. Kelley Road, Orlando, Florida 32831-2518 on this 13th day of March 2014.

EDWARD J. WEISS
ASSISTANT PUBLIC DEFENDER

19



IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

JAQUEZ SHAKIM ROLAND,

        Appellant,

v.                                                                            Case No.  5D13-2881

STATE OF FLORIDA,

        Appellee.

_____/

Decision filed May 6, 2014

Appeal from the Circuit
Court for Flagler County,
Raul Zambrano, Judge.

James S. Purdy, Public Defender, and
Edward J. Weiss, Assistant Public
Defender, Daytona Beach, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and L. Charlene Matthews,
Assistant Attorney General, Daytona
Beach, for Appellee.

PER CURIAM.

      AFFIRMED.

TORPY, C.J., ORFINGER and LAWSON, JJ., concur.

# M A N D A T E

from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FIFTH DISTRICT

THIS CAUSE HAVING BEEN BROUGHT TO THIS COURT BY APPEAL OR BY PETITION, AND AFTER DUE CONSIDERATION THE COURT HAVING ISSUED ITS OPINION OR DECISION;

YOU ARE HEREBY COMMANDED THAT FURTHER PROCEEDINGS AS MAY BE REQUIRED BE HAD IN SAID CAUSE IN ACCORDANCE WITH THE RULING OF THIS COURT ATTACHED HERE TO AND INCORPORATED AS PART OF THIS ORDER, AND WITH THE RULES OF PROCEDURE AND LAWS OF THE STATE OF FLORIDA.

WITNESS THE HONORABLE VINCENT G. TORPY JR., CHIEF JUDGE OF THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA, FIFTH DISTRICT, AND THE SEAL OF THE SAID COURT AT DAYTONA BEACH, FLORIDA ON THIS DAY.

DATE: May 30, 2014

FIFTH DCA CASE NO.: 5D 13-2881

CASE STYLE:  JAQUEZ SHAKIM ROLAND       v.       STATE OF FLORIDA

COUNTY OF ORIGIN: Flagler

TRIAL COURT CASE NO.:  2011-01100-CFFA

I hereby certify that the foregoing is
(a  true copy of) the original Court mandate.

PAMELA R. MASTERS, CLERK

cc:

Office Of Attorney General          Office Of The Public Defender          Edward J.Weiss
L.Charlene Matthews                   Clerk Flagler

# H

**IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR FLAGLER COUNTY, FLORIDA**

STATE OF FLORIDA,
    Plaintiff,

Vs.                            Case # 2011-CF-001100

JAHQUEZ ROLAND,
    Defendant.
_____/

### 3.850 MOTION FOR POSTCONVICTION RELIEF
### (With Incorporated "Memorandum Of Law")

COMES NOW, the Defendant, Jahquez Roland, proceeding *pro se*, pursuant

to Fla. R. Crim. P. 3.850, and moves this Honorable Court to review this motion

and its grounds for relief and rule according to their merit. The Defendant asserts

that this motion is both legally and facially sufficient, and its claims establish a

prima facie case for relief. The Defendant further moves this Court to set this

cause for an evidentiary hearing to allow for the presentation of competent

evidence and testimony in support of the relief sought, a new trial subsequent to

the Court vacating the convictions and sentences currently imposed. In support of

this motion, the Defendant alleges the following:

1. Mr. Roland was arrested on February 22, 2012 in connection with an
   incident which had occurred on October 30, 2011. An Information was
   subsequently filed on March 7, 2012, charging Mr. Roland with Count 1,
   Robbery With A Firearm in violation of F.S. 812.13(2)(a) and F.S.
   775.087(2); Count 2, Grand Theft in violation of F.S. 812.014(2)(c); Count
   3, False Imprisonment in violation of F.S. 787.08(2); and Count 4, Battery in

1

Violation of F.S. 784.03(1)(a).  Count 1 was later amended to Robbery With A Weapon in violation of F.S. 812.13(2)(b), filed on May 15, 2013.

2. Mr. Roland was appointed the Office of the Public Defender to represent the defense.  Attorney Regina Nunnally was assigned to Mr. Roland's case.  The State was represented by Assistant State Attorneys Richard Price and Ben Fox.  The presiding judge at Mr. Roland's trial was the Honorable Judge Melissa Moore-Stens.

3. Mr. Roland proceeded to trial, and jury selection commenced on May 20, 2012.  On May 23, 2012, the jury returned a verdict of guilty on all 4 counts as charged by the Amended Information.  On July 12, 2013, Mr. Roland was sentenced to 30 years on Count 1 as a Prison Releasee Reoffender, 5 years on Count 2, 5 years on Count 3 as Prison Releasee Reoffender, and 11 months 29 days on Count 4, with Counts 1, 2, and 3, imposed consecutively.  A Notice of Appeal was timely filed on August 5, 2013.  Mr. Roland did not testify at trial.

4. On December 18, 2013, a motion to correct a sentencing error was filed pursuant to Rule 3.800(b)(2), to remove an illegal PRR designation from Count 3, False Imprisonment.  On January 15, 2014, a hearing was conducted with Mr. Roland present, and the sentence was corrected by removal of the PRR designation on Count 3.

5. Appellate Counsel filed an Anders Brief on March 13, 2014 in Mr. Roland's appeal, case number 5D13-2881.  On May 6, 2014, the Fifth District Court of Appeal Per Curiam Affirmed Mr. Roland's convictions and sentences.

6. There are currently no motions pending before the Court.  This is the first Rule 3.850 Postconviction Motion filed in this cause.

This motion is being filed in good faith and with the belief that the

Defendant is entitled to redress.

2

## DECLARATION

This Rule 3.850 postconviction motion has been prepared by a "next friend" fellow state prisoner under the authority of Johnson v. Avery, 89 S.Ct. 747 (1969). The "next friend" and the Defendant, Jahquez Roland, are laymen at law, and as such, seek the Court's indulgence in viewing this motion under less stringent standards than formal pleadings drafted by trained attorneys, should the State fault the motion in any respect. See; Code v. Montgomery, 725 F.2d 1316 (11th Cir. 1984); Haines v. Kerner, 92 S.Ct. 594 (1972); and Boag v. MacDougall, 102 S.Ct. 700(1982).

## JUDICIAL NOTICE

Notice is hereby given that the following grounds presented are couched not only in State law, but also under Federal Constitutional Theory, and as such, the Defendant moves this Court to take "judicial notice" of same, as well as notice of the potential requirement for Federal Review of same, should it become necessary to prevent a fundamental miscarriage of justice. Accordingly, the Defendant moves this Court to remain cognizant of such in its consideration and adjudication of this motion. See; Agan v. State, 503 So.2d 1254 (Fla. 1987), Reversed, Agan v. Dugger, 835 F.2D 1337 (11th Cir. 1987); Harris v. Reed, 489 U.S. 255 (1989).

3

## STANDARD OF REVIEW

When ineffective assistance of counsel is alleged, the burden is on the Defendant to specifically allege the grounds for relief and to establish whether the grounds resulted in prejudice.

"The benchmark for determining ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process so that the proceedings could not be relied on to have produced a just result." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Determining whether counsel was ineffective has two components. First, the Defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the Defendant must show that the deficient performance of counsel prejudiced the Defendant. Establishing prejudice requires showing the errors were so serious as to deprive the Defendant of a fair proceeding. "The proper standard for attorney performance is reasonably effective assistance". Id.

The Defendant must affirmatively prove prejudice. To prove prejudice, the Defendant must prove a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." Id. Downs v. State, 453 So.2d 1102, 1108 (Fla. 1984)

4

A Defendant is entitled to an evidentiary hearing on a postconviction motion unless (1) the motion, files, and records in the case conclusively show that the Defendant is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. The Defendant bears the burden of establishing a *prima facie* case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden. Each claim for postconviction relief must be examined to determine if it is legally sufficient, and if so, whether it is refuted by the record. Absent an evidentiary hearing, factual allegations made by the Defendant must be accepted to the extent that they are not refuted by the record. See; Freeman v. State, 761 So.2d 1055, 1061 (Fla. 2000).

5

## **STATEMENT OF FACTS**

On October 30, 2011, Sharps Liquors located in Flagler County was robbed. This robbery was said to have occurred at approximately 10:20 A.M.

At the time of the robbery, Mr. Roland was at home with his brother, Caleb Barker. Mr. Roland and his brother shared a duplex located at 11 B Service Tree Place in Palm Coast. Mr. Barker had just come home from his 12 A.M. – 8 A.M. shift at Tamoca Correctional Institution where he worked as a Correctional Officer. It is approximately a 45 min. – 1 hour drive from their home to the Prison located in Daytona Beach, Florida.

When Mr. Roland's brother came home, he showered and then sat in the living room to eat. Mr. Roland had made breakfast. The two brothers began discussing their afternoon plans which included a visit to Houligans Sports Bar to meet friends and watch the early afternoon football games.

A short time thereafter, Mr. Roland received a phone call from a friend who informed him that he needed a ride. The friend told Mr. Roland that he and his girlfriend were in trouble and asked Mr. Roland to hurry over to the Burger King in front of the Flagler Plaza. The friend did not describe the trouble that they were in.

Mr. Roland left his home quickly and forgot to take his cellphone from the phone charger. The Flagler Plaza is approximately a 10 minute drive from Mr.

6

Roland's house. On the way to Burger King, Mr. Roland's vehicle, a 2000 Chevrolet Impala, broke down and the transmission went out. This occurred in front of the BP gas station on Hwy. 100. Mr. Roland coasted into the gas station parking lot and was going to call his brother and his friend. It was then that he realized he did not bring his cellphone.

As the Burger King was only a few minutes away, Mr. Roland decided to jog there and meet his friend and his friend's girlfriend. In a rush to get out of his house and go help his friend, Mr. Roland put on a pair of sweatpants over his shorts and grabbed his wallet, keys, and a ten-dollar bill for gas.

When Mr. Roland arrived at the Burger King, he was sweaty, out of breath, and upset because his car broke down. He entered and went looking for his friend. Mr. Roland did not see him, so he went to the counter to ask for a cup for water. Mr. Roland got water and went to the restroom to clean up. Mr. Roland removed the sweatpants, which were sweaty, old, and worn, and threw them away in the bathroom. Mr. Roland then went back to the front counter.

At the counter, Mr. Roland asked if Patti was working, and was told that she was off. Patti was a neighbor of Mr. Roland's girlfriend and had seen him at her apartment building many times. Mr. Roland then asked to use Burger King's phone. He was given the cordless phone and went to sit in a booth to make a call. Mr. Roland first called his own cellphone number hoping that his brother would

7

answer. As the call went unanswered, Mr. Roland next called his brother's cellphone. Mr. Barker had fallen asleep and did not answer that call either.

Mr. Roland returned the phone to the counter after dialing both numbers multiple times, all to no avail. It was then that Mr. Roland remembered that he had a ten-dollar bill with him and must have dropped it in the restroom when he was cleaning up and throwing away the worn sweatpants. Mr. Roland went back to the restroom to find a Burger King employee cleaning the area with the door propped open. Mr. Roland told the employee that he needed to get in the bathroom. After searching the floor and not seeing the money, Mr. Roland confronted the employee and asked him where his money was at, as he assumed that the employee had picked up the ten-dollar bill. The employee spoke little English but denied finding the money.

Mr. Roland was unable to call his friend because he only had the number on the phone at his house. He sat down for a time in the Burger King and eventually, his friend and his friend's girlfriend showed up and the three left together.

The three walked back to the BP Gas station on Hwy. 100. Mr. Roland secured his vehicle and informed the clerk at the BP that he would be back to get it as soon as he got his brother. Mr. Roland's friend had called someone else that Mr. Roland did not know, and this girl came to the BP to pick them up. She gave Mr. Roland a ride back to his house in Palm Coast.

8

At the time, Mr. Roland was unaware that the liquor store had been robbed, and still is unaware of his friend's involvement, or lack thereof.

In the second week of October, this same friend had been over at Mr. Roland's duplex the day that Mr. Roland sold his Honda dirt-bike. The friend had asked Mr. Roland what he was going to do with his riding gear and offered to buy it for $100.00. As it was used, had a slight tear, and he didn't need it, he agreed to sell it and Mr. Roland's friend took it that day. Mr. Roland knew that his friend owned a Kawasaki road bike.

On February 22, 2012, Mr. Roland was arrested at his home and charged by Information with one Count of Robbery w/a Weapon, one Count of Grand Theft, one Count of False Imprisonment, and one count of Battery.

9

## GROUND ONE

TRIAL COUNSEL WAS INEFFECTIVE FOR MISADVISING THE DEFENDANT NOT TO TESTIFY AND FOR MISADVISING THE DEFENDANT THAT THE JURY WOULD LEARN THE FACTS AND NATURE OF HIS PRIOR CONVICTION AND PRISON TERM IF HE WERE TO TESTIFY. COUNSEL'S MISADVICE WRONGLY PREVENTED THE DEFENDANT FROM TESTIFYING AND PREJUDICE ENSUED AS THE DEFENDANT WAS UNABLE TO PRESENT A HYPOTHESIS OF INNOCENCE WHICH WOULD HAVE GIVEN DOUBT TO THE STATE'S WHOLLY CIRCUMSTANTIAL CASE. THE DEFENDANT WAS DENIED HIS U.S. CONSTITUTIONAL RIGHT TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL.

During the course of the trial, numerous facts had been established by the State. The establishment of this evidence, as factual, supported the State's theory of prosecution, and included the fact that Mr. Roland's DNA was present on the clothing worn during the robbery and that Mr. Roland was seen at a Burger King restaurant located close to the scene of the robbery a short time after said robbery had occurred, asking to use their phone.

Although these facts may have strongly inferred Mr. Roland's guilt, this evidence, and every other inference put forth by the State, was wholly circumstantial, and no direct evidence whatsoever was presented or existed.

As such, it was vital to Mr. Roland's defense strategy to present a reasonable hypothesis of innocence that could not be refuted by the State's evidence. The fact

10

that Mr. Roland had informed counsel of how his DNA came to be on the clothing, what he was doing at the Burger King, who he was calling, and where he was at the time of the robbery, all made the introduction of these facts that much more vital, as they would not only explain the State's evidence, but were the truth.

Not only would these facts have established a reasonable hypothesis of innocence, but would have been supported by other evidence adduced at trial, such as the fact that Mr. Roland did not meet the description of the robbery suspect, the robbery suspect had a phone clipped to his belt and was speaking on a Bluetooth device during the robbery, and the Police K-9 search dog tracked in a direction away from the Burger King restaurant. Mr. Roland would not have asked to use Burger King's phone, had he been the suspect who just minutes prior, was using a cellphone.

It was neither illegal for Mr. Roland to have his DNA present on clothing that he had recently sold to a friend nor was it illegal to be at a restaurant only yards away from the robbery scene a short time after said robbery, but without an explanation to these established facts, the jury was left with no choice but to infer Mr. Roland's guilt by way of the circumstantial evidence presented.

Through cross-examination, an explanation of the facts established by the State would have been presented, and Mr. Roland's reasonable hypothesis of innocence, which just happened to be the truth, would have provided grave doubt

11

to the prosecution's theory and legally, would have been cause for acquittal. The State possessed no evidence inconsistent with said hypothesis.

Counsel's defense strategy was one of misidentification, not only at the robbery scene, but also at the Burger King. This strategy was flawed, as once Mr. Roland's presence at the restaurant was established over Counsel's argument, guilt was inferred. Counsel weakly argued that all evidence was circumstantial.

After considering the evidence presented at trial and hearing the testimony of Burger King employees and DNA experts, Mr. Roland knew he had to testify on his own behalf or the circumstantial evidence presented would result in a conviction for a crime he did not commit. He had additionally advised his attorney that he did want to testify on his own behalf when they had met for a conference at the jail prior to trial.

Counsel advised Mr. Roland not to testify, as she was a great closer and would be able to try the case without his testimony. She also told Mr. Roland's girlfriend to convince him not to testify. This advice was unreasonable, as Mr. Roland's testimony would have been the only available evidence or testimony that Counsel could have placed before the jury which would have fully presented the "reasonable hypothesis of innocence" that would have created doubt, and would have established cause for acquittal under the special standard of review applied to wholly circumstantial cases. "Trial counsel's act in advising defendant not to

12

testify in trial for burglary and battery constituted ineffective assistance claim; defendant's testimony was only evidence supporting his defense..." Visger v. State, 953 So.2d 741 (Fla. 4th DCA 2007) "Counsel failed to appreciate the fact that there was no evidence to support the defense theory..." Id. As Counsel's defense theory was misidentification and improper inference based upon circumstantial evidence, the establishment of a "reasonable hypothesis of innocence" was vital to success at trial. Counsel's misadvise prejudiced Mr. Roland by precluding the full presentation of facts that would have explained the State's possession of evidence which otherwise would have, and in fact did, infer Mr. Roland's guilt.

        At trial and over Counsel's objection, Mr. Roland nodded his head indicating to the Court that he did want to testify. Counsel grabbed Mr. Roland's arm, pulled him to the side, and stated the following; "They have your DNA. *So when they hear you've got a burglary conviction and that you just did 10 years for it, no jury in the world would believe that you didn't rob the liquor store."* This statement constituted misadvice that deprived Mr. Roland of the right to testify, as the State did not have the ability to impeach him with the facts and nature of his prior conviction, assuming that Mr. Roland conceded to the number of his prior felony convictions when asked. "Defendant's postconviction claim that he was deprived of his right to testify because of attorney's misadvice that State could

13

impeach him with the facts and nature of his prior convictions stated a legally

sufficient claim for ineffective assistance of counsel, and thus defendant was

entitled to an evidentiary hearing or the attachment of portions of record

conclusively refuting the claim." Ferrer v. State, 2 So.3d 1111 (Fla. 4th DCA

2009), citing Hope v. State, 960 So.2d 912 (Fla. 4th DCA 2007); and Tyler v. State,

793 So.2d 137, 141 (Fla. 2nd DCA 2001). This ground satisfies both deficient

performance and prejudice prongs of Strickland test. See, Oisorio v. State, 676

So.2d 1363 (Fla. 1996).

Pursuant to the Florida Supreme Court's decision in Lott v. State, 931 So.2d

807 (Fla. 2006), the first step in determining "ineffective assistance of counsel

where defendant claims he would have testified is to determine whether the

defendant voluntarily agreed with counsel not to take the stand." Id.

At trial, the following exchange occurred, in pertinent part:

THE COURT:
> We'll bring the jury back in. Oh, wait. I'm sorry. Mr.
> Roland, at this point I need to inquire of you as to
> whether or not you wish to testify in this matter. Because
> I'm going to bring the jury back in and have Miss
> Nunnally - - ask her if she's - - call her first witness, and
> if she advises that she rests, obviously, I need to confer
> with you that that's a decision *that the two of you have
> discussed and reached a joint conclusion on that.* So is it
> your intention to testify today, sir?

THE DEFENDANT:
> (Nods Head)

THE COURT:
> I need you to answer audibly.

14

THE DEFENDANT:
        No.
THE COURT:
        No.  Okay.  You've had enough time to talk to your
        attorney about that decision?
THE DEFENDANT:
        Yes, Ma'am.

The First prong in the Lott analysis has been established.

"If that is established, then the trial court must answer the separate and

second question which is whether counsel's advice to defendant 'even if

voluntarily followed, was nevertheless deficient because no reasonable attorney

would have discouraged [defendant] from testifying'." Id.  As previously argued,

no reasonable attorney would have advised Mr. Roland not to testify when his

testimony was the only evidence available to support the theory of defense

concerning evidence that was wholly circumstantial.

Mr. Roland asserts that had he not been affirmatively misadvised with

regard to the jury learning the facts and nature of his prior conviction, and had

Counsel properly advised that his testimony was necessary to present his

"reasonable hypothesis of innocence", he never would have agreed with his

attorney but rather, would have testified on his own behalf.  Mr. Roland was

denied reasonable advice from his attorney and Counsel's misstatement regarding

his past offense wrongfully prevented Mr. Roland from testifying on his own

behalf.  "While ultimately the decision to testify or not is that of the defendant, the

15

defendant is entitled to have reasonable advice of a lawyer." <u>Simon v. State</u>, 47

So.3d 893 (Fla. 3rd DCA 2010) "Misadvice regarding the right to testify can be a

ground for relief on the basis of ineffective assistance of counsel if it wrongly

prevents the defendant from testifying." <u>Nelson v. State</u>, 126 So.3d 1195 (Fla. 4th

DCA 2012)

As evidence establishing that Mr. Roland would have testified had it not

been for Counsel's affirmative misadvice, the following statement was made by

Mr. Roland at sentencing, in pertinent part:

THE DEFENDANT:
> ...I couldn't take the stand at trial, I would have said all
> of this, or at least tried to get it in, *but it wasn't in my best*
> *interest due to my past, so I couldn't say these things.*

At sentencing, Mr. Roland spoke of misidentification at the Burger King

restaurant, due to his attorney's strategy presented in trial. However, had counsel

properly advised that his presence at Burger King had been well established and

that he needed to testify to explain how his DNA was on the jacket and gloves

worn during the robbery, and to explain what he was doing at the Burger King

restaurant a short time after said robbery, (both wholly circumstantial) Mr. Roland

would have testified as follows:

1. Mr. Roland would have testified that he was at home with his brother when
the robbery occurred.

16

2. Mr. Roland would have explained that he had sold his dirt bike and that his friend purchased all of his riding gear, including the jacket and gloves used in the robbery, weeks prior to said robbery.

3. Mr. Roland would have testified that he had received a phone call from his friend the day of the robbery asking for a ride and asking to be picked up at the Burger King restaurant.

4. Mr. Roland would have testified that he stand 6'3" tall and shown that he is light-skinned, a description that was inconsistent with the suspect's description of 5'9" and dark-skinned.

5. Mr. Roland would have testified that his car broke down on the way to Burger King, that he jogged for 5 minutes to get there, that he was upset and out of breath, and was sweaty upon his arrival at the restaurant.

6. Mr. Roland would have testified that he went to use the restroom, took off his sweat-soaked, old and worn sweatpants and discarded them.

7. Mr. Roland would have testified that he believed he had dropped a ten-dollar bill while changing, and when he returned to the restroom to retrieve it, an employee was cleaning so he approached him and asked for the money.

8. Mr. Roland would have testified that eventually, his friend and his friend's girlfriend came to Burger King and the three left together, returned to his disabled vehicle, and waited for a ride.

9. Mr. Roland would have testified that he had no knowledge at the time he went to meet his friend that his friend had committed a crime, no knowledge that the gear he sold was used in a robbery, and no direct knowledge to this day that his friend committed the robbery.

10. Mr. Roland would have testified that he first called his own cellphone number, as the phone was in his kitchen on a charger, and then his brother's cellphone number, both numerous times, in order to get his brother to assist him with his disabled vehicle, as he had no phone with him.

11. Mr. Roland would have testified that Corporal Kim Davis had come to see him only days after his arrest. He would have testified that Corporal Davis

17

told him that she knew that he did not rob the liquor store, asked him for the name of the person who had his leather gear and actually committed the robbery, and threatened to pin the crime on him if he did not cooperate.

12. Finally, Mr. Roland would have testified that Corporal Davis had provided him with her business card and told him to think about how it would look if he went to trial as a black man who robbed a white woman, especially with his arrest record.

It is clear that said testimony would have established a hypothesis of innocence that would not have been inconsistent with the State's evidence, resulting in acquittal. Deficient performance and prejudice have been established, and Mr. Roland is entitled to an evidentiary hearing in order to establish his burden of proof in support of the relief sought, a new trial.

18

## GROUND TWO

> TRIAL COUNSEL WAS INEFFECTIVE FOR
> FAILING TO INVESTIGATE AND PRESENT AT
> TRIAL AN ALIBI WITNESS. COUNSEL'S FAILURE
> RESULTED IN PRECLUDING THE PRESENTATION
> OF AN ALIBI DEFENSE. COUNSEL'S DEFICIENT
> PERFORMANCE PREJUDICED THE DEFENDANT
> BY WITHHOLDING EVIDENCE SUPPORTING THE
> DEFENDANT'S REASONABLE HYPOTHESIS OF
> INNOCENCE.    SAID ALIBI DEFENSE WOULD
> HAVE    SUPPORTED    ACQUITTAL,    THUS
> AFFECTING THE OUTCOME OF THE TRIAL.
> DEFENDANT    WAS    DENIED    HIS    U.S.
> CONSTITUTIONAL RIGHT TO DUE PROCESS AND
> EFFECTIVE ASSISTANCE OF COUNSEL.

Upon meeting with his attorney, Mr. Roland told her that he is not who they

think he is, that he did not rob the liquor store, and that he was at home with his

brother at the time that the store was robbed.

As previously discussed, he and his brother, Caleb Tafari Barker, shared a

three-bedroom duplex in Palm Coast, Florida. On the morning of the Sharps

Liquor store robbery, Mr. Roland had been at his home. Mr. Barker had come

home from his job as a Correctional Officer for the Florida Department of

Corrections that morning, and the two brothers were eating together in the living

room, discussing plans for later that day. Mr. Roland received a phone call from a

friend who was in trouble and needed a ride, and Mr. Roland left the house to go to

the Burger King restaurant in front of the Flagler Plaza. Mr. Barker did not go

with his brother and fell asleep on the couch. However, he knew where Mr.

19

Roland was headed to and why. Later that morning, Mr. Roland returned to their home, woke up his brother, and told him that his Chevrolet Impala had broken down on Hwy. 100 and was in the BP parking lot. Mr. Roland and Mr. Barker left the home and drove in Mr. Barker's Dodge to retrieve the Impala. The two were able to get the disabled vehicle back to the duplex by pushing it with the Dodge.

Mr. Roland described this series of events to his attorney and specifically instructed her to speak with Mr. Barker, investigate what he knew, and secure him as a witness for the defense. Mr. Barker was an alibi witness.

Counsel advised Mr. Roland that she would not investigate Mr. Barker to establish Mr. Roland's alibi, as the jury would find out that he was Mr. Roland's brother and the State would prove that, as such, Mr. Barker would say anything to help him out, so his testimony would not be believed. Counsel explained that most of the evidence was circumstantial, but that the DNA evidence was scientific, so any defense witness would not be believed.

As to Mr. Barker's credibility, he has never been in trouble and has no prior felony record, worked for the State as a Correctional Officer at the time, and was virtually unable to be impeached.

Detectives who were investigating the robbery had actually spoke to Mr. Barker on multiple occasions because his phone number was one of the numbers called by Mr. Roland from Burger King. Mr. Barker had informed detectives that

20

he was asleep and missed those calls. He was never asked if Mr. Roland had admitted to making the calls or he would have told them about the disabled Impala, the phone call Mr. Roland had received, and how Mr. Roland had left their house after the time that the robbery had occurred.

Whenever Mr. Roland and his attorney met, Mr. Roland would continually question her as to why she had not depositioned his brother to prove his innocence. Counsel always replied with her concern about the DNA evidence. However, the DNA evidence was circumstantial, as more than one contributor was found on the evidence, and Counsel's concern could have been overcome.

Mr. Barker was easily located and Defense counsel was made aware of his location. Mr. Barker was willing and would have been available to testify at trial, had counsel investigated Mr. Roland's alibi defense.

Counsel was deficient in assuming that the jury would not believe Mr. Barker's testimony simply because he was Mr. Roland's brother. "Credibility and weight to be given to witness testimony is for the jury to determine." Meus v. State, 968 So.2d 706 (Fla. 2nd DCA 2007)

Had Mr. Barker testified, he would have stated that he remembered the day that the Sharps Liquor store was robbed because it was the same day that his brother's vehicle had broke down. He would have testified that he left his place of work shortly after 8 A.M. and got home around 9 A.M. He would have testified

21

that Mr. Roland made breakfast while he was in the shower, and that the two sat in the living room to eat. He would have testified that he remembered Mr. Roland receiving a phone call from a friend and remembered Mr. Roland telling him that he had to drive to Burger King to pick somebody up. He would have testified that when Mr. Roland left the house, it would have been well after 10:00. He would have testified that he remembered when Mr. Roland had left because the two were making plans to meet friends at a local sports bar named Houligans to watch football and were planning to depart just as Mr. Roland received the phone call to pick up a friend at Burger King. He would have testified that he had fallen asleep in the living room, did not hear the phones in the house ringing, and stayed asleep until Mr. Roland returned to wake him up and informed him that his vehicle had broken down on Hwy. 100 and was stranded at the BP gas station. He would have testified that he drove his brother to the BP and assisted him with getting the vehicle back to their home. He would have testified that when he looked at his cellphone, there were multiple missed calls from Burger King and that when he asked Mr. Roland who would have been calling from there, Mr. Roland told him that it was him and that he had jogged to the Burger King after his car broke down, that he had forgot his cellphone in the kitchen on the charger, and had asked to use Burger King's phone. In addition to the testimony concerning the day of the Sharps Liquor store robbery, Mr. Barker would have testified that although he was

22

not present when the actual sale took place, he had knowledge that Mr. Roland had sold his dirt bike and riding gear (clothing) earlier that month.

Had Mr. Barker been investigated as an alibi witness and been presented at trial to testify, the testimony not only would have established a rock-solid alibi for Mr. Roland's whereabouts at the time of the robbery, but said testimony would have supported the circumstantial evidence defense and further established Mr. Roland's reasonable hypothesis of innocence. Such testimony would have clarified why Mr. Roland was at the Burger King shortly after the robbery, why the police K-9 dogs did not track toward the Burger King, and why Mr. Roland was asking to use Burger King's phone even after the robbery suspect was identified as having a cellphone clipped to his belt and speaking on a Bluetooth device during the robbery. Mr. Roland was prejudiced by the deletion of this testimony, as this key piece of evidence that was required to establish Mr. Roland's hypothesis of innocence was withheld from presentation. "In a circumstantial evidence case, the State must 'present evidence from which the jury can exclude every reasonable hypothesis except that of guilt' in order to avoid a judgment of acquittal...Accordingly, trial counsel *was charged with marshalling any and all evidence that would have supported [Mr. Meus'] hypothesis of innocence."* Meus v. State, 968 So.2d 706 (Fla. 2nd DCA 2007) "A claim that counsel failed to call a witness who could establish an alibi states a facially sufficient ground for relief."

23

Peter v. State, 844 So.2d 699 (Fla. 4th DCA 2003), citing Stringer v. State, 757

So.2d 1226 (Fla. 4th DCA 2000).

      Both deficient performance and prejudice have been established, and every

prong necessary to assert a facially sufficient claim of ineffective assistance of

counsel for failure to call a witness has been alleged.  See, Nelson v. State, 875

So.2d 579, 582-83 (Fla. 2004).  Mr. Roland must be provided an evidentiary

hearing on this ground in order to establish his burden of proof in support of the

relief sought, a new trial.

## <u>GROUND THREE</u>

TRIAL COUNSEL WAS INEFFECTIVE FOR
FAILING TO OBJECT TO LAW ENFORCEMENT'S
TESTIMONY CONCERNING THE DEFENDANT'S
DRIVER LICENSE PHOTO MATCHING A
SURVEILLANCE VIDEO, IN THE ABSENCE OF A
PROPER PREDICATE TO ALLOW FOR THE
INCLUSION OF SAID TESTIMONY.   AS THIS
IDENTIFICATION TESTIMONY WAS A KEY
FEATURE OF THE PROSECUTION'S CASE AND
CONTRIBUTED TO THE JURY'S VERDICT,
COUNSEL'S DEFICIENT PERFORMANCE
PREJUDICED THE DEFENDANT.   THE
DEFENDANT'S RIGHT TO DUE PROCESS OF LAW
AND RIGHT TO EFFECTIVE ASSISTANCE OF
COUNSEL, AS GUARANTEED BY THE U.S.
CONSTITUTION, WERE DENIED.

During the State's direct examination, the following exchange occurred, in

pertinent part:

Q:

> Okay. All right.  And through that investigation, did you
> determine a suspect's name?

A:

> Yes.

Q:

> And who was that?

A:

> Jaquez Roland.

Q:

> When you determined the name Jaquez Roland, did you
> find a photograph of this suspect?

A:

> Yes.

Q:

> And how did you find a photograph of him?

25

A:

Through the DHSMV website, DAVID.

Q:

Okay. And you were able to identify this person as Jaquez Roland?

A:

Yes.

Q:

Did you subsequently look at the video at Burger King to see if you could identify the person on that video to be Jaquez Roland?

It was at this moment that Defense Counsel had a duty to object on the ground of a *lack of predicate.*

In the absence of a proper predicate to allow for law enforcement's opinion that a suspect's license photo matched a person depicted in a video surveillance tape, said opinion was not admissible and would have been excluded, had Counsel raised the appropriate objection. In Ruffin v. State, 549 So.2d 250, 251 (Fla. 5th DCA 1989), the Fifth District Court of Appeal reversed and remanded for a new trial when the trial court allowed testimony of police officers who opined that "Ruffin was the man in the videotape showing the crime." That Court explained:

> "This was an invasion of the province of the jury. When factual determinations are within the realm of an ordinary juror's knowledge and experience, such determinations and the conclusions to be drawn therefrom must be made by the jury…[The officers] were not eyewitnesses to the crime, they did not have any special familiarity with Ruffin, and they were not qualified as any type of experts in identification. Id.

26

Due to Counsel's deficient performance in failing to object, the following

response was presented to the jury and highlighted as a key feature of the

prosecution's case:

A:
> *Yes, it appeared it was the same person.*

Q:
> *So the person you saw on the Burger King video was the same person you saw in the DAVID photo of Jaquez Roland.*

A:
> Yes, I believe so.

Q:
> Now, the person you developed as Jaquez Roland, and you saw his photograph and identified him on the Burger King video – do you see that person in the courtroom today?

A:
> Yes.

Q:
> And can you point to that person and identify him by an article of clothing.

A:
> He's wearing the silver vest, black shirt (indicating).

Q:
> *Having identified a suspect through the video, did you seek or obtain any samples of his DNA, fingerprints, blood, anything like that?*

A:
> *Yes, I did.*

The admission of this testimony cannot be considered harmless, as the State

argued in closing that law enforcement made a positive identification of Mr.

Roland, as follows:

27

MR. FOX:

> Also, if you remember, Corporal Davis, while the video was still working, saw the video herself. *Obtained a DAVID photo which is DHSMV, or Driver's Highway Safety Motor Vehicle photograph of the defendant, saw the video, and she matched up the DAVID photo to the defendant and made a positive identification of the defendant.*

As Defense Counsel's primary strategy was misidentification, the admission

of testimony which was inadmissible that was directly related to identification can

be found to have contributed to the outcome of the trial. The State directed the

jury to consider law enforcement's positive identification, and without such

evidence there was a reasonable probability that the outcome of the trial would

have been different. Ineffective assistance of counsel has been established and Mr.

Roland is entitled to an evidentiary hearing on this ground in order to establish his

burden of proof in support of the relief sought, a new trial.

28

## GROUND FOUR

TRIAL COUNSEL WAS INEFFECTIVE FOR
FAILING TO OBJECT TO THE PROSECUTOR'S
INAPPROPRIATE COMMENT ON THE EVIDENCE
DURING CLOSING ARGUMENT. THE
PROSECUTOR'S MISCONDUCT WENT TO THE
HEART OF THE DEFENSE'S THEORY OF
MISIDENTIFICATION AND AFFECTED THE
FUNDAMENTAL FAIRNESS OF THE TRIAL. THE
VERDICT WAS AFFECTED AND PREJUDICE
ENSUED AS A RESULT OF COUNSEL'S
DEFICIENT PERFORMANCE. THE DEFENDANT'S
U.S. CONSTITUTIONAL RIGHT TO DUE PROCESS
OF LAW AND RIGHT TO EFFECTIVE ASSISTANCE
OF COUNSEL WERE DENIED.

Defense Counsel's key theory of defense was misidentification. This

defense was brought out during cross-examination and was specific to the

differences between the physical characteristics of the robbery suspect and Mr.

Roland.

One of the defense arguments in support of this theory of misidentification

was that two eyewitnesses to the robbery, a customer and the victim, described the

perpetrator as a dark-skinned black male, a description that is inconsistent with that

of Mr. Roland. Defense Counsel was a very dark-skinned African-American

female, and in an effort to highlight this difference, questioned the victim as to

whether the perpetrator had dark-colored skin like hers, to which the victim

answered in the affirmative. The following exchange took place during cross-

examination of the victim in pertinent part:

29

Q:

Good morning, Miss Crowley.

A:

Morning.

Q:

*The individual you saw was dark-skinned; is that correct?*

A:

*Yes.*

Q:

*Was not light-skinned?*

A:

*No.*

Q:

*Was not brown-skinned?*

A:

*No.*

Q:

*So basically my complexion?*

A:

*Roundabout, yes.*

Q:

*I'm sorry?*

A:

*Roundabout, yes.*

In closing argument, Counsel presented this difference in skin color as evidence to establish that Mr. Roland could not have been the person who committed the robbery, regardless of a possible identification at a nearby Burger King minutes later. The following was presented in defense's closing argument, in pertinent part:

MS NUNNALY:

*The person was not light skinned.  That person was not brown skinned.  That person was dark in color, similar to me.*

30

> *We have Mr. Bowser's testimony. He said – he said he saw a dark male, a black male, dark complexion, Mexican, with blue jeans on.*
>
> *Someone else. Someone who's dark skinned.*
>
> *Because it is about identity, and my client don't fit the description of the person that they claim walked into that liquor store.*
>
> *Reasonable doubt as to guilt comes from the evidence. The evidence comes from the State. It comes from the conflict in the evidence.*
>
> *Crowley saw a dark-skinned male with tiger eyes, gray dreads, black jacket, black jeans. The video showed a dark-skinned male wearing dark jacket and green pants.*

It is clear from these excerpts that the key feature of defense counsel's closing argument was that Mr. Roland was a light-skinned black male who could not have fit the description of the perpetrator who robbed Sharps Liquors. The State argued that the perpetrator wore contacts, a wig, and clothes to hide his identity. However, skin color could not be disguised.

In an effort to discredit Defense Counsel's closing argument and refute the one discrepancy that could not be explained, the prosecutor misstated the testimony brought forth by the defense during cross-examination of the victim, as follows:

MR. FOX:

> *Also, Miss Nunnally wants to present, telling you that people were saying that this was a black-skinned – a*

31

> *dark skinned male.  You can check your own recollection*
> *on this, but I recall Mr. Bowser saying that the male that*
> *he saw was not as dark as Miss Nunnally.  I don't have*
> *Miss Crowley saying that he was dark like Miss Nunnally*
> *or that – just that he was a black male.*

This final comment was improperly argued and was a clear misstatement of

the testimony previously placed before the jury.  To lend credence, the Prosecutor

asks the jury to use their own recollection to recall whether or not Mr. Bowser

compared the perpetrator's skin color to Defense Counsel's, then inappropriately

misstates testimony to mislead the jury and negate Mr. Roland's sole theory of

defense which was irrefutable.

Trial Counsel was deficient for failing to object to the Prosecutor's

misstatement of testimony, and prejudice ensued as the improper comment went to

the heart of the Defendant's theory of innocence.  "Criminal trial is neutral arena

wherein both sides place evidence for the jury's consideration, and role of counsel

in closing argument is to assist the jury in analyzing that evidence, not to obscure

the jury's view with personal opinion, emotion, and nonrecord evidence." Linic v.

State, 80 So.3d 382 (Fla. 4th DCA 2012)

Had Counsel objected to the Prosecutor's misstatement of evidence, the

Trial Court could have issued an appropriate curative instruction.  "Where it might

have been a close call for jury and prosecutor improperly injected facts and

inferences that were not supported by evidence…trial court should have

32

affirmatively rebuked offending prosecutor so as to impress upon jury gross

impropriety of being influenced by improper arguments and specifically instructed

jury, *contemporaneously thereto*, that comments made during closing arguments

did not constitute evidence. Id., See Edwards v. State, 428 So.2d 357, 359 (Fla. 3rd

DCA 1983)

    This failure by Counsel to object to the Prosecutor's closing argument

cannot be considered harmless, and affected Mr. Roland's right to a fair and

impartial trial." Claim that counsel was ineffective for failing to object to

prosecutors alleged misstatement of testimony was not refuted by evidence."

Bristol v. State, 987 So.2d 184 (Fla. 2nd DCA 2008) "Prosecutor's misstatement of

evidence in closing argument materially contributed to burglary conviction such

that defendant was deprived of a fair and impartial trial." Robinson v. State, 989

So.2d 747 (Fla. 2nd DCA 2008)

    As argued, the theory presented by Counsel was misidentification, and the

only description unable to be disguised was the perpetrator's skin color. Such a

variance between the skin color of Mr. Roland and that of the perpetrator can only

be described as exculpatory. As such, the Prosecutor's misstatement went to the

heart of the defense, Counsel's failure to object prejudiced Mr. Roland, and

ineffective assistance of counsel has been established. "The Prosecutor's improper

argument went directly to the heart of [Robinson's] defense. We can only

conclude that [Robinson] was deprived of a fair and impartial trial.  Accordingly, we reverse the burglary conviction and sentence, and we remand for a new trial."

Id. at 751

      Deficient performance and prejudice have been established, and Counsel must be found to have been ineffective.  Mr. Roland is entitled to an evidentiary hearing on this ground in order to establish his burden of proof in support of the relief sought, a new trial.

## **GROUND FIVE**

> TRIAL COUNSEL WAS INEFFECTIVE FOR
> FAILING TO MOVE FOR A MISTRIAL WHEN THE
> JURY OVERHEARD AN INAPPROPRIATE
> COMMENT REGARDING THE DEFENDANT'S
> "APPARENT GUILT" AS STATED BY AN OFFICER
> OF THE COURT AS THE JURY WAS RETIRING TO
> DELIBERATE. THE COMMENT, WHICH WAS
> CLEARLY HEARD BY THE JURY, AFFECTED THE
> DEFENDANT'S ABILITY TO RECEIVE A FAIR AND
> IMPARTIAL TRIAL AND MAY HAVE
> CONTRIBUTED TO THE VERDICT. COUNSEL'S
> DEFICIENT PERFORMANCE PREJUDICED THE
> DEFENDANT AND RESULTED IN A DENIAL OF
> DUE PROCESS AND EFFECTIVE ASSISTANCE OF
> COUNSEL, AS GUARANTEED BY THE U.S.
> CONSTITUTION.

After the jury was instructed by the Court, the judge excused the members

from the courtroom to retire to the jury room to begin deliberations. Defense

Counsel was standing by the jury box. As the bailiff opened the gate to release the

jurors, the bailiff stated to defense counsel, "you know that your client is guilty.

Otherwise he couldn't have been crying when watching the tape of the robbery."

This inappropriate comment made by an Officer of the Court was overheard

by all jury members, as they were standing only a few feet away. Mr. Roland's

attorney was aware that the bailiff's opinion had been overheard by the panel.

Defense Counsel failed to bring this incident to the attention of the Court, to ask

for a curative instruction or, in the alternative, move for a mistrial.

35

The fact that the jury may have relied upon the bailiff's opinion as additional evidence, combined with the fact that the opinion was a specific statement pertaining to Mr. Roland's guilt, renders said opinion harmful, and adversely affected Mr. Roland's right to a fair trial. Counsel's deficient performance in failing to move for a mistrial or at least request a curative instruction prejudiced Mr. Roland, as said statement was the last comment placed before the jury prior to deliberations, said comment was made by a Court Officer who had witnessed countless numbers of trials and whose opinion would be considered credible, and said opinion was a statement regarding Mr. Roland's apparent guilt.

It cannot be proven that this comment made by the bailiff did not improperly influence the jury to return a finding of guilty, and as such, the outcome of the trial cannot be viewed as reliable or fair.

Once the jury had retired to begin deliberations, Mr. Roland's attorney approached Mr. Roland's girlfriend who was seated in the courtroom and told her what the bailiff had said in front of the jury. The jury completed their deliberations, returned to the courtroom, and returned a verdict of guilty as charged in the Information on all four counts.

Days later when Mr. Roland contacted his girlfriend, she informed him of what his attorney had told her about the bailiff's comment and the jury overhearing it. Mr. Roland contacted Counsel by phone and questioned her about the incident.

36

Counsel verified the occurrence as described by Mr. Roland's girlfriend. Mr. Roland asked Counsel why the issue was never brought to the judge's attention, and why she did not move for a mistrial. Mr. Roland asked Counsel to contact the Court and remedy this injustice. Counsel advised Mr. Roland that the time for asking for a mistrial had already expired as 10 days had already passed, that it did not matter anyway because "they had his DNA which was too strong to overcome", and argued with Mr. Roland that she knew she could not win the case. Mr. Roland replied that the DNA expert even testified that there was an additional contributor to the DNA found on the clothing, and that he had not worn the clothes that day, did not commit the robbery, and had no knowledge or involvement in the crime. He accused Counsel of believing the State and siding with them rather than arguing the facts that would have proven his innocence.

Counsel's failure constituted error that prejudiced Mr. Roland and must result in a finding of ineffective assistance of counsel. "The proper procedure to take when objectionable comments are made is to object and request an instruction from the court that the jury disregard the remarks." Harris v. State, 34 So.3d 187 (Fla. 1st DCA 2010), quoting Duest v. State, 462 So.2d 446, 448 (Fla. 1985)

Counsel also misadvised Mr. Roland that the time to move for a mistrial was 10 days, when by law, such is incorrect. "While a motion for mistrial may be made *as late as the end of the closing argument*, a timely objection must be made

in order to allow a curative instruction…" <u>Buford v. State</u>, 8 So.3d 478 (Fla. 4th DCA 2009)

Although the majority of persuasive authorities refer to inappropriate comments made during the course of a witness presentation or closing argument, the same rules must apply when the jury overhears an opinion referring to a defendant's guilt when said comment reaches down into the validity of the issue. The comment made by the bailiff negated the sole defense theory of misidentification and affected the fundamental fairness of the entire proceeding.

Deficient performance and prejudice have been established and Counsel must be found to have been ineffective.  Mr. Roland is entitled to an evidentiary hearing in order to establish his burden of proof in support of the relief sought, a new trial.

## **GROUND SIX**

> TRIAL COUNSEL WAS INEFFECTIVE FOR
> FAILING TO SUBJECT THE PROSECUTION'S CASE
> TO A MEANINGFUL ADVERSARIAL TESTING BY
> RAISING A MISIDENTIFICATION DEFENSE
> RATHER THAN ARGUING THE FACTS PROVIDED
> BY THE DEFENDANT WHICH WOULD HAVE
> CREATED A REASONABLE HYPOTHESIS OF
> INNOCENCE THAT WAS NOT INCONSISTENT
> WITH ANY OF THE WHOLLY CIRCUMSTANTIAL
> EVIDENCE PRESENTED BY THE PROSECUTION.
> COUNSEL'S DEFICIENT PERFORMANCE
> ALLOWED A GUILTY VERDICT TO BE REACHED
> WHEREAS THE HYPOTHESIS WOULD HAVE
> DEMANDED ACQUITTAL, THUS PREJUDICING
> THE DEFENDANT. THE DEFENDANT WAS
> DENIED BOTH DUE PROCESS OF LAW AND
> EFFECTIVE ASSISTANCE OF COUNSEL, AS
> GUARANTEED BY THE U.S. CONSTITUTION.

The entirety of the State's presentation was based upon "wholly

circumstantial evidence which consisted of the following:

1) DNA with Mr. Roland as the major contributor, *and an additional minor contributor*.

2) Mr. Roland's established presence at a Burger King restaurant only yards away from the liquor store that was robbed.

3) Testimony that Mr. Roland was acting nervous and sweating at Burger King.

4) Testimony that Mr. Roland used Burger King's phone.

5) Testimony that Mr. Roland had removed sweatpants in Burger King's bathroom, thrown them away, and had accidentally left a $10.$^{00}$ bill in the pocket.

6) Testimony that Mr. Roland had asked a Burger King employee for his money back. (The misplaced $10.$^{00}$)

7) Testimony from the lead detective that Mr. Roland's drivers license photo matched the person on a lost Burger King video.

This "wholly circumstantial evidence" was inconsistent with established facts presented at trial, such as:

1) The K-9 search dog tracked in a direction opposite from the Burger King.

2) The suspect of the liquor store robbery had a cell phone clipped to his belt, was talking on a bluetooth device, had dark skin, stood 5'9", and had long dreads.

3) The suspect was described as wearing dark-colored jeans and was seen on video wearing dark green jeans, not sweatpants.

4) More than $10.$^{00}$ was stolen.

5) Mr. Roland had placed phone calls to his brother on Burger King's phone and the calls went unanswered.

6) Mr. Roland departed the Burger King with 2 people, an African-American male and female.

As a theory of defense, Counsel attempted to disestablish Mr. Roland's presence at the Burger King rather than concede his presence and provide an explanation. It should have been evident through discovery that Mr. Roland's presence at Burger King would be proven, and Counsel's development of a frivolous strategy in the face of overwhelming evidence was the equivalent of no defense at all. No crime was committed at Burger King and for Counsel to concentrate her efforts on a misidentification at this restaurant, rather than

40

developing and presenting a "reasonable hypothesis of innocence", based upon the

facts relayed from Mr. Roland to his attorney, was deficient performance. Raising

a frivolous defense that was destined to fail, due to Counsel's failure to prepare for

a circumstantial case, prejudiced Mr. Roland and precluded the presentation of his

version of events to establish the hypothesis of innocence which would have

demanded acquittal.

Although a circumstantial evidence defense existed, Counsel advised Mr.

Roland that she could not win the case due to the scientific evidence of DNA. Mr.

Roland told his attorney numerous times that his was not the only DNA on the

items recovered. Counsel's failure to recognize this DNA evidence as

circumstantial and her belief that a guilty verdict was imminent does not excuse

her actions in raising a defense certain to fail. "Sixth Amendment does not require

that counsel do what is impossible or unethical; if there is no bona fide defense to a

charge, counsel cannot create one and may disserve the interests of his client by

attempting a useless charade." United States v. Cronic, 104 S.Ct. 2039 (1984)

A viable defense existed to be cause for acquittal, and Counsel's failure to

recognize all evidence as circumstantial and refusal to allow Mr. Roland to testify

on his own behalf precluded the presentation of a reasonable hypothesis of

innocence that no evidence of the State's could contradict.

41

Even if Counsel believed that misidentification at Burger King would provide a defense, once it became evident that Mr. Roland had been positively identified at the restaurant where no crime had been committed, Counsel had an obligation to reconsider her defense strategy and explain Mr. Roland's proven circumstantial presence.

Counsel's main concern heading into trial was her inability to overcome the scientific DNA evidence which was circumstantial in light of the surrounding circumstances. Two types of DNA were found on the jacket and gloves worn in the robbery. Mr. Roland was the major contributor. Mr. Roland admitted to Counsel that he had once owned the items and had worn them for a time, but had recently sold them to the same person who had called him the day of the robbery to ask for a ride. As another person's DNA was found of the items worn, it is undisputable that two people had worn the items. It was not illegal for Mr. Roland to have his DNA on the items, but it was crucial to the defense to establish how it got there and why he was not wearing the items that day.

Once a case is established to be based upon "wholly circumstantial" evidence, as the case against Mr. Roland was, a special standard of review is employed to determine if the State's evidence can exclude every reasonable hypothesis of innocence. If it does not, then the verdict must be for acquittal. "if the State introduces competent evidence that conflicts with the defendant's theory

of events 'it becomes the jury's duty to determine whether the evidence is
sufficient to exclude every reasonable hypothesis of innocence beyond a
reasonable doubt'." Cordero-Artigas v. State, 75 So.3d 838 (Fla. 2nd DCA 2011),
quoting State v. Law, 559 So.2d 187, 189 (Fla. 1989).

    Has Counsel established a theory of defense based upon the "wholly
circumstantial" nature of the State's evidence, the outcome of the proceeding
would have been different, as a matter of law. "Where the only proof of guilt is
circumstantial, a conviction cannot be sustained unless the evidence is inconsistent
with any reasonable hypothesis of innocence." Law at 188. "A special standard of
review of the sufficiency of the evidence applies where a conviction is wholly
based on circumstantial evidence. Where the only proof of guilt is circumstantial,
no matter how strongly the evidence may suggest guilt, a conviction cannot be
sustained unless the evidence is inconsistent with any reasonable hypothesis of
innocence. Id.

    Had Counsel performed as the "Counsel" guaranteed by the U.S.
Constitution's 6th Amendment, Mr. Roland's theory of events would have been
presented to the jury, and together with the State's own evidence, such as the
suspect's physical description and testimony of a cellphone seen by the victim, said
theory would have not only established a reasonable hypothesis of innocence, but
also would have supported the argument put forth by Counsel in closing argument

43

that someone else committed the crime. "The circumstantial evidence must establish to a reasonable certainty that the accused and no one else committed the offense charged. It is not sufficient that the facts create a strong possibility of, and be consistent with guilt. They must be inconsistent with innocence." Lindsey v. State, 14 So.3d 211, 215 (Fla. 2009)

The State was not in possession of any evidence that would contradict Mr. Roland's version of events, and Counsel's failure to present said events resulted in conviction rather than acquittal. "While the State does not have to rebut every possible event variation that might be inferred from the evidence, it has to produce evidence that contradicts the defendant's theory." Graham v. State, 56 So.3d 97, 101 (Fla. 4th DCA 2011)

Had Counsel established the "wholly circumstantial" nature of the evidence and ensured the presentation of a "reasonable hypothesis of innocence", the charges would not have gone forward to the jury, as a judgment of acquittal argument could have been established and the Court would have been required to acquit, based upon lack of sufficiency of the evidence to refute Mr. Roland's hypothesis of innocence. "We conclude that the State's circumstantial evidence was not inconsistent with [Mr. Shultz's] hypothesis of innocence, and therefore, the trial court erred in denying his motion for judgment of acquittal." Schultz v. State, 109 So.3d 320 (Fla. 2nd DCA 2013)

44

Counsel's excuse to Mr. Roland was that she could not win the case due to the scientific nature of the DNA evidence. Counsel failed to recognize, as previously argued, that Mr. Roland's DNA was just another circumstance that could have been reasonably explained, had counsel acted effectively. "The State contends that the circumstantial evidence standard is inapplicable here because there was direct evidence that Singleton's DNA was on the cigar found at the scene. *But that was not direct evidence of Singleton's participation in the burglary and theft; it was direct evidence merely of a circumstance that suggested his participation.*" (emphasis added). The fact that an additional contributor to the DNA profile was found necessarily enhances the argument that Mr. Roland's DNA was merely circumstantial.

All evidence established that someone else committed this crime, but Counsel's deficient performance in precluding a "wholly circumstantial evidence" defense theory allowed said circumstantial evidence to convict an innocent man.

The lead detective threatened Mr. Roland with "pinning the crime" on him unless he gave up the name of the person who wore his jacket and gloves, even though she knew he did not do the crime". Mr. Roland maintained his silence and Counsel's actions prejudiced Mr. Roland by precluding a hypothesis of innocence that would have demanded acquittal, and either inadvertently or intentionally assisted Corporal Davis with convicting the wrong man.

45

Counsel must be found to have been ineffective and Mr. Roland must be afforded and evidentiary hearing to establish his burden of proof in support of the relief sought, a new trial where competent representation can present Mr. Roland's version of events that will demand acquittal.

## **GROUND SEVEN**

TRIAL COUNSEL'S CUMULATIVE ERROR
AFFECTED THE VERDICT TO SUCH AN EXTENT
THAT COUNSEL CANNOT BE SAID TO HAVE
PERFORMED AS THE 'COUNSEL' GUARANTEED
BY THE U.S. CONSTITUTION'S SIXTH
AMENDMENT. THEREFORE, THE DEFENDANT'S
CONVICTIONS AND SENTENCES MUST BE
VACATED AND THE CAUSE MUST BE SET FOR A
NEW TRIAL.

The State's case against Mr. Roland was "wholly circumstantial" and as
such, the continual admission of the circumstantial evidence without explanation
from the defense as to its existence left the jury with no choice but to find for a
verdict of guilt.

It was not illegal for Mr. Roland to be at a Burger King, but Counsel
developed an entire strategy around a misidentification not only at the liquor store
that was robbed, but also at the Burger King, even though Mr. Roland conceded his
presence to Counsel and the State established it through competent evidence.

Mr. Roland had an alibi for the time that the offense was committed, but
Counsel never investigated that defense.

Two separate DNA types were found on the jacket and gloves worn during
the robbery, and although Mr. Roland was the major contributor, no effort was put
forth to establish that Mr. Roland had recently sold those clothes to the same

47

person who had called him a short time after the robbery to ask for a ride from Burger King.

No cross-examination effort was conducted to establish that the lead detective had come to see Mr. Roland in jail, had stated she knew he did not rob the liquor store, had stated that his DNA was on the clothing, and had attempted to coerce Mr. Roland into giving up the name of the person who had worn his jacket and gloves or threatened that she would pin the crime on him.  Such impeaching information would not only have discredited the detective's testimony, but also would have placed into question the only testimony tying Mr. Roland to the liquor store robbery, a false statement concerning a white stripe on the shoes seen in the robbery surveillance tape, and an alleged white stripe seen on the a lost Burger King video that was never mentioned by anybody until the day of trial and was inconsistent with all other evidence of a 5'9" dark-skinned male with long dreads talking on a cellphone in the liquor store, and seen wearing boots.

A "reasonable hypothesis of innocence" could have been established through Mr. Roland's testimony, but Counsel misadvised him that the jury would learn that he had just served 10 years in prison on a burglary charge.

Finally, Counsel allowed into evidence that testimony of the lead detective, without objection as to lack of predicate, that she had positively identified Mr. Roland on the Burger King video from a drivers license photo.  Although no crime

48

was committed at Burger King, this testimony of a "positive identification" held weight with the jury and was used in the State's closing as a key feature to earn a conviction .

All of these errors combined and considered as "cumulative error" must be reviewed as a whole and will establish that Counsel's performance resulted in a fundamentally unfair trial. "Where several errors are identified, the Court considers the cumulative effect of evidentiary errors and ineffective assistance of counsel claims together." Hurst v. State, 18 So.3d 975, 1015 (Fla. 2009), quoting Suggs v. State, 923 So.2d 419 (Fla. 2005).

## CONCLUSION

**WHEREFORE**, based upon the foregoing facts, argument, and authorities cited, the Defendant humbly prays this Honorable Court set this cause for an evidentiary hearing to allow for the presentation of competent evidence and testimony establishing his burden of proof in support of the relief being sought, a vacation of the sentences and convictions, and a new trial, at which competent conflict-free counsel may be appointed to represent the defense.

Respectfully Submitted,

/s/

Jahquez Roland, DC#L03988
Defendant, *pro se*

49

## UNNOTARIZED OATH

**UNDER PENALTY OF PERJURY**, I declare that I have read the

foregoing "3.850 Motion For Postconviction Relief", or it has been read to me, I

understand its contents and the English language, and all the facts stated in it are

true. (Declaration pursuant to F.S. 92.525 [2014].

$\underline{10 \ / \ 22 \ / \ 14}$
Date

/s/ _____
Jahquez Roland, DC#L03988
Defendant, *pro se*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing "3.850

Motion for Postconviction Relief" has been furnished to the following parties:

1. Flagler County Clerk of the Court – 1769 E. Moody Blvd., Bldg. 1, Bunnell,
   FL 32110

2. Office of the State Attorney, Seventh Circuit – 1769 E. Moody Blvd., Bldg.
   1, 3rd Floor, Bunnell, FL 32110

By presenting said document to Madison C.I. prison officials for mailing, via U.S.

Mail, this $\underline{22}$ day of $\underline{OcTOBER}$, 2014.

/s/ _____
Jahquez Roland, DC#L03988
Defendant, *pro se*
Madison Correctional Inst.
382 SW MCI Way
Madison, Florida 32340

50



IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT
IN AND FOR FLAGLER COUNTY, FLORIDA

**STATE OF FLORIDA**                                    **CASE NO.: 2011-1100CF**

VS.

**JAHQUEZ ROLAND /**
**DEFENDANT**


## STATE' S RESPONSE TO DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF


The State of Florida, by and through the undersigned Assistant State Attorney, and files this response to Grounds I, II, III, IV, V, VI, and VII of Defendant's Motion for Post Conviction Relief, pursuant to Fla. R. Crim. P. 3.850. The State of Florida states that the Defendant is not entitled to relief, but that he is entitled to a hearing on his Motion.

A factual dispute exists between the Defendant and his former attorney, Regina Nunnally, as to Ground I of the Defendant's Motion for Post-Conviction Relief. The undersigned has spoken with Ms. Nunnally, who refutes the claim that she was ineffective by misadvising the defendant on whether to testify at trial. Ground II also requires a factual determination in which entitles the Defendant to a hearing, although the State contends he is not entitled to relief. Ground III of the Defendant's Motion for Post-conviction Relief also requires testimony to make a record as to trial strategy and defenses presented in trial. Ground IV alleges Ms. Nunnally was ineffective for failing to object to the prosecutor during closing argument for misstating testimony. The State asserts that this allegation fails to show that the outcome would have been different. Ground V alleges that defense counsel failed to move for a mistrial when jury overheard comments by the bailiff. A factual dispute exists between Ms. Nunnally and the Defendant regarding this incident. The Defendant is not entitled to relief on this gound, but is entitled to a hearing. Ground VI alleges ineffective assistance by counsel for trial strategy in presenting a defense. The Defendant clearly sets out that this was Counsel's strategy and is not entitled to relief. Ground VII alleges that the cumulative nature of these errors are harmful.

As grounds thereof, the State of Florida requests that this Honorable Court set a hearing on Defendant's Motion for Post-Conviction Relief.

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion has been furnished by U. S. Mail to JAHQUEZ ROLAND, #L03988, Madison Correctional Institute, 382 SW MCI Way, Madison, FL 32340 this 11th day of May, 2015.

CHRISTINA OPSAHL
ASSISTANT STATE ATTORNEY
FLORIDA BAR NO: 17428
1769 E. MOODY BLVD., BLDG1
BUNNELL, FL 32110



IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR VOLUSIA COUNTY, FLORIDA

STATE OF FLORIDA

                                     CASE NO.: 2011-CF-1100
                                     DIVISION 50:  Judge J. David Walsh

v.


JAHQUEZ ROLAND,

              Defendant.
_____/

## **ORDER DENYING DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF**

THIS MATTER came before the Court for consideration of the Defendant's *pro se* "3.850 Motion for Postconviction Relief," filed on October 24, 2014, pursuant to Florida Rule of Criminal Procedure 3.850.  The Court, having reviewed the motion, the State's Response, the court file, and arguments presented at an evidentiary hearing, and being fully advised in the premises, hereby finds as follows:

### **Procedural History**

Defendant was charged by an Amended Information with Robbery with a Weapon (County I), Grand Theft (Count II), False Imprisonment (Count III), and Battery (Count IV), in violation of sections 812.13(2)(b), 812.014(1), (2)(c), 787.02(2), 784.03(1)(a), Florida Statutes (2011).  Exhibit A.  A trial was held on May 22 and 23, 2013, and the jury returned verdicts of guilty on each of the charges.  On July 12, 2013, Defendant was sentenced to 30 years of incarceration for robbery with a weapon as a prison releasee re-offender, 5 years of incarceration for grand theft to be served consecutive to the sentence for Count I, 5 years of incarceration for false imprisonment to be served consecutive to the sentence for Count II, and 11 years and 29 months of incarceration to be served concurrently with the sentence in Count I for battery.

1

Exhibit B. After a motion by Defendant pursuant to Florida Rule of Criminal Procedure 3.800(b)(2), the trial court corrected his sentence to remove the prison releasee re-offender designation from Count 3. Exhibit C. Defendant was represented by Regina Nunnally, Assistant Public Defender.

Defendant appealed, and his judgment and sentence was *per curiam* affirmed, with Mandate issued on May 30, 2014. Exhibit D.

On October 24, 2014, Defendant timely filed the present motion, pursuant to Florida Rule of Criminal Procedure 3.850. The State filed a Response on May 11, 2015, requesting an evidentiary hearing on all grounds. On December 11, 2015, the Court held an evidentiary hearing. Defendant was *pro se*, and the Court heard testimony from Defendant, Ada Whites, and Ms. Nunnally.

## **Legal Analysis**

In the present motion, Defendant alleges seven grounds, all premised on allegations of ineffective assistance of counsel. Defendant alleges that his trial counsel was ineffective in (1) advising him not to testify, (2) investigating and presenting his alibi, (3) failing to object to law enforcement's testimony regarding his driver's license photograph matching the person in the surveillance video, (4) failing to object to the State's inappropriate comments during closing, (5) failing to move for a mistrial after the jury heard a comment by a bailiff, and (6) failing to subject the State's case to "meaningful adversarial testing." His final ground is (7) cumulative error. The Court addresses each of these claims separately below.

To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance fell below that of reasonably competent counsel, and (2) that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the

2

proceedings would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). When considering claims for ineffective assistance of counsel, courts must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* To show prejudice, the *Strickland* standard requires, "a demonstration that the result of the proceeding has been rendered unreliable, and our confidence in the outcome of a proceeding has been undermined by counsel's deficiency." *Thompson v. State*, 990 So. 2d 482, 490 (Fla. 2008).

A defendant must prove both prongs of the analysis and overcome the strong presumption that counsel's conduct was not deficient. *Strickland*, 466 U.S. at 689-90. Because defendants must satisfy both prongs of the *Strickland* standard, when a defendant fails to satisfy one prong, it is not necessary to determine whether he or she has satisfied the other prong. *Stewart v. State*, 801 So. 2d 59, 65 (Fla. 2001).

**Ground One**

In Ground One, Defendant alleges that he received ineffective assistance of counsel for Ms. Nunnally's alleged misadvice that he not testify. Defendant asserts that Ms. Nunnally counseled him not to take the stand in his own defense because the jury would then have the opportunity to hear that Defendant had a prior conviction for burglary.

Where a defendant alleges that he would have testified but for the advice of counsel, the first step is to analyze whether he voluntarily agreed with counsel not to take the stand. *Lott v. State*, 931 So. 2d 807, 818-19 (Fla. 2006). The second step is to examine whether counsel's

3

advice to the defendant was deficient because "no reasonable attorney would have discouraged [defendant] from testifying." *Id.*

During the evidentiary hearing, Defendant admitted that he voluntarily agreed with Ms. Nunnally not to take the stand; however, he emphasized that he had advised Ms. Nunnally many times prior to trial that he wanted to testify. Defendant argued that Ms. Nunnally advised him that if he took the stand, then the jury would be able to hear about his prior conviction for burglary. Defendant wanted to testify to tell the jury that he jogged to Burger King that day to assist a friend with a broken down car, and while at Burger King, he asked to use the phone to call his brother, who then came to the Burger King to help him push a car.

Ms. Nunnally testified at the evidentiary hearing that she advised Defendant not to testify and informed him that if he did testify, the State could inquire about the number of convictions he has. She testified that she advised him that if he stated an incorrect number of convictions, then the "door was opened," and the State could inquire about the nature of those convictions. She stated that Defendant told her that something different had occurred the day of the robbery, and she had never heard about a friend, a car breaking down, or pushing the car somewhere. She said that because Defendant's main defense was misidentification, it made no sense for Defendant to testify that he was at the Burger King that day.

The Court finds Ms. Nunnally's testimony to be reliable and credible. She has worked as a public defender since September 2003, and the Court finds it credible that she would have correctly advised Defendant regarding the law. Further, the Court finds competent, substantial evidence that Defendant knowingly and voluntarily decided not to testify because of Ms. Nunnally's competent advice regarding trial strategy and the risks involved in taking the stand.

4

Defendant fails to establish both deficient performance and prejudice. Therefore, Ground One is denied.

## Ground Two

In Ground Two, Defendant alleges that he received ineffective assistance of counsel because Ms. Nunnally failed to investigate and present an alibi witness. Defendant testified during the evidentiary hearing that his brother, Caleb Tafari Barker, could have testified to Defendant's version of events the day of the robbery: both he and his brother were home when Defendant received a call, his brother was asleep, Defendant left the home to help a friend, his car broke down, and Defendant ran to the Burger King to call his brother who came and helped him push the car. Defendant questioned why Ms. Nunnally did not depose his brother.

Ms. Nunnally testified that she attempted to contact Mr. Barker through an investigator. The investigation referral and investigator's report were introduced as State's Composite Exhibit 1. Ms. Nunnally pointed out that the investigation referral had two phone numbers and an address for Mr. Barker. The investigator's report showed that he tried to contact Mr. Barker "several times." Normally, her investigator would leave his contact information, and she testified that she did not receive a call from Mr. Barker at any time. She questioned why Defendant did not tell his brother, with whom he was in contact, that his counsel would like to speak with him. Ms. Nunnally was unequivocal about the fact that she does not depose defense witnesses for tactical reasons. Therefore, the Court finds no deficient performance by Ms. Nunnally because she attempted to locate Mr. Barker, but was unable to do so.

In addition, based upon the testimony she heard at the evidentiary hearing, Ms. Nunnally doubted that Mr. Barker was an alibi witness because he was asleep and could not have testified as to where Defendant was that day. The Court agrees and finds that Defendant has not

established prejudice.   Therefore, the Court finds that Defendant has not established either deficient performance or prejudice, and Ground Two is denied.

**Ground Three**

In Ground Three, Defendant alleges that he received ineffective assistance of counsel for counsel's failure to object to Corporal Kim Davis's testimony that Defendant, judging from his driver's license photo, matched the person in the surveillance video from Burger King. Defendant alleged that Ms. Nunnally had a duty to object because the officer lacked a proper predicate to testify regarding the video because the video was not in evidence.  At the evidentiary hearing, Defendant also argued that Ms. Nunnally could have objected, and by failing to do so, she also failed to preserve the issue for appeal.

During the evidentiary hearing, Ms. Nunnally testified that she filed a motion in limine prior to trial that would have excluded the video from Burger King and all testimony associated with that video because the video had been lost by Burger King. *See* Exhibit E.  The Court denied the motion.  Composite Exhibit F.  The Court's decision was appealable.  Further, Ms. Nunnally objected to the video during the trial.  Exhibit G, Trial Transcript ("T.T.") at 216.  The Court finds no deficient performance by Ms. Nunnally in attempting to exclude all evidence related to the Burger King video.

Defendant also fails to establish that he was prejudiced.  During his testimony in the evidentiary hearing, Defendant admitted that he was present at Burger King.  Patti Smith, a Burger King employee who was acquainted with Defendant, also testified that she saw the video and Defendant was the person in the video.  T.T. at 216.  Therefore, the evidence established that Defendant was present at the Burger King the day of the robbery, and the Corporal Davis's testimony was not dispositive of that fact.

6

Because Defendant failed to prove either deficient performance or prejudice, Ground Three is denied.

## **Ground Four**

In Ground Four, Defendant alleges that he received ineffective assistance of counsel for counsel's failure to object to the States "inappropriate" comments during the rebuttal closing argument. In the evidentiary hearing, Defendant clarified that the prosecutor's comments misstated witnesses' testimonies (the victim Rebecca Lee Crowley and eyewitness Thomas Bowser) regarding the skin color of the perpetrator, which brought into doubt Defendant's defense of misidentification.

To establish prejudice for counsel's failure to object to improper prosecutorial comments, the prosecutor's comments must "either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than . . . it would have otherwise." *Walls v. State,* 926 So. 2d 1156, 1167 (Fla. 2006), *quoting Spencer v. State,* 645 So. 2d 377, 383 (Fla. 1994).

The trial transcript shows that Mr. Bowser testified that the perpetrator had "a lighter complexion;" thus, Defendant's allegations as to Mr. Bowser are refuted by the record. T.T. at 69-71. As for the testimony of Ms. Crowley, Ms. Nunnally admitted during the evidentiary hearing that perhaps she could have objected, but she did not see the comment as a misstatement. She believed that the State had a different characterization of the evidence. *Compare* T.T. at 55, 346-47, 366, 375.

Regardless of whether the comment was proper, Defendant clearly was not deprived of a fair trial because of one isolated comment. Ms. Nunnally raised the defense of misidentification

7

through cross examination of the witnesses and during closing argument.  The Court finds no prejudice, and Ground Four is denied.

## **Ground Five**

In Ground Five, Defendant alleges that he received ineffective assistance of counsel for counsel's failure to move for a mistrial after the jury heard a comment made by a bailiff regarding Defendant's "apparent guilt" when the jury was retiring for deliberation.

On this ground, the Court heard testimony by Defendant; Ada Whites, Defendant's girlfriend; and Ms. Nunnally.  Ms. Whites testified that she was present at the trial when she saw the officer approach Ms. Nunnally at counsel's table and make a comment from about two to three feet away.  She said that the officer said that Defendant had a tear come out of his eye and that was a sign of guilt.  It was unclear from the testimony whether Ms. Whites heard the comment; however, Ms. Whites claimed that the jury, in the jury box, heard the comment.  She stated that during a break, she asked Ms. Nunnally, "What did he mean by that [the tear falling comment]?"

Ms. Whites testified that she told Defendant about the officer's comment during a phone conversation after the verdict while he was in jail.  Defendant testified that when he asked Ms. Nunnally about the officer's comment, Ms. Nunnally told him that it was too late to file for a mistrial because ten days had already passed since the verdict.

Ms. Nunnally testified that Officer Mark O'Malley did approach her during trial after the State had played the video from inside the Sharp's Liquor Store at the beginning of the State's case in chief.  She stated that Officer O'Malley whispered in her ear that he saw Defendant react to the video and wipe his face, and the officer was concerned that the jury may have been watching Defendant.  At the time, Ms. Nunnally had no concern that the jury overheard the

8

officer's comment. During the break, Ms. Nunnally told Ms. Whites about the comment. Ms. Nunnally was emphatic that Ms. Whites did not overhear the comment.

The Court finds that the comments were made when the Court was going to a break, and not when the jury was retiring to deliberate. The Court further finds the testimony of Ms. Nunnally to be reliable and credible, and there is no evidence that the jury overheard the officer's comment. Therefore, a motion for mistrial would not have been granted, and Ms. Nunnally's performance was not deficient. Further, even if the jury heard the comment, the Court finds no prejudice because the result of the trial has not been rendered unreliable by Ms. Nunnally's alleged failure to file a motion for mistrial. Defendant has proven neither deficient performance nor prejudice, and Ground Five is denied.

## Ground Six

In Ground Six, Defendant alleges that he received ineffective assistance of counsel for counsel's failure to subject the State's case to "meaningful adversarial testing" because counsel should have presented an alternate theory of the evidence, which would have been successful because the State's case against Defendant was circumstantial.

The Court finds that Ms. Nunnally did subject the State's case to meaningful adversarial testing: she filed a motion in limine to exclude evidence (Exhibit E; Composite Exhibit F); she cross-examined each State witness (*see* T.T. at 3, 109, 209); she made timely and appropriate objections during the trial (*see, e.g.,*T.T. at 183-84); and she presented the defense of misidentification during closing argument (T.T. at 346-47, 366). A defendant is entitled to reasonably effective counsel, not to perfect counsel. *O'Connell v. State*, 733 So. 2d 556, 558 (Fla. 5th DCA 1999), *citing Waterhouse v. State,* 522 So.2d 341 (Fla.1988). The Court finds that Ms. Nunnally's performance was effective.

9

Further, Ms. Nunnally testified during the evidentiary hearing that Defendant never proposed any defense other than misidentification prior to trial. She testified that, in her opinion, misidentification was the strongest defense. *See, e.g., Hamilton v. State*, 915 So. 2d 1228, 1231 (Fla. 5th DCA 2005) (strategic decisions by counsel may be determined in an evidentiary hearing). The Court finds Ms. Nunnally's testimony to be reliable and credible, and further finds no deficient performance by Ms. Nunnally. Ground Six is denied.

## Ground Seven

In Ground Seven, Defendant alleges that the errors by defense counsel combined to be considered as "cumulative error," and Ms. Nunnally's performance, when reviewed as a whole, resulted in a fundamentally unfair trial.

Defendant fails to demonstrate multiple counsel errors. *Mendoza v. State*, 87 So. 3d 644, 657 (Fla. 2011); *see also, Hurst v. State*, 18 So. 3d 975, 1015 (Fla. 2009) (where the alleged errors are individually either procedurally barred or without merit, the claim of cumulative error also fails). Therefore, the Court's confidence in the verdict and sentence are not undermined, and Ground Seven is denied.

Therefore, it is ORDERED and ADJUDGED Defendant's "3.850 Motion for Postconviction Relief" is **DENIED**.

The defendant has the right to appeal this order within 30 days of its rendition.

The Clerk of Court must provide a copy of this order to the Defendant, along with a certificate of service.

DONE and ORDERED in Chambers, Kim C. Hammond Justice Center, Bunnell, Florida this _____ day of January, 2016.

**J. DAVID WALSH**
CIRCUIT COURT JUDGE

Copies To:

Christina Opsahl, Assistant State Attorney, Office of the State Attorney, 1769 E. Moody Blvd., Bldg. #1, Bunnell, FL 32110

Jahquez Roland, D.C. #L03988, Mayo Correctional Institution – Annex, 8784 U.S. Highway 27 West, Mayo, Florida 32066-3458

**CERTIFICATE OF SERVICE**

I certify that a copy hereof has been furnished to JAHQUEZ ROLAND by ( ) delivery

(X) mail ( ) facsimile on _____1/14/16_____.

DEPUTY CLERK



1

1          IN THE CIRCUIT COURT, SEVENTH
           JUDICIAL CIRCUIT, IN AND FOR
2          FLAGLER COUNTY, FLORIDA

3          CASE NO.:  2011 CF 1100

4    STATE OF FLORIDA

5
     vs.                        APPEAL TRANSCRIPT
6                               EVIDENTIARY HEARING

7    JAQUEZ SHAKIM ROLAND,

8          Defendant.

9    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10       (STENOGRAPHICALLY TRANSCRIBED VIA DIGITAL RECORDING)
              TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE J. DAVID WALSH,
                CIRCUIT COURT JUDGE
12
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14   DATE TAKEN:          DECEMBER 11, 2015

15   TIME:               COMMENCED 9:06 A.M.
                         CONCLUDED 11:51 A.M.
16
     PLACE:              KIM C. HAMMOND JUSTICE CENTER
17                       1769 EAST MOODY BOULEVARD
                         BUNNELL, FLORIDA
18   STENOGRAPHICALLY
     REPORTED BY:        SUSAN LEE PARKINSON, RPR, RMR
19                       COURT REPORTER AND NOTARY PUBLIC

20
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

21

22              VOLUSIA REPORTING COMPANY
                 432 SOUTH BEACH STREET
23          DAYTONA BEACH, FLORIDA  32114
            T. 386.255.2150  F. 386.258.1171
24              www.volusiareporting.com

25

2

```
1    APPEARANCES:

2
             CHRISTINA OPSAHL, ESQUIRE
3            Office of the State Attorney
             1769 East Moody Boulevard
4            Bunnell, Florida  32110
             (386)313-4300
5
             Attorney for the State of Florida
6

7            JAQUEZ SHAKIM ROLAND, Pro Se

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                    C O N T E N T S

2                                                    Page

3

4                    DEFENDANT'S WITNESS

5    ADA WHITES

6        Direct Examination by the Court        40
         Cross-Examination by Mr. Roland        52
7

8                     STATE'S WITNESS

9    REGINA NUNNALLY

10       Direct Examination by Ms. Opsahl       64
         Cross-Examination by Mr. Roland        75
11

12   CERTIFICATE OF REPORTER                    131

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    P R O C E E D I N G S
 2                      (audio begins)
 3          THE COURT:  All right.  We have the matter of
 4    State versus Jaquez Roland, 2011 CF 1100.  Are you
 5    Mr. Roland?
 6          THE DEFENDANT:  Yes, sir.
 7          THE COURT:  All right.  Mr. Roland present, in
 8    custody, and on the State's side I have Miss Opsahl
 9    and I see Miss Nunnally present as a witness today.
10          Is the State ready to proceed?
11          MS. OPSAHL:  Yes, Your Honor.
12          THE COURT:  And are you ready to proceed,
13    Mr. Roland?
14          THE DEFENDANT:  I guess.
15          THE COURT:  All right.  Now, you're gonna need
16    to speak up a little bit for me because everything
17    that we say is being recorded.
18          I'm Judge Walsh, I'm gonna conduct the hearing
19    this morning and, Mr. Roland, I did have the
20    opportunity to review your motion, which is in the
21    record and let's take a look.
22          Do you have a copy of your motion before you
23    now?
24          THE DEFENDANT:  Yes, sir.
25          THE COURT:  Okay.  Good.  The defense motion
```

```
1        for post-conviction relief was filed October the

2        24th, 2014, by Mr. Roland pro se.  The defendant

3        moved for appointment of counsel.  The Court denied

4        that.

5             I feel that this is primarily a factual issue,

6        Mr. Roland, so I'll proceed without your need of

7        counsel today.

8             Now, Mr. Roland, let me go over some things

9        with you.  You have what's called the burden to

10       prove your case today.  You must show the Court

11       good grounds to justify the granting of your motion

12       for post-conviction relief.

13            One thing that I think some people don't fully

14       understand is that, were you to be successful in

15       your motion, it doesn't mean your case goes away.

16            It means that the case actually goes back to a

17       trial posture from the very beginning, meaning that

18       you'd be subject to a new trial and to a -- were

19       you to be found guilty, to a new sentencing, where

20       you could actually be sentenced to greater than

21       what you were sentenced on originally, but that

22       being said, you have the right to be heard on your

23       motion.

24            It's under a certain rule of procedure.  What

25       I'm going to do is first hear from you.  I would
```

1        suggest that we proceed to address each of your

2        grounds individually, let you be heard on that, let

3        the State be heard on that.

4            If you have any witnesses you wish me to hear

5        from, you have to identify them, so I can hear from

6        those witnesses, and then the State would have the

7        opportunity to rebut your motion.  They would

8        likely present the testimony of the attorney.

9            Now, if you need a break or anything, let me

10       know.  Do you need some water or anything?

11           THE DEFENDANT:  Not right now, sir.

12           THE COURT:  Okay.  If you do, let me know --

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  -- I'll be glad to get that for

15       you.  Now, with that, I'm gonna proceed to have you

16       sworn, so please raise your right hand to be sworn,

17       Mr. Roland.

18           THE CLERK:  Do you swear or affirm that the

19       testimony you're about to give is the truth, the

20       whole truth and nothing but the truth, so help you

21       God?

22           THE DEFENDANT:  Yes, ma'am.

23           THE CLERK:  Thank you.

24           THE COURT:  All right.  Now, Mr. Roland, let

25       me first begin by having you tell me your name and

7

1      how old you are.

2             THE DEFENDANT:  Jaquez Roland, 38.

3             THE COURT:  Are you presently incarcerated at

4      the Department of Corrections?

5             THE DEFENDANT:  Yes, sir.

6             THE COURT:  All right.  And you are the one

7      filing the motion today?

8             THE DEFENDANT:  Yes, sir.

9             THE COURT:  All right.  Mr. Roland, let's

10     begin by having you address the grounds for your

11     motion.

12            The first motion ground is shown as ground

13     number one, alleging that your trial counsel was

14     ineffective for misadvising the defendant not to

15     testify and for misadvising the defendant that the

16     jury would learn the facts and nature of his prior

17     conviction and prison term if you were to testify.

18            Okay.  Now, the record, Mr. Roland, reflects

19     that you were -- looks like you were before the

20     Court for jury selection May 20th of 2013, that

21     verdicts of guilty were returned on May the 23rd of

22     2013.  Okay?

23            Now, as to your first ground, that your

24     counsel is ineffective for misleading you or

25     misadvising you, tell me, please, the basis for

1       that.

2            THE DEFENDANT:   The basis for this ground,

3       Your Honor, is basically like, I wanted to take the

4       stand in the trial and I had -- I let my counsel

5       know this numerous times before we went to trial.

6            Now, I understand she had a strategic motive

7       to where she didn't want to -- she didn't think it

8       was in my best interest for me to take the stand,

9       but at the time during trial, the way the trial was

10      going, I realized that I had to take the stand.

11           It was the only way, because we really had no

12      defense besides the identification factor.  They

13      needed to hear from me.  I felt the jury needed to

14      hear from me.

15           When I asked when it was time, Judge

16      Moore-Stens asked me would I take the stand, I was

17      getting ready to, but my counsel, Miss Nunnally,

18      she grabbed me, she was like, no, don't take the

19      stand, because you have a burglary conviction, you

20      just got out of prison for doing ten years and, you

21      know, this is a robbery, they're both thefts, so

22      the jury hears you've been -- you've just got out

23      of prison for a burglary, they're not gonna believe

24      you didn't do this robbery, then you have DNA

25      factors and all of that stuff.

1          So I still wanted to take the stand at that

2    time, but when she said that, I didn't know at the

3    time that that was wrong.  I just thought, okay,

4    that's a normal thing.

5          THE COURT:  That what was wrong?

6          THE DEFENDANT:  That her telling me that they

7    will find out what I was in prison for, instead of

8    just asking me how many convictions you have.

9          I didn't know at that time that -- I thought

10   they would go into my past.  Basically, what she

11   told me, I thought was true at that time, but it

12   wasn't until I started researching the matter after

13   I was sentenced and in prison already that I found

14   out that that was midadvice, because the State

15   would not have been able to go into those charges

16   or those priors and like open them up specifically,

17   as long as I conceded to the number that was given.

18         So that's why I raised ground one, because had

19   it not been for that information, I would have

20   definitely took the stand.

21         Even the day before trial, when she came to

22   visit me at the jail, that was my whole -- I was

23   like, I need to take the stand, I need to take the

24   stand, but she didn't want to.

25         And, you know, it's my attorney, it's a big

1      case, carries a lot of time, I don't want to fight

2      her per se in the matter, like go against her.  I

3      wanted her to be comfortable during the trial too,

4      but like I said, at the end of it all, it's through

5      the research that I found out that that was

6      midadvice.

7            If she hadn't of told me that, I would have

8      took the stand.  I wasn't -- I wasn't really

9      concerned about what the State would say or not,

10     because the evidence that I had to present, I felt

11     once the jury heard that, it would at least result

12     in an acquittal or something, it was that strong,

13     but when she said they will open up, it made a lot

14     of sense to me.

15           I mean, if we have a robbery case here and

16     then you have someone that's just got out of prison

17     for ten years for burglary, you know, one and two

18     equals three and I felt that's how the jury would

19     look at it, so I didn't take the stand because of

20     that.

21           THE COURT:  When did you tell your attorney

22     that you wanted to testify?

23           THE DEFENDANT:  I told her prior to trial,

24     weeks before, and definitely the night before,

25     because she came to interview me the night before

11

1    and I told her, I was like, I want to take the

2    stand.

3        It even got to the point to where she went and

4    told my girlfriend, outside during recess of the

5    trial, way before it even came to that, tell

6    Jaquez, don't take the stand, to not take the

7    stand.

8        Now, she didn't mention the prior thing to

9    her, she only told me that, but she did tell her

10   not to -- to tell me not to take the stand.

11       And she told me after trial, on the phone in

12   the jail and I didn't even know, because I couldn't

13   speak to my girlfriend during the trial, but she

14   didn't let me know.

15       I found out over the phone.  You know, that

16   conversation is recorded.  So, I mean, I'm not okay

17   making this stuff up or anything, but this is what

18   happened.

19       I let her know the night before trial in the

20   interview at the jail and then the day of trial,

21   where she actually -- she actually grabbed me by my

22   shirt to pull me back down in the chair.

23       THE COURT:  Where was this?

24       THE DEFENDANT:  In the court, during trial.

25   This was the time when the judge, she had to ask me

1       if I wanted to take the stand.  It was at that

2       point and then she pulled me back down.

3            That's when she whispered, you know, with the

4       nature of the priors and stuff, in my ear and so I

5       didn't take it.

6            THE COURT:  All right.  Now, the case

7       proceeded to -- through trial.  Did you at any

8       point during the trial, after your attorney advised

9       you against testifying, renew your request?

10           THE DEFENDANT:  The only -- the only time I

11      renewed it, Your Honor, was right before, when

12      Judge Moore-Stens asked me, cause that was the last

13      time it was an issue.

14           That was the last time I could even -- once I

15      said no, it was overwith for me testifying.  So

16      when Judge Moore-Stens asked me, she's like, right

17      now I have to ask you, before, you know, the jury

18      comes back in, cause they were out, do you want to

19      testify, and we had already talked, me and

20      Miss Nunnally had just talked before.

21           I guess she knew that this was the time for

22      that, because the State had rested, so now it was

23      our turn, and that was the last time, right before

24      that.  After that there was no more issue of that,

25      because I had already said no.

1          THE COURT:  So the judge also asked you if you

2     wanted to testify?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  And what did you say?

5          THE DEFENDANT:  I told her, no, ma'am.

6          THE COURT:  Okay.

7          THE DEFENDANT:  I think I nodded my head.  I

8     nodded my head -- I nodded my head -- yeah, I

9     nodded my head yes and that's when she pulled me

10    and then talked to me.

11         Then the judge was like, she's like, you have

12    to say something, you can't just nod your head, so

13    I was like, no, ma'am, and then that was the end of

14    that.

15         THE COURT:  All right.  Now, I'm going to read

16    to you a portion of the transcript of proceedings

17    that was in the record on appeal, Mr. Roland.

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Specifically from page 297 --

20    actually, 298.  The record begins after the Court

21    denied the motions for judgment of acquittal.

22         At that point the Court says to you the

23    following.  We'll bring the jury back in -- oh,

24    wait, I'm sorry.  Mr. Roland, at this point I need

25    to inquire of you as to whether or not you wish to

1          testify in this matter, because I'm going to bring

2          the jury back in and have Miss Nunnally, ask her if

3          she's call her first witness, and if she advises

4          that she rests, obviously I need to confer with you

5          that that's a decision that the two of you have

6          discussed and reached a joint conclusion on that,

7          so is it your intention to testify today, sir?

8              The Defendant:  And it just says, (nods head).

9          The Court:  I need you to answer audibly.  The

10         Defendant:  No.  The Court:  No.  Okay.  You've had

11         enough time to talk to your attorney about that

12         decision?  The Defendant:  Yes, ma'am.

13             The Court:  Okay, all right, then we'll go

14         ahead and bring the jury back in and have

15         Miss Nunnally rest on the record and then I'll

16         explain to the jury that we're going to go ahead

17         and send them out for lunch and come back about

18         1:15.

19             Okay.  Do you recall that portion of the

20         trial?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  And is that in agreement with what

23         your recollection is?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  So you did, upon asking by the

```
1        judge, tell her you did not wish to testify?
2              THE DEFENDANT:  Yes, sir.
3              THE COURT:  Okay.  Anything else you want to
4        tell me about that issue?
5              THE DEFENDANT:  I mean, that's -- it's nothing
6        to really add, I mean, I wanted to take it, but
7        when she said that, I couldn't -- I don't know.
8        Maybe I should have just took it anyway.
9              THE COURT:  Should have took what?
10             THE DEFENDANT:  The stand.  Maybe I should
11       have just still got up there, because they needed
12       to hear that, but I didn't know, you know, the way
13       -- I was just thinking, okay.
14             I didn't really know that if you take the
15       stand those priors would really like hurt you.  I
16       know there were actually some things, but not
17       really.
18             The whole prior thing was kind of new to me,
19       but when she made the comparison between the
20       burglary and the robbery, it even made me want to
21       like, whoa, yeah, you know, you got a point, so I
22       had to sit down for that and that's -- that's
23       pretty much how it went.
24             I mean, I know Miss Nunnally, she could tell I
25       still wanted to do it, but it wouldn't have been in
```

```
 1        my best interest, and that's why I told them at
 2        sentencing I wanted to, but because of my past, you
 3        know, due to me thinking that they would have
 4        opened that up, I didn't feel like it would have
 5        been a fair shot, so I had no choice but to deny
 6        taking the stand.
 7             THE COURT:  Okay.  Thank you, Mr. Roland.
 8             THE DEFENDANT:  Yes, sir.
 9             THE COURT:  State, I'll give you an
10        opportunity if you have any questions you'd like to
11        ask the defendant on that issue.
12             MS. OPSAHL:  Not of the defendant, Your Honor.
13             THE COURT:  Thank you.  All right.  Let's move
14        on then to the next issue, Mr. Roland.  The next
15        issue is your ground number two and it recites,
16        trial counsel was ineffective for failing to
17        investigate and present at trial an alibi witness,
18        said alibi defense would have supported acquittal.
19             All right.  Now, which alibi witness are you
20        referring to?
21             THE DEFENDANT:  My brother, Caleb Tafari
22        Barker (phonetic).
23             THE COURT:  One more time his name.
24             THE DEFENDANT:  Caleb Tafari Barker?
25             THE COURT:  Barker?
```

1            THE DEFENDANT:  Yes, sir.

2            THE COURT:  This is your brother?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  All right.  Now, did you ever tell

5     Miss Nunnally about the fact that your brother was

6     an alibi witness?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  When did you tell her?

9            THE DEFENDANT:  Way before trial.  Way before

10    trial, up until trial.  My brother was actually, I

11    won't say a suspect, but he was involved, he was

12    looked at in this case, he was all in my paperwork

13    and she knew that.

14           THE COURT:  What do you mean he was involved

15    in your case?

16           THE DEFENDANT:  His number, his number was

17    called, my brother's phone number was called, and

18    the detectives, they ran that phone number and

19    that's how they figured out that it was my brother,

20    because his name came back and the address of an

21    apartment that we shared.

22           And so he was originally looked at, because at

23    one point I think the detectives were trying to say

24    that he either helped me or he was a part of this

25    robbery.

1          So he was all -- I have some paperwork here

2     with that.  I don't know if you would like to see

3     it or not.

4          THE COURT:  Well, I don't think so.  I mostly

5     want to know now, what leads you to believe your

6     brother would have been helpful as an alibi

7     witness?

8          THE DEFENDANT:  Because my brother would have

9     -- my brother would have testified that I was home

10    when he got off work and that I received a phone

11    call.

12         I told him I had to run out.  I ran out the

13    house so fast, I didn't even -- I didn't even take

14    my cell phone with me, so I left it.

15         So at the Burger King, I called my phone

16    number and I called my brother's phone number.

17    Well, what Flagler Sheriff's Office did was run the

18    phone records from the Burger King and that's how

19    they found out that my brother -- that's how his

20    name came about and they thought, okay, this is the

21    number, you called this number, yes, ma'am, Kim

22    Davis, yes, ma'am, that's my brother,

23    such-and-such, and this is your number, yes, ma'am.

24         Both my number was under my name and my

25    brother's phone was under his name, two different

```
 1      cell phones.

 2           So I was letting her know like, first of all,

 3      why didn't you -- you never even investigated my

 4      brother, never --

 5           THE COURT:  Who are you speaking about?

 6           THE DEFENDANT:  Miss Nunnally.  She never even

 7      investigated my brother.  She never depo'd him.

 8      There was never anything, no type of inquiry at all

 9      on her behalf about my brother.  It was like she

10      sat back and let the State do everything.

11           I kept telling her, can you call him, he has

12      -- I needed someone to talk for me and he -- when I

13      told her this, all she would say is that, this is

14      your brother, they're not gonna believe you, he'd

15      say anything.

16           I heard like there was all kind of stuff she

17      said about that, because it was different times

18      that I approached her about this, about calling my

19      brother as a witness on my behalf, but every time

20      it was just like she derailed it or didn't get

21      around to it, so as a result, I wasn't able to call

22      him for trial.

23           I let her know this and the same thing, this

24      is your brother, I don't think we're gonna need

25      him, your case is identification, I'm a good
```

20

1       closer, don't worry.

2           You know, these were some of the things that I

3       was told, but I still didn't even -- I always

4       thought something was funny about that ground,

5       because the simple fact, he wasn't even

6       investigated or depo'd, even after I made you aware

7       of it.

8           This is an alibi witness.  He was home.  He

9       can testify that I was home when he got home, which

10      will conflict with the time that this robbery took

11      place.

12          My brother was a correctional officer at

13      Tomoka CI on that day.  Okay.  That day we had

14      plans for Hooligan's, to go watch a football game.

15          I didn't even plan on leaving the house that

16      day, because it was so early.  I didn't plan to

17      leave until time for the games to start.

18          Well, my brother came home, he was like, yeah,

19      we could do that, but let me rest up, because he

20      worked the graveyard shift at Tomoka, so he was

21      tired.  He got off at eight o'clock in the morning.

22          So he got home and everything, I'm making

23      breakfast, he's tired, I made him something to eat,

24      you know, he ended up falling asleep right on the

25      sofa in the living room.

```
 1              I get the call, okay, such-and-such, come get
 2         me.  I'm like, where you at.  I'm up here at the
 3         Burger King.  All right.  Yo, I tell my brother,
 4         I'm getting ready to leave, I got to go pick up
 5         someone, boom, I leave.
 6              I left my phone there.  My brother could have
 7         testified to all this.  I had no witnesses in this
 8         trial on my behalf and I felt the jury definitely
 9         needed to hear this, because they already had said
10         at trial there's two sides to every story, but what
11         did I have on my behalf to offer.
12              You have gloves with DNA.  You had -- even the
13         eyewitnesses' description don't matter.  My
14         presence at the Burger King was already solidified
15         through the testimony, so I needed this witness to
16         be there.
17              This was my hypothesis of innocence, his
18         testimony alone.  If he was there, I wouldn't even
19         had to take the stand, because I would have someone
20         to explain it better for me from a neutral, someone
21         that's neutral, where, okay, the jury is like,
22         okay, well, we hearing this from him, he had
23         nothing to do with the crime, it's possible this
24         could have happened and this is exactly what
25         happened, but she never called him in.
```

1          I don't know why she never called him in.  He
2     was originally involved in the case.  He should
3     have been at least depo'd.  This was never done.
4          And, I mean, after time and time making her
5     aware of this, I don't understand, is it up to me
6     that she goes out and depos and investigate my
7     brother when he's already a part of the case
8     originally?
9          The State did, so why didn't she?  She never
10    followed him.  She never investigated him.  She
11    never even tried to look for him.  She never even
12    called him.
13         So I'm like, when she's telling me, we don't
14    need it, I'm like, okay, well, maybe we don't, if
15    you haven't at least tried to speak to him about
16    the matter, send one of your investigators to go
17    talk to him, you did none of this, and as a result
18    of this, I wasn't able to call him in trial.
19         And this testimony, oh, man, this testimony
20    would have been so powerful, just the fact for the
21    jury to hear, I can't say what the outcome of the
22    trial would have been, Your Honor, but I know the
23    jury needed to hear this.
24         She failed to call him in.  It's clean-cut.
25         THE COURT:  All right.  Any other alibi

1     witnesses that you're suggesting should have been

2     called?

3          THE DEFENDANT:  Not for this ground, sir.

4          THE COURT:  All right.  Does the State have

5     any questions of the defendant on issue number two?

6          MS. OPSAHL:  Not of the defendant, Your Honor.

7          THE COURT:  Okay.  Move on to your third

8     ground, Mr. Roland.  In ground number three you

9     allege that trial counsel was ineffective for

10    failing to object to law enforcements testimony

11    concerning the defendant's driver license photo

12    matching a surveillance video in the absence of a

13    proper predicate to allow for the inclusion of said

14    testimony.

15         Now, I need you to tell me exactly what video

16    surveillance you're referring to.

17         THE DEFENDANT:  Your Honor, I'm gonna need --

18    this ground right here, I'm gonna -- this was the

19    main ground that I asked for counsel on, because

20    it's a failure to object and I'm not a lawyer, so I

21    felt that counsel -- counsel could argue, if you

22    would appoint me counsel, they could present the

23    same ground to you better than I could, but being

24    as that I was denied, I don't know, I mean, I don't

25    really feel comfortable going into this, because

24

```
 1          it's a bit -- I had help with this ground, I had

 2          help with this whole motion, and I kind of -- I

 3          know what it's saying, but I don't believe I have

 4          the ability today to actually give it to you the

 5          way I wanted to get the meaning across, you know,

 6          the way I'm raising it in here.

 7              I'm kind of having a little trouble with that,

 8          so that's why I asked for the motion to appoint

 9          counsel, because it's a failure to object on

10          Miss Nunnally's behalf.

11              THE COURT:  Okay.  Give me a moment here to

12          review your motion.  Okay.  I'm reviewing your

13          motion and the substance of the motion, Mr. Roland,

14          appears to be your position that the witness who

15          was being questioned at trial, and I think this was

16          a law enforcement officer, but it's not really

17          clear in your motion, but it appears to be a law

18          enforcement officer --

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  -- testified that he produced a

21          photograph from the driver's license records of

22          Jaquez Roland, and the question was, now, the

23          person you developed as Jaquez Roland and you saw

24          his photograph and identified him on the Burger

25          King video.
```

1          The prior question was that it appeared to be

2     the same person as on a Burger King video.  Okay?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Now, am I correct though that you

5     did not dispute you were at the Burger King?

6          THE DEFENDANT:  I was -- my testimony put me

7     at the Burger King.

8          THE COURT:  So you were at the Burger King?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  So what's your quarrel with the

11     fact the witness said he saw you on the Burger King

12     video?

13          THE DEFENDANT:  No.  First of all, they didn't

14     have a video at trial.  They misplaced the video.

15     There was no video.

16          Originally there was a video, but they said

17     they lost it, so they didn't have a video at trial

18     at all.

19          What I'm saying is that she didn't object to

20     when the officer used his opinion.  Basically, he

21     put me in that.  It was for the jury to make that

22     determination.

23          THE COURT:  Make what determination?

24          THE DEFENDANT:  If I'm -- if I'm the one they

25     see on that tape.  He can't -- the detective

26

```
1        couldn't use, law enforcement basically, could not

2        use their -- they're not experts in the whole

3        matter, basically saying, oh, that was him, I just

4        looked at it.

5             They were not witnesses to the crime, they did

6        not know me prior to the crime, so they couldn't

7        say that.

8             It was her job to object.  At the point where

9        she was asked, where it says right here, okay,

10       through the DHSMV website, DAVID, were you able to

11       identify this person as Jaquez Roland?  Yes.  Did

12       you subsequently look at the video at Burger King

13       to see if you could identify the person on that

14       video to be Jaquez Roland?

15            It was at this moment that defense counsel had

16       a duty to object on lack of predicate.  There was

17       no predicate there.  He's basically just putting me

18       there.

19            How do you take a video, whether I'm on that

20       video or not, how do you take that video and

21       compare it to looking at a website?

22            You don't know who you're looking at.  You

23       didn't know anything before.  You don't know what

24       you were looking at.

25            You only got my name because an employee at
```

1        the Burger King said, yes, that's Jaquez Roland.

2        That's the only -- that's how they had a name, and

3        then they took that and on the stand law

4        enforcement said, okay, I looked at the tape and

5        looked at the photo and made a match.

6            That's -- you can't do that.  That's for the

7        jury to do that.  She didn't object to it.  Had she

8        would have objected, I'm gonna reflect back on the

9        motion, in the absence of a proper predicate to

10       allow for law enforcement's opinion that a

11       suspect's license photo match a person depicted in

12       a video surveillance tape, said opinion was not

13       admissible and would have been excluded had counsel

14       raised the appropriate objection.

15           That's Ruffin versus State (phonetic).  Now, I

16       don't want to go into the case law and all that,

17       but it's part of the motion, so I'm gonna read it.

18           Okay.  Ruffin was the man in the videotape

19       showing the crime, the Court explained.  This was

20       an invasion of the province of the jury.  This is

21       what I'm trying to say.

22           When factual determinations are within the

23       realm of an ordinary juror's knowledge and

24       experience, such determinations and the conclusions

25       to be drawn therefore must be made by the jury.

1          The officers were not eyewitnesses to the

2     crime.  They did not have any special familiarity

3     with Ruffin, nor did they qualify as any type of

4     experts in identification.

5          Due to counsel's deficient performance in

6     failing to object, the following response was

7     presented to the jury and highlighted as a key

8     feature of the prosecution's case.

9          Yes, it appeared it was the same person.  So

10    the person you saw on the Burger King video was the

11    same person you saw on the DAVID photo of Jaquez

12    Roland?  Yes, I believe so.

13         Now, the person you developed as Jaquez Roland

14    and you saw his photograph and identified him on

15    the Burger King video, do you see that person in

16    the courtroom today?  Yes.

17         And can you point that person -- can you point

18    out the person and identify him by an article of

19    clothing.  He's wearing a silver brace, black

20    shirt.

21         Having identified a suspect through video, did

22    you seek or obtain any samples of the DNA,

23    fingerprints, blood, anything like that?  Yes, I

24    did.

25         The admission of this testimony cannot be

1    considered harmless as the State argued in closing

2    that law enforcement made a positive identification

3    as follows.

4         And, see, that never happened and she should

5    have objected.  Even when -- even in closing, she

6    didn't even object then, because that was never

7    done.

8         Also, if you remember, Corporal Davis, while

9    the video was still working, saw the video herself,

10   obtained a DAVID photo, which the DHSMV or Driver's

11   Highway Safety Motor Vehicle photograph of the

12   defendant saw the video and she matched up the

13   DAVID photo to the defendant and made a positive

14   identification of defendant.

15        As defense counsel primary strategy was

16   misidentification, the admission of testimony which

17   was inadmissible was directly related to the

18   identification can be found to have contributed to

19   the outcome of the trial.

20        The State directed the jury to consider the

21   law enforcements testimony basically without being

22   able to see anything.  They just basically took

23   their word for it, cause she said she made a

24   positive identification.

25        She's no expert.  She did not know me.  She

1      had no knowledge.  She wasn't a witness.  She

2      should have objected.

3          And that's what this ground is saying, she

4      failed to object.  That has nothing to do with me.

5      That's her duty.  And was it harmless, yes, it was.

6          I mean, it's like hearsay, basically.  Why was

7      the jury -- number one, we don't even have a

8      videotape.  There's evidence being brought in front

9      of the jury about a videotape that doesn't even

10     exist right now.

11         Okay.  They lost it, they lost it.  However it

12     came up missing, who knows, but it wasn't there, so

13     for the law enforcement -- for law enforcement to

14     get up and say, okay, well, I made that

15     determination, I felt that was unfair.

16         That was very unfair, because not only is she

17     saying, take my word for it, the jury has nothing

18     to put their pieces of the puzzle together with,

19     because the tape is missing.  Why didn't she

20     object?

21         It's not my job to object, it's hers, and this

22     -- had they would have heard that and then it goes

23     into closing argument about the same thing.

24         Now you got the State saying that law

25     enforcement made a positive identification and this

1        and that, so it's like putting a nail into the

2        coffin further, when all of this would have been,

3        had she would have objected, I don't know what

4        would have happened, but it would have definitely

5        been something done about this.

6            There would have definitely been something

7        about it and this is why I needed help with this

8        ground.

9            As you can see, I'm having trouble, you know,

10       trying to get it across, that's why I had to read

11       it from the actual motion, but, you know, this, I

12       know it's wrong and it was ineffective on her part

13       for not objecting to it.

14           Had she would have objected to it, it could

15       have been struck or whatever instructions you would

16       have given her and possibly change the outcome of

17       the trial, because the prosecutor went back into it

18       at closing arguments.

19           THE COURT:  Mr. Roland, do you have your copy

20       of your motion before you?

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  I'd like you to look at the very

23       end of the motion on page number 50.

24           THE DEFENDANT:  Fifty.

25           THE COURT:  Where there is an unnotarized

1       oath.  Do you see that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  And you did sign that and swear

4       that all the facts set forth in your motion are

5       true?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  I'd like you to go back to page

8       number seven in your motion, in your statement of

9       facts.

10             On page seven, in the next to last paragraph,

11      are the words, when Mr. Roland arrived at the

12      Burger King, he was sweaty, out of breath and upset

13      because his car broke down, he entered and went

14      looking for his friend, Mr. Roland did not see him,

15      so he went to the counter to ask for a cup of

16      water, Mr. Roland got water and went to the

17      restroom to clean up, Mr. Roland removed the

18      sweatpants, which were sweaty, old and warn and

19      threw them away in the bathroom, Mr. Roland then

20      went back to the front counter.

21             Am I correct that in those statements of facts

22      you agree that you were at the Burger King?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Okay.  Thank you.  Anything else

25      you want to present --

1          THE DEFENDANT:  No.

2          THE COURT:  -- on that issue?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  Let's move on then to the next

5     issue, which is your issue number four.  And this

6     is your ground number four.

7          State's trial counsel was ineffective for

8     failing to object to the prosecutor's inappropriate

9     comment on the evidence during closing argument.

10    The prosecutor's misconduct went to the heart of

11    the defendant's -- I'm sorry -- to the defense's

12    theory of misidentification and affected the

13    fundamental fairness of the trial.

14         The failure to object to the prosecutor's

15    inappropriate comment, and I'm looking further in

16    your motion stating, in closing argument counsel

17    presented this difference in skin color as evidence

18    to establish that Mr. Roland could not have been

19    the person who committed the robbery.

20         Now, I need you to tell me exactly, what

21    comment was it that you felt your attorney should

22    have objected to?

23         THE DEFENDANT:  She should have objected to

24    the fact that when, I think it was Mr. Fox that was

25    talking at the time, he -- while he was in his

34

1    closing, he was saying that I was identified, no

2    one -- basically he said no one identified me.

3        They didn't say I wasn't -- it wasn't a very

4    dark-skinned person and stuff like that that robbed

5    the place, and that was untrue, because the whole

6    -- all of the witnesses, no one, they described a

7    dark-skinned, very dark skin.

8        They even made a comparison to Miss Nunnally

9    at trial, that they were about her skin -- it was

10   her skin complexion and about '5"9.

11       So and during closing he got up and he says on

12   the defense argument, I have to reflect again to

13   this, because of the failure to object, one of the

14   arguments in supporting this theory of

15   misidentification was that two eyewitnesses to the

16   robbery, a customer and the victim, described the

17   perpetrator as a dark-skinned black male, a

18   description that is inconsistent with that of

19   Mr. Roland.

20       Defense counsel was a very dark-skinned

21   African American female and in an effort to

22   highlight this difference, questioned the victim as

23   to whether the perpetrator had dark skin color like

24   hers, to which the victim answered in the

25   affirmative.

1          The following exchange took place during

2     cross-examination of the victim in pertinent part.

3          Good morning, Miss Crowley.  Good morning.

4     The individual you saw was dark skinned; is that

5     correct?  Yes.  Was not light skinned?  No.  Was

6     not brown skinned?  No.  So, basically, my

7     complexion?  Round about, yes.  I'm sorry?  Round

8     about, yes.

9          In closing argument counsel presented this

10    difference in skin color as evidence to establish

11    that Mr. Roland could not have been the person who

12    committed the robbery, regardless of a plausible

13    identification at a nearby Burger King minutes

14    later.

15         The following was presented in defense closing

16    argument in pertinent part.  Miss Nunnally:  The

17    person was not light-skinned, the person was not

18    brown-skinned, that person was dark in color,

19    similar to me.

20         We have Mr. Bouser's (phonetic) testimony.  He

21    said he saw a dark male, a black male, dark

22    complexion, Mexican, with bluejeans on, someone

23    else, someone who is darked-skinned, because it is

24    about identity and my client don't fit the

25    description of that person that they claim walked

1    into that liquor store.

2        Reasonable doubt as to guilt comes from the

3    evidence.  The evidence comes from the State.  It

4    comes from the conflict in the evidence.  Crowley

5    saw a dark-skinned male, with tiger eyes, gray

6    dreads, black jacket, black jeans.  The video

7    showed a dark-skinned male, wearing dark jacket and

8    green pants.

9        It is clear from these excerpts that the key

10   feature of defense counsel closing argument was

11   that Mr. Roland was a light-skinned black male who

12   could not have fit the description of the

13   perpetrator who robbed the Sharps Liquors.

14       The State argued that the perpetrator wore

15   contacts and wigs, clothes to hide his identity,

16   however, skin color could not be disguised.

17       In an effort to discredit defense counsel's

18   closing argument and refute the one discrepancy

19   that could not be explained, the prosecutor

20   misstated the testimony brought forth by the

21   defense during cross-examination of the victim as

22   follows.

23       Mr. Fox:  Also Miss Nunnally wants to present

24   telling you that people were saying that this was a

25   black-skinned, a dark-skinned male, you can check

1       your own recollection on this, but I recall

2       Mr. Bouser saying that the male that he saw was not

3       as dark as Miss Nunnally.

4           I don't have Miss Crowley saying he was dark

5       like Miss Nunnally or just that he was a black

6       male.

7           This final comment was improperly argued and

8       was a clear misstatement of the testimony

9       previously placed before the jury.

10          To lend credence, the prosecutor asked the

11      jury to use their own recollection to recall

12      whether or not Mr. Bouser compared the

13      perpetrator's skin color to defense counsel's, then

14      inappropriately misstates testimony to mislead the

15      jury and negate Mr. Roland's sole theory of

16      defense, which was irrefutable.

17          Trial counsel was deficient for failing to

18      object to the prosecutor's misstatement of

19      testimony and prejudice ensued as the improper

20      comment went to the heart of defendant's theory of

21      innocence.

22          Criminal trial is a neutral arena wherein both

23      sides place evidence before the jury's

24      consideration.

25          The role of counsel in closing argument is to

38

1       assist the jury in analyzing the evidence, not to

2       obscure the jury's view with personal opinion,

3       emotion and non-record evidence.

4           Had counsel objected to the prosecutor's

5       misstatement of evidence, the trial court could

6       have issued an appropriate -- (unintelligible) --

7       instruction, where it might have been a close call

8       for jury and prosecutor improperly injected facts

9       and inference that were not supported by the

10      evidence.

11          The trial court should have affirmatively

12      rebuke offending prosecutor, so as to impress upon

13      jury gross and -- (unintelligible) -- of being

14      influenced by improper arguments and specifically

15      instruct the jury.  Contemporaneously thereto that

16      comments made during closing arguments did not

17      constitute evidence.

18          This failure by counsel to object to the

19      prosecutor's closing argument cannot be considered

20      harmless.

21          So this is what I was trying to say in this

22      ground.  He says something that wasn't true.  She

23      should have objected, especially when our whole

24      defense is identification.

25          My skin color is a part of my identification.

1           That's a very important piece.  She didn't object

2      to it again.  He -- what the State said was not

3      true, because we had just heard testimony from the

4      witnesses saying the opposite.

5           She didn't object.  The jury gets this in

6      closing arguments, right before they go deliberate,

7      and as a result guilty verdict.

8           I don't know if that swayed them per se, but

9      it had to play a part.  Our whole defense was about

10     identification.  So it can't be said that that was

11     harmless.

12          THE COURT:  Okay.  Does the State have any

13     questions of Mr. Roland on that issue?

14          MS. OPSAHL:  Not of Mr. Roland, no, Your

15     Honor.

16          THE COURT:  Okay.  Move on to the next point,

17     which is your ground number five.  It reads,

18     counsel was ineffective for failing to move for a

19     mistrial when the jury overheard an inappropriate

20     comment regarding the defendant's, quote, apparent

21     guilt, end quote, as stated by an officer of the

22     Court as the jury was retiring to deliberate.

23          All right.  Now, were you present when this

24     comment was made?

25          THE DEFENDANT:  No, Your Honor.  I actually

```
 1          have a witness as to this ground right here, ground
 2          five.
 3                  THE COURT:  And who is the witness?
 4                  THE DEFENDANT:  Miss Ada Whites.
 5                  THE COURT:  Is she here?
 6                  THE DEFENDANT:  Yes, sir.
 7                  THE COURT:  Where is she?  Please come up,
 8          ma'am.  Please step up to the podium.  Please raise
 9          your right hand to be sworn.
10                  THE CLERK:  Do you swear or affirm that the
11          testimony you're about to give is the truth, the
12          whole truth and nothing but the truth, so help you
13          God?
14                  MS. WHITES:  Yes.
15     THEREUPON,
16                              ADA WHITES
17     was called as a witness and, having been duly sworn by
18     the Clerk of Court, testified upon her oath as follows:
19                          DIRECT EXAMINATION
20                  THE COURT:  Please state your name, Miss.
21                  MS. WHITES:  Ada Whites.
22                  THE COURT:  Would you spell your name.
23                  MS. WHITES:  A-D-A, Whites, W-H-I-T-E-S.
24                  THE COURT:  Whites, W-H-I-T-E-S?
25                  MS. WHITES:  S, yes.
```

1          THE COURT:  Ada Whites.  Miss Whites, would

2    you please have a seat up here in the witness

3    stand.

4          All right, ma'am, again, Miss Ade Whites, you

5    have been summoned today as a witness in this

6    cause.  This is a case in which the Court is

7    hearing evidence regarding claims of ineffective

8    assistance of counsel.

9          The defendant, Mr. Roland, has indicated you

10   might have evidence to present relating to this

11   issue.  Let me begin first by asking you a couple

12   of questions.

13         First of all, what is your relationship to

14   Mr. Roland?

15         MS. WHITES:  Girlfriend.

16         THE COURT:  And for how long have you been his

17   girlfriend?

18         MS. WHITES:  Since February the 9th, 2012.

19         THE COURT:  Were you present at his trial on

20   these charges?

21         MS. WHITES:  Yes.

22         THE COURT:  And were you present at all times

23   throughout the trial?

24         MS. WHITES:  Yes.

25         THE COURT:  All right.  Now, let me read to

42

1        you the ground that's been claimed as an issue

2        today.

3            There's claim being made that an officer

4        within the court made a statement regarding the

5        defendant's apparent guilt as the jury was

6        retiring.

7            Were you present?

8            MS. WHITES:  Yes.

9            THE COURT:  All right.  Now, tell me first of

10       all, where were you at that time?

11           MS. WHITES:  I was in the audience.

12           THE COURT:  Okay.  In the audience.  Now, I

13       don't know if it was in this courtroom.  I was not

14       the presiding judge at the time.

15           Was it this courtroom or a different

16       courtroom?

17           MS. WHITES:  I think it was a different

18       courtroom.

19           THE COURT:  But here in this courthouse?

20           MS. WHITES:  Yes.  I was there.

21           THE COURT:  All right.  Now, this courtroom is

22       probably a little bit -- arranged a little bit

23       differently, but, as you see, there's a jury box on

24       one side of the courtroom.

25           MS. WHITES:  It was on this side.

43

```
1              THE COURT:  Okay.  So you were on the same
2       side as the jury box?
3              MS. WHITES:  No.  The jury was on that side.
4              THE COURT:  All right.  So you were on this
5       side, meaning, as you're sitting in the witness
6       stand, on the right side in the back, in the
7       audience, but the jury was over on the left side?
8              MS. WHITES:  Yes.
9              THE COURT:  The opposite side from where you
10      were sitting?
11             MS. WHITES:  Yes.
12             THE COURT:  All right.  Now, can you tell me
13      first of all, was the judge in the courtroom at the
14      time you heard the comment?
15             MS. WHITES:  It was like, at the like, right
16      close to the closing for a break or whatever.  The
17      guy, officer, he had made the comment about a tear
18      falling out Mr. Roland's eye and I had asked
19      Miss Nunnally about what did that -- you know, what
20      was that about.
21             THE COURT:  All right.  Let me just back up a
22      little bit.  Now, I guess I began by asking you if
23      the judge was still in the courtroom.
24             Do you know whether the judge was still in the
25      courtroom?
```

44

```
1              MS. WHITES:  It was like -- it was like we was
2         getting ready to break, so I don't know if he had
3         stepped out or whatever, but I remember talking to
4         Miss Nunnally about the incident.
5              THE COURT:  All right.  So let me say this.
6         It was near a break.
7              MS. WHITES:  Uh-huh.
8              THE COURT:  You're in the back of the
9         courtroom, in the audience area, on the opposite
10        side from where the jury is.
11             Where was the jury at the time you heard the
12        comment?
13             MS. WHITES:  They was over there.
14             THE COURT:  Over where?
15             MS. WHITES:  In their seats.
16             THE COURT:  So the jury was still in the jury
17        seats?
18             MS. WHITES:  Yes, because the officer, he came
19        to Miss Nunnally and he made the comment, and when
20        he made the comment, when we was getting ready to
21        leave out, I asked Miss Nunnally, I'm like, he said
22        something about the tear, that's a sign of guilt,
23        and she was -- we had a small conversation about it
24        and that was it.
25             THE COURT:  All right.  Now, I'd like you to
```

45

1          again go back for a moment and just take me through
2          what you say you observed and heard from the time
3          the court entered the break.
4              MS. WHITES:  It was -- we was getting ready
5          for break and the officer came to Miss Nunnally,
6          Miss Nunnally was on this side, and he stated that
7          Mr. Roland had a tear come out his eye and that was
8          a sign of guilt.
9              I asked Miss Nunnally what did he mean about
10         that.
11             THE COURT:  Now, what you're describing then
12         is that you heard the officer make a comment to
13         Miss Nunnally?
14             MS. WHITES:  Well, he came up to
15         Miss Nunnally.
16             THE COURT:  All right.  So the officer came up
17         to Miss Nunnally.  How close did he get to
18         Miss Nunnally?
19             MS. WHITES:  Like right -- she was like right
20         in that area and he was right by this sort of, like
21         by the -- like if the table is right there, he was
22         like right -- Miss Nunnally was this way, facing
23         this way, and he walked up to Miss Nunnally.
24             THE COURT:  Now, you just stood and you showed
25         me what appears to be that the officer walked up to

1      Miss Nunnally --

2           MS. WHITES:  Uh-huh.

3           THE COURT:  -- in a standing position.  Was

4      Miss Nunnally standing?

5           MS. WHITES:  I don't know was she standing.  I

6      think she stood up, but I did ask her about the

7      comment.

8           THE COURT:  Not quite there yet --

9           MS. WHITES:  Okay.

10          THE COURT:  -- just what was said.  So you

11     observed the officer walk up to Miss Nunnally.  How

12     close did he get to Miss Nunnally when you say he

13     made this comment?

14          MS. WHITES:  They was probably like from here

15     to there.  They wasn't too --

16          THE COURT:  Help me out.  That doesn't help me

17     out.  You've got to give me your best estimate of

18     how close the officer was to her.

19          MS. WHITES:  Like right -- probably like two,

20     three feet away.  It was not a long distance.

21          THE COURT:  Would you call it a conversational

22     distance, close enough to speak to one another?

23          MS. WHITES:  Yes.

24          THE COURT:  All right.  So two to three feet.

25     And at the time that the officer made the comment,

1    you said the jury was in their seats or they

2    already left?

3        MS. WHITES:  I think they was -- everybody was

4    getting ready to go to break, so they probably was

5    getting ready to stand up to leave out, but

6    everybody was getting ready to go to break.

7        THE COURT:  Everybody was getting ready to

8    break, but you earlier said that they were in their

9    seats.

10       You're saying now that you think they may have

11   been up from their seats?

12       MS. WHITES:  I mean, by the time he walked

13   over, you know what I'm saying, they probably was

14   -- you know, I didn't really pay -- when he came to

15   her, they was there, okay, and after the

16   conversation was made, you know, I asked her about

17   it.

18       So I was personally dwelling on what

19   Miss Nunnally had to say.  I wasn't, you know,

20   paying attention to where the -- you know, where

21   the jury was at or whatever.  I was asking, you

22   know, her what did the guy mean about that.

23       THE COURT:  So at the time you heard the

24   comment that you've said, you don't know where the

25   jury was?

48

1          MS. WHITES:  When I was -- when I -- they was

2     over there and when I was talking to Miss Nunnally,

3     like I said, when I asked her about the comment,

4     you know, we started going to break.

5          THE COURT:  What did you ask Miss Nunnally?

6          MS. WHITES:  What did -- what did the officer

7     mean about the tear falling.

8          THE COURT:  Now, can you tell me, who was this

9     officer that made the comment?

10          MS. WHITES:  It was a white male.

11          THE COURT:  Did he have a uniform on?

12          MS. WHITES:  Yes.  He was in the courtroom.

13          THE COURT:  So he was a uniformed officer?

14          MS. WHITES:  Uh-huh.

15          THE COURT:  And he was in the courtroom?

16          MS. WHITES:  Uh-huh.

17          THE COURT:  Yes?

18          MS. WHITES:  Yes.

19          THE COURT:  Okay.  And is he the only person

20     that you're claiming made a comment?

21          MS. WHITES:  Yes.

22          THE COURT:  Okay.  And if you can best you can

23     now tell me what the comment was.

24          MS. WHITES:  He said that he had a tear come

25     out of his eye and it's a sign of guilt, and if I

49

```
 1      seen it, I know the jury seen it.
 2          THE COURT:  Are you saying he made that last
 3      comment as well or are you saying you --
 4          MS. WHITES:  No.  That's what he said.  He
 5      said, it was a tear coming out his eye, if he seen
 6      it, he know the jury seen it and it's a sign of
 7      guilt.
 8          THE COURT:  All right.  And where was the jury
 9      at the time you spoke to Miss Nunnally?
10          MS. WHITES:  Well, coming up to Miss Nunnally,
11      they was over there.
12          THE COURT:  Over where?
13          MS. WHITES:  In the jury area.
14          THE COURT:  Okay.  So when you spoke to
15      Miss Nunnally, I presume it was by her table?
16          MS. WHITES:  Yes.
17          THE COURT:  The jury --
18          MS. WHITES:  No, not by her table.  I was like
19      standing, cause you couldn't -- you couldn't go
20      past them things.
21          I was standing, waiting for her, and when she
22      started to walk out, I asked her, what did -- what
23      did it mean, cause I didn't know what it meant.
24          THE COURT:  Now, as I take it, you are
25      suggesting you were behind the bar, in the area
```

1          separating the audience from the Court well.

2              Is that what you're saying?

3              MS. WHITES:  Right you know how that door is

4          right there, I was right there pretty much waiting

5          for her to come, cause I wanted to know what it

6          meant.  I didn't know what it meant.

7              THE COURT:  So you were standing in the

8          audience side of where the swinging door is?

9              MS. WHITES:  Yes.

10             THE COURT:  And you were waiting for

11         Miss Nunnally to come by so you could ask her your

12         question?

13             MS. WHITES:  Yes, sir.

14             THE COURT:  Now, where was the jury at that

15         time?

16             MS. WHITES:  Like I said, when I walked up, I

17         remember them being in the -- in the area, but

18         after I talked to Miss Nunnally, I went on -- you

19         know, went on out the courtroom.

20             THE COURT:  So you're a little -- I'm not

21         quite sure I understand.  Are you saying the jury

22         had already left the courtroom when you spoke to

23         Miss Nunnally?

24             MS. WHITES:  No, not that I -- not that I can

25         reencount (verbatim), no.

```
 1              THE COURT:  You're thinking the jury was still
 2         in the jury box area?
 3              MS. WHITES:  Yes.
 4              THE COURT:  All right.
 5              MS. WHITES:  Cause when I walked up, they was
 6         still there.
 7              THE COURT:  All right.  Now, how far was the
 8         area where you observed or heard the officer make
 9         this comment to Miss Nunnally?
10              How far was that from where the jury was?
11              MS. WHITES:  Like a regular -- like from there
12         to there, like a regular -- like a regular
13         courtroom.  Like they was on this side and he
14         walked up to her, where she was at her area.
15              THE COURT:  Okay.  So Miss Nunnally was at her
16         table, the jury was still over in the area of the
17         jury box and then that's where you saw the officer
18         have his conversation with Miss Nunnally?
19              MS. WHITES:  Yes.
20              THE COURT:  And then you waited on the other
21         side of the swinging door for Miss Nunnally to pass
22         through so you could speak to her?
23              MS. WHITES:  Yes, to ask her about what was
24         said.
25              THE COURT:  And you think the jury was still
```

1          in the jury box at that time?

2                MS. WHITES:  Yes.

3                THE COURT:  All right.  Now, does the

4          defendant, Mr. Roland, have any questions of the

5          witness, Miss Whites?

6                THE DEFENDANT:  Yeah.  Can I go?  You ready?

7                THE COURT:  Go right ahead.

8                            CROSS-EXAMINATION

9    BY THE DEFENDANT:

10         Q    First of all, relax.  I know you nervous, but

11   just relax.  He has to ask you this stuff.

12               You -- when you heard this comment, what did

13   you -- how -- for the record, how did you let me know

14   that this is what you heard?

15               How was this brought to me, from you to me?

16   How did you bring this information to me?

17         A    Over the phone.

18         Q    Okay.  Okay.  I'm just asking.  I have to ask

19   you this.  And when you asked me this, you were

20   basically -- did you tell me you heard this from

21   Miss Nunnally, that's why you asked -- you brought me

22   this information?

23         A    No.  I said the officer had made a comment to

24   Miss Nunnally.

25         Q    I understand, but the reason you were telling

53

```
1   me was to let me know that this had took place, because
2   I had no knowledge of it, correct?
3        A    Yes.
4        Q    Okay.
5        A    Yes.
6        Q    That's about it.  What did she tell you?  What
7   did she tell you in response to that, when you asked her
8   the question?
9             I know it's been some time.  Just relax and
10  think.
11       A    I don't remember her response.
12       Q    Don't remember?
13       A    No.
14       Q    Okay.
15       A    I mean, she responded something, but I can't
16  think of the exact words, cause after she made the
17  comment, it just like, you know.
18       Q    Okay.  But whatever -- whatever she responded
19  to was enough for you to let me know, correct?
20       A    Well --
21       Q    You thought it was important to let me know,
22  that's why you told me on the phone?
23       A    I thought it was important because it was like
24  he said, that's a sign of guilt.
25            THE DEFENDANT:  Okay.  I'm only asking you
```

54

1         these things so you could remember on your own.  I

2         don't want to take you to what was said or

3         whatever, even though I have it down here, but I

4         want you to tell the Court, so that's why I'm

5         asking you, so relax, you all right.

6              All right.  And that was that.  I don't have

7         any more questions, Your Honor.

8              MS. OPSAHL:  I don't have any questions for

9         Miss Whites.

10             THE COURT:  No questions?

11             MS. OPSAHL:  No, Your Honor.

12             THE COURT:  Give me just a moment here.

13        Miss Whites, was this the only comment that you're

14        saying you overheard the officer say to

15        Miss Nunnally?

16             MS. WHITES:  Yes.  Yes.

17             THE COURT:  Okay.  Okay, Miss Whites, thank

18        you very much.  You may stand down.

19             Mr. Roland, I've heard from your witness.

20        Anything further you would like to say about that?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  First of all, before you go

23        further, did you hear such a comment?

24             THE DEFENDANT:  No, sir.

25             THE COURT:  Where were you at the time?

```
1            THE DEFENDANT:  I was at the jail, on the
2       phone.  When I was made -- when this was brought to
3       my attention, I was at the jail talking with
4       Miss Whites on the phone.
5            THE COURT:  But actually I'm referring to, at
6       the time it was made, were you not in the
7       courtroom?
8            THE DEFENDANT:  Yes, sir.
9            THE COURT:  You were in the courtroom?
10           THE DEFENDANT:  Yes, sir, I was in the
11      courtroom.
12           THE COURT:  Where were you?
13           THE DEFENDANT:  I was sitting down in one of
14      these chairs, but in Melissa's, Miss Melissa's
15      courtroom.
16           THE COURT:  Okay.  And if you were in your
17      chair, was Miss Nunnally with you at the time?
18           THE DEFENDANT:  She was, but she stepped out,
19      because at that time the bailiff was -- the jury
20      were going to deliberate.
21           The bailiff was taking me back to the cells,
22      the holding cells, and Miss Nunnally was going out
23      to that door to take care of whatever business she
24      had to attend to.
25           So it was kind of like everybody -- it was at
```

56

1    that time when everybody was getting up to go their

2    own way, you know, the jury is going back to

3    deliberate in the room back there, the judge, she's

4    gonna go do her thing, Miss Nunnally went to go do

5    her thing, the State, everybody just kind of went

6    their own way pending the verdict, until the

7    verdict came back, so it was around that time right

8    there.

9         THE COURT:  Did you hear the comment?

10        THE DEFENDANT:  I didn't hear the comment.  I

11   didn't hear the comment.  I wasn't made aware of

12   the comment until I called my girlfriend and, you

13   know, she was ecstatic about it.

14        She told me at the time what went on.  So when

15   she told me about this, this was after the verdict

16   and everything, because it didn't take long for me

17   to get the verdict back.

18        The next -- I think it was the next day or

19   shortly thereafter, I contacted Miss Nunnally by

20   phone and I asked Miss Nunnally about this and she

21   -- I asked her, I basically asked her, why didn't

22   you move for a mistrial.

23        She didn't deny that the statement was said in

24   the presence of the jury.  She just stated that,

25   you know, I'm the one that told your girlfriend

57

1    about it, basically saying like, if it wasn't for

2    me, you wouldn't even know, which is true.

3        I didn't find out from Miss Nunnally, I found

4    out from Miss Whites, but when I asked her about

5    it, I was like, okay, well, why didn't you move for

6    mistrial.

7        She stated that, we only have -- we only have

8    ten days to move for a mistrial and the ten days

9    were already expired.

10        So it took that long for me to approach her

11    about this, Miss Nunnally I'm speaking of, and

12    that's when she stated that ten days were past and

13    I can't move for a mistrial, because I let the ten

14    days expire.  That's what she told me.

15        I didn't know there was a time limit on it,

16    but, I mean, at the point she's telling me this,

17    I'm like, forget ten days, why didn't you do it

18    right then, you should have known -- if you already

19    agree that it was said in front of the jury.

20        The bailiff who stated this was a older

21    bailiff, an older guy, he has white hair.  I don't

22    know his name, but I know who she's speaking of,

23    because that was the one that came over and talked

24    to her.  I remember seeing him come and talk to

25    her, but I don't know what they were talking about.

58

```
 1          The only other bailiff at that time was

 2     present was Buendo (phonetic), Mr. Buendo, and

 3     Buendo took me out the courtroom, so I know it

 4     wasn't him that made the comment to Miss Nunnally,

 5     so it had to be no one else but the other guy.

 6     That was the only other bailiff in there at that

 7     time.

 8          And, you know, I asked her about it.  She

 9     stated that the ten days -- she only had ten days

10     to do it and it had passed already.

11          I actually wrote her about it and received

12     correspondence in writing on this matter from her

13     at the same time and she basically just said the

14     same thing on her letter to me, that she could not

15     move -- unfortunately, I could not move for a

16     mistrial because of the ten-day window period and

17     this and that and, basically, it was like, ah,

18     well, I'm sorry, I didn't do it in time, you know,

19     that type of thing.

20          But in this motion I'm only saying, I'm only

21     -- the ineffective is coming in where, okay, you

22     heard this from the bailiff, you were in the

23     presence of the jury, I mean, if you're

24     representing me, why didn't you at least move for a

25     mistrial, you had grounds, if it was said in front
```

1        of the jury, if she heard, if Miss Whites heard it,

2        the jury heard it.

3            They were still in there.  The jury did not

4        leave.  We all left together.  I remember that

5        personally, because I looked at each juror before I

6        left trying to read them and see, like, okay, how

7        is this thing gonna go, and I'm looking at

8        everybody, which one is more likely to say guilty,

9        which one is more likely to say not guilty.

10           So I maintained eye contact and that was

11       something that she told me to do, so I followed her

12       instruction on that, but when you heard this

13       comment in the presence of the jurors, I mean, who

14       knows, the jury may not even have been paying

15       attention to what the bailiff was saying to her,

16       but he said it within the courtroom, where they

17       could hear.

18           There's microphones all over the courtroom.  I

19       don't know if they were on at that time, but it's

20       not like we're at a concert or something to where

21       it's quiet.

22           It's like a library in the courtroom, there's

23       not no noise, so anything that was said can be

24       heard, and the only reason why I didn't key into

25       their conversation is because, for one, it wasn't

```
 1    my business and it's behind me, so I wasn't really
 2    -- I didn't think it had anything to do with that.
 3    I didn't think it was something like that until I
 4    called and that's when I was made aware of it.
 5         I asked Miss Nunnally about it.  She stated
 6    the ten days had passed and we couldn't move for a
 7    mistrial, you know.  That's why this ground is real
 8    -- this a real short ground and that's exactly what
 9    happened.
10         THE COURT:  Any questions by the State of the
11    defendant on these issues?
12         MS. OPSAHL:  No, Your Honor.
13         THE COURT:  All right.  Your next issue,
14    Mr. Roland, is number -- ground six, trial counsel
15    was ineffective for failing to subject the
16    prosecution's case to a meaningful adversarial
17    testing by raising a misidentification defense
18    rather than arguing the facts provided by the
19    defendant, which would have created a reasonable
20    hypothesis of innocence that was not inconsistent
21    with any of the wholly circumstantial evidence
22    presented by the prosecution.
23         All right.  Now, I read your motion, which you
24    say was based upon the State's theory of
25    circumstantial evidence supporting a guilty finding
```

1      and that you feel that this was inconsistent with

2      other evidence.

3           And what is it you're saying that

4      Miss Nunnally did that was deficient?

5           THE DEFENDANT:  Your Honor, once again, this

6      is another ground.  I'm gonna read it right quick.

7      I'll read it in silence and --

8           THE COURT:  Well, if what you're telling me is

9      what's in the motion, I'll read that.

10          THE DEFENDANT:  No, it's in the motion.

11          THE COURT:  So that's what you're relying

12     upon?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  All right.  Thank you.  Does the

15     State have any questions of Mr. Roland on ground

16     number six?

17          MS. OPSAHL:  No, Your Honor.

18          THE COURT:  All right.  Then with that, we're

19     gonna take a brief recess, Mr. Roland, give us all

20     a break and then I'll hear from the State and your

21     witness.

22          We'll take 15 minutes, come back at 10:30.

23     We'll begin at that time.  Stand in recess 15

24     minutes.

25          THE BAILIFF:  All rise.

```
 1              (THEREUPON, there was a brief recess.)

 2          THE COURT:  Judge Nichols, if you'd like to

 3      sit right around in here somewhere.  That way you

 4      can see.  Judge Nichols is just gonna sit a little

 5      bit on this hearing.

 6          All right.  The State is now present, the

 7      defendant is now present.  I've been advised that

 8      witness, Miss Whites, who just recently testified,

 9      needs to leave for work.

10          Is that okay with you, Mr. Roland?

11          THE DEFENDANT:  Yes, sir, Your Honor, as long

12      --

13          THE COURT:  Okay, Miss Whites, you're free to

14      go.  All right.  Now, we've gone through ground

15      numbers one through six of the motion.

16          Is there anything else that you'd like to

17      bring up at this time before we turn to the State,

18      Mr. Roland?

19          THE DEFENDANT:  There's one more ground.

20          THE COURT:  What's that?

21          THE DEFENDANT:  On the motion.

22          THE COURT:  Right.  I believe, if I'm not

23      mistaken, that was a cumulative error suggestion?

24          THE DEFENDANT:  I think so.

25          THE COURT:  The way I deal with that,
```

1          Mr. Roland, if there is a showing of a basis for me

2      to sustain any of the grounds that you have

3      mentioned, I'll then consider that, but, of course,

4      if I find none of those grounds show it, then

5      there's no need for me to consider ground number

6      seven.

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  So I'll really base that upon what

9      you've set forth in your motion.

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Anything else?

12         THE DEFENDANT:  No, sir.

13         THE COURT:  Thank you.  Then with that, State,

14     if you'd like to present your witness.

15         MS. OPSAHL:  Yes, Your Honor.  State would

16     call Regina Nunnally.

17         THE COURT:  Miss Nunnally, please step up, be

18     sworn.

19         THE CLERK:  Do you swear or affirm that the

20     testimony you're about to give is the truth, the

21     whole truth and nothing but truth, so help you God?

22         MS. NUNNALLY:  I do.

23         THE COURT:  Miss Nunnally, please have a seat

24     up here in the witness stand.  The witness has been

25     sworn.  Can you see the witness, Mr. Roland?

64

```
1                THE DEFENDANT:  Yes, sir.

2                THE COURT:  Okay.  Good.  You may proceed,

3        State.

4   THEREUPON,

5                          REGINA NUNNALLY

6   was called as a witness and, having been duly sworn by

7   the Clerk of Court, testified upon her oath as follows:

8                        DIRECT EXAMINATION

9   BY MS. OPSAHL:

10       Q     Could you state your name, please.

11       A     Regina Nunnally.

12       Q     Where are you employed?

13       A     I'm employed with the Public Defender's Office

14   here in Bunnell, Florida.

15       Q     And how long have you been an attorney?

16       A     I've been licensed, I believe, since April of

17   2003, worked with the Public Defender's Office since

18   September of 2003.

19       Q     And so since 2003, you had approximately how

20   many cases involving criminal defense?  Thousands?

21       A     In the thousands, yes.

22       Q     And did you have an opportunity to represent

23   Jaquez Roland?

24       A     Yes, ma'am.

25       Q     And did you represent him the entire time when
```

```
 1   his case was pending?

 2        A    Yes, ma'am.

 3        Q    And at some point during trial did you have a

 4   conversation, prior to trial or during trial, about

 5   whether or not he would testify on his own behalf?

 6        A    Yes, ma'am.

 7        Q    Okay.  Did you ever tell him that the jury

 8   would find out the specifics and the nature of his prior

 9   offenses if he were to take the stand?

10        A    I never told him that.

11        Q    What did you tell him?

12        A    Normally I tell my clients if they want to

13   take the stand, if they have convictions, that that

14   would come out in trial, they would have to testify as

15   to how many convictions that they have, and if for

16   whatever reason, if they have a problem with -- there's

17   some inconsistency about how many they have or they

18   don't know or they open that door then the prosecution

19   can bring up the nature of their convictions, and that's

20   what I told Mr. Roland.

21        Q    Okay.  And as far as Mr. Roland's alibi

22   witness that he testified to --

23             THE COURT:  Let me just, if I may just hold

24        that for just one moment, please.  If I might just

25        inquire.
```

```
 1              Are you saying that you did advise the
 2        defendant of the danger that the underlying offense
 3        might be revealed, I'm sorry, the previous offense
 4        might be revealed?
 5              MS. NUNNALLY:  If he were to testify
 6        differently from the record, it could come out.  I
 7        just -- I warn my clients that all the time, that
 8        if they're gonna take the stand, they need to know
 9        what they're talking about and they need to know
10        how many convictions.
11              You can't get up there and start wavering
12        about what you have, because that can open a door
13        for the State to come in and then question you
14        about not only the convictions, but the nature of
15        the convictions.
16              So I do that as a warning, to let them know
17        that they need to know how many convictions,
18        because other than that, it stops there.
19              If they're accurate about the number they have
20        then it stops right there, unless they say
21        something more.  So that's my normal routine and
22        that's what I would tell him.
23              THE COURT:  Thank you.  Go ahead, State.
24  BY MS. OPSAHL:
25        Q    The alibi witness, I believe Mr. Barker, did
```

1    Mr. Roland advise you of the identity of this person?

2        A    He did.

3        Q    Did you try to find him?

4        A    We did.

5        Q    And did you refer this to an investigator in

6    your office?

7        A    I did.

8        Q    And were you able to locate him and was he

9    cooperative?

10       A    Based on my investigator, he attempted to

11   contact Mr. Barker on several occasions and was not --

12   was unsuccessful.

13           MS. OPSAHL:  May I approach, Your Honor?

14           THE COURT:  Yes.

15           MS. OPSAHL:  And I don't have these marked.

16       I'm sorry.

17   BY MS. OPSAHL:

18       Q    I'm gonna show you what's gonna be marked as

19   Composite Exhibit A for identification, one and two, and

20   tell me if you recognize those documents.

21       A    I do.

22       Q    And what do you recognize them as?

23       A    They are -- one is an investigator referral,

24   that is a document that's on our Stack Program that we

25   generate, and the other document is the report that my

 1   investigator gave back to me.

 2        Q    Are those a fair and accurate representation

 3   of the referral regarding this alibi witness and the

 4   report back from your investigator?

 5        A    Yes, ma'am.

 6             MS. OPSAHL:  At this time, Your Honor, I'd ask

 7        to move into evidence what's been marked as State's

 8        A, one and two, as Exhibit 1.

 9             THE COURT:  Do you have copies for the

10        defendant?

11             MS. OPSAHL:  I do not, Your Honor.

12             THE COURT:  Mr. Roland, the State will hand

13        you a copy of the item being offered in evidence,

14        two pages.  Take a look at those.

15             THE DEFENDANT:  Yeah, I see this.  This has

16        nothing to do with my brother.

17             THE COURT:  Well, just you can talk about that

18        later, but you have seen the exhibits?

19             THE DEFENDANT:  I have those, but those are

20        not -- that -- the victim in that case is not even

21        a part of this case.

22             I've seen another victim's whole name on here.

23        That's why I'm saying.  What I'm saying, I had

24        that, but that's not a part of this robbery case at

25        all.

1           THE COURT:  So you're saying, you have seen a

2       copy of this document?

3           THE DEFENDANT:  Those two documents, yes.

4           THE COURT:  Any objection to it?

5           THE DEFENDANT:  Yes.

6           THE COURT:  What's your objection?

7           THE DEFENDANT:  My objection is they have no

8       relevance to the case at point right now.

9           THE COURT:  Okay.  Let me just see the

10      documents for a moment, Madam Clerk.  Okay.  Thank

11      you.  The Court will overrule the objection.  I

12      will admit the composite exhibit as number one for

13      the State, two pages.

14          Okay.  You may proceed, State.

15  BY MS. OPSAHL:

16      Q   And as far as ground three, the defendant

17  raises the allegation that you were ineffective in

18  failing to object to the law enforcement officer's

19  testimony that his DL photo matched the surveillance

20  video.

21          Who is Patty Smith?

22      A   Patty Smith, my understanding, was a friend of

23  Mr. Roland's girlfriend and the -- there was actually

24  about three -- about two more cases that was

25  simultaneously going on and the ex-girlfriend and him

```
 1   were having issues and apparently Patty Smith knew him

 2   through Shaudrea Brooks, and she had a case, a burglary

 3   case, that was going on simultaneously with that, so

 4   that's my understanding, that Patty Smith was a friend

 5   of Shaundrea Brooks.

 6       Q     And Patty Smith knew the defendant, had seen

 7   him before and would recognize him?

 8       A     Uh-huh.  Yes, ma'am.

 9       Q     And did she view the surveillance video from

10   the Burger King that day?

11       A     Based on my investigation, that's what she

12   told my investigator, that she did.  I think I might

13   have taken her deposition, cause I took depositions in

14   all these cases.

15           So, yeah, she said she saw the video.  She

16   wasn't there when he showed up at the Burger King, and

17   the police showed her the video and she was able to say,

18   yeah, that's Quez.

19       Q     So she identified him from that same video

20   having prior knowledge of his identity?

21       A     Yes, ma'am.

22       Q     And let me ask you, did law enforcement lose

23   this video or did Burger King not have it anymore?

24       A     Well, Burger King, apparently, it was ruled

25   that Burger King -- it was Burger King's fault, cause I
```

1    did file a motion either in limine to keep the talk of

2    the video out, because we didn't have that.

3         And so what happened was, the video was viewed

4    by law enforcement, but Burger King, apparently, was

5    working with some other agency that would record and it

6    was lost before police could get it.

7         So, yeah, it was ruled that it was Burger

8    King's issue, not a police issue.

9         Q    So the video was viewed by law enforcement, we

10   just didn't have a copy of it by the time the trial or

11   discovery started?

12        A    Right.

13        Q    Is that fair?  Okay.  And you did file a

14   motion in limine objecting to any mention of the video

15   or what was in the video?

16        A    Uh-huh, identification, yes.

17        Q    And it was ruled that that was admissible

18   evidence?

19        A    Yes, ma'am.

20        Q    Now, ground four is alleged that you were

21   ineffective for failing to object to improper comments

22   by the Assistant State Attorney during closing, and this

23   is in reference to the skin color of the defendant and

24   the description given by the witnesses.

25        Did you in fact make the argument in closing

72

```
 1   that the description didn't match the defendant's?

 2        A    Yes, ma'am.

 3        Q    And did you cross-examine that witness on that

 4   as well?

 5        A    I did.

 6        Q    Now, ground five is failing to move for a

 7   mistrial when the jury overheard an inappropriate

 8   comment.  This is in regards to what the bailiff said.

 9   Tell us what happened.

10        A    Okay.  During the testimony of the victim at

11   Sharps Liquor Store, prosecution played the video of

12   that particular incident.

13             I was not sitting with Mr. -- with Mr. Roland

14   at the time, I was sitting at the -- behind the

15   prosecution's table during their direct with the alleged

16   victim, and it was after that particular testimony, and

17   I believe it was Deputy O'Leary, he came up to me and

18   whispered in my ear, he said, I saw Mr. Roland at the

19   table and he dropped his head, and he said it looked

20   like he was wiping a tear, wiping his face, and he said

21   to me, he said, I just wanted to let you know that,

22   because the jury can take that as guilt.

23        Q    Okay.

24        A    I had a conversation with his girlfriend.  She

25   didn't come to me.  I told her what the officer told me.
```

1    I believe I told Mr. Roland, but if I didn't, I would

2    have told him like, you know, be careful what you do at

3    the table, don't make any -- don't do anything or say

4    anything, you know, just keep a poker face, straight

5    face, all the way through it, but I told her about it.

6         I know that.  She didn't come to me and ask me

7    anything.  She wasn't even standing near me when the

8    officer came to me about that.  She was sitting out in

9    the audience.

10        Q    Now, was this in earshot of the jury?  Was the

11   jury in the room when this comment was made?

12        A    You know, I can't be a hundred percent about

13   that, but I can say this, he talked to me personally, he

14   didn't say it in front of the jury.  He didn't say it

15   loud enough for anybody to hear.  He wouldn't want

16   anybody to hear it.  He came and told me.

17        Q    Now, let me ask you in your, I think, 2003,

18   right, 12 years' being with the Public Defender's

19   Office, you've conducted jury trials, right?

20        A    Yes, ma'am.

21        Q    Represented defendants who were in custody,

22   right?

23        A    Yes, ma'am.

24        Q    And is it common practice or have you ever

25   seen a defendant being transported out of the courtroom

74

1    in front of the jury when he's in custody by an officer?

2        A    Never.  That would be prejudicial.

3            THE COURT:  I'm sorry, I did not hear that,

4        Miss Nunnally.

5            MS. NUNNALLY:  I said never.

6            THE COURT:  Never?

7            THE DEFENDANT:  When you're in front of the

8        jury, they don't -- the police officers don't

9        escort my client in and out.  That would be

10       considered prejudicial on his part.

11   BY MS. OPSAHL:

12       Q    And ground six is, you know, kind of a

13   catchall, just that you were ineffective in the defense

14   that you decided to present.

15           The defense for Mr. Roland that you felt

16   strategically was the best defense would be

17   misidentification?

18       A    Yes.

19       Q    And was there any other defense that he told

20   you about or asked you about or requested that you

21   present to a jury?

22       A    No.

23           MS. OPSAHL:  Nothing further.

24           THE COURT:  Mr. Roland, the Court has now

25       heard the direct testimony of Attorney Nunnally.

1      You have the right to ask her questions if you

2      would like about any of these issues.  You may

3      proceed.

4          THE DEFENDANT:  Yes.

5                        CROSS-EXAMINATION

6  BY THE DEFENDANT:

7      Q    How you doing, Miss Nunnally?

8      A    I'm doing fine, Mr. Roland.

9      Q    Long time no see.

10      A    Uh-huh.

11      Q    Okay.  We're gonna start from number one.  Do

12  you remember me advising you that I wanted to testify on

13  my behalf?

14      A    Really I don't, but I know we talked about it.

15  I know we talked about you wanting to -- wanting or

16  testifying and I just advised you as to, you know, what

17  your testimony should be and, you know, the dangers that

18  you open yourself up to, but I left that up to you.

19      Q    Hold on a minute.  You don't recollect at all,

20  I mean, months prior to trial, bond hearing after bond

21  hearing, that me testifying would be the best strategy

22  for us due to the fact that it was misidentification?

23          You don't remember any of that?  You don't

24  remember talking to me the night before, coming to the

25  jail to see me?

```
 1        A    I had your case for 17 months.  I know we -- I

 2   went to the jail and spoke to you about the case, about

 3   the witnesses, about testimony and you did not -- your

 4   testimony was that you went jogging up to the Burger

 5   King.

 6        Q    Jogging?

 7        A    Yeah.  That's what you told me.

 8        Q    Oh, yeah, yeah, yeah.

 9        A    You told me you went jogging to the Burger

10   King and you asked for --

11        Q    Hold on.  Hold on.  Hold on.

12        A    Let me finish.

13             THE COURT:  Mr. Roland, you got to let her

14        finish.  All right?

15             MS. NUNNALLY:  You told me that you went

16        jogging, that you went to the Burger King, you

17        asked for Patty Smith, she wasn't there.  Okay?

18        You asked for a cup of water, you used the phone,

19        some people came and you left.

20             That was all you told me.  And I told you,

21        they already established that you were at the

22        Burger King, why you gonna get up there and put

23        yourself there.

24             Your argument was misidentification.  I didn't

25        want you to put yourself there.  That was our
```

77

1       strategy.  So you testifying, of course, would not

2       have been in your best interest, cause you would

3       have put yourself at the place you claim you wasn't

4       there.

5    BY THE DEFENDANT:

6       Q    Okay.  First of all, Miss Nunnally, I never

7    claimed I was not there.  I told you I jogged from my

8    car to the Burger King.

9            Why would I say I'm not there?  How could I

10   not be there if I'm telling you that I jogged from my

11   car?  You just testified to that.

12           Now, I don't know where you saying I'm not

13   there and you told me all this.  All I'm -- I'm only

14   concerned with this one ground right now and I'm saying

15   that, I told you multiple times that I wanted to

16   testify, up until the night before, when you came to

17   interview me, and now you're saying here you don't

18   remember telling me.

19           One, you didn't only tell me not to testify,

20   and I wish Miss Whites was still here, because you told

21   her to tell me not to testify the day of trial.  When it

22   came to that point, you was like, tell him, but she's

23   not here, we're not even gonna go that route, but I'm

24   telling you, because I know what you told me.

25           I asked you this hundreds of times.  The

78

1    reason why I kept asking you that is cause, for one, you

2    never called none of my -- we'll get into that later,

3    but I kept asking you and you specifically told me the

4    day of trial, when you grabbed me -- you don't remember

5    grabbing me and pulling me to you?

6        A    No.

7        Q    That's on camera.  It will show that.

8             THE COURT:  Mr. Roland, you can't argue with

9        her.  Just ask her a question.  Okay?  Go ahead.

10            THE DEFENDANT:  Yes, sir.  I'm sorry.

11            THE COURT:  What's your question?  I mean, I

12       understand your point.  You say that you did say

13       you wanted to testify.  The witness has now said

14       that she advised you against testifying.

15            THE DEFENDANT:  She advised -- every time I

16       asked her to testify, she advised me against it,

17       but this particular day of trial, you advised me

18       that if I did take the stand that they will open up

19       my priors and compare a burglary to a robbery.

20            MS. NUNNALLY:  May I comment?  Is that okay?

21            THE COURT:  Go ahead, Miss Nunnally.

22            MS. NUNNALLY:  All right.  Just based on what

23       you said, you said multiple times you asked me you

24       want to testify and I said no.  If I told you no, I

25       would have told you why.

1           THE DEFENDANT:  You did.

2           MS. NUNNALLY:  Okay.  And what we talked about

3       were the dangers that you can have when you get up

4       and testify, but I also told you that it didn't

5       make sense for you to testify when your whole --

6       your whole thing is, I wasn't at the Burger King.

7           I said, why would you put yourself there.  If

8       you're claiming that that wasn't you, they've lost

9       the video, everybody is pointing you there, it

10      makes no sense for you to put yourself there.  That

11      would not be in your best interest.

12          I said, you don't want to do that.  That was

13      my -- that's how I saw it.  That's the way I

14      approached it.  I know I told you about it, and if

15      you wanted to testify, I most likely told you again

16      how I felt and then you made the choice not to.

17          THE DEFENDANT:  Okay.

18          MS. NUNNALLY:  But the story you told me was

19      not the story about you breaking down the car and

20      pushing the car.  None of that came up.  I don't

21      remember any of that.  That right there was never

22      told to me.

23  BY THE DEFENDANT:

24      Q    Okay.  So what you're saying is, I basically

25  told you I wasn't ever at the Burger King?

1      A     No.  You told me you ran up to the Burger

2    King, you jogged and you went to the Burger King.  All

3    this other stuff about car breaking down, you didn't

4    drive a car, you ran, about your friends breaking down

5    at the Burger King, you ran to the Burger King.  All

6    that stuff was news to me.

7           When Miss Opsahl told me about that in that

8    motion, I looked at her like, he ain't never told me

9    that, that wasn't his story.

10     Q    Miss Nunnally, okay, all I'm asking --

11          THE COURT:  I think you pretty well covered

12      that.  I understand your difference.  Okay?  Is

13      there anything more you want to say about it?

14          THE DEFENDANT:  I mean --

15          THE COURT:  If not, let's move on to number

16      two.

17          THE DEFENDANT:  We can move on, Your Honor.

18          THE COURT:  I'm sorry?

19          THE DEFENDANT:  That's fine.

20          THE COURT:  That's fine.  Okay.

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Number two is we're dealing with

23      the issue of the alibi witness that you mentioned.

24      You want to ask her any questions about that?

25      Mr. Barker, I believe it was.

```
 1              THE DEFENDANT:  Yes.

 2   BY THE DEFENDANT:

 3       Q    Miss Nunnally, do you recall me asking you to

 4   send your investigators out and asking you why you never

 5   depo'd my brother, Mr. Barker?

 6       A    Okay.  Caleb Barker was your brother.

 7       Q    Yes, ma'am.

 8       A    I did do an investigation referral.  May I

 9   refer to it?

10              THE COURT:  Yes, you may.

11              MS. NUNNALLY:  Okay.

12              THE COURT:  Can we have the exhibit, please,

13         Madam Clerk.  This is Exhibit Number 1.

14              MS. NUNNALLY:  Okay.  I did the investigative

15         referral on May 11th.

16              THE COURT:  What year is that, Miss Nunnally?

17              MS. NUNNALLY:  2012.

18              THE COURT:  Thank you.

19              MS. NUNNALLY:  In the investigative referral,

20         I asked my investigator, contact Caleb Barker, your

21         brother, at 11-B Service Tree Place and I gave him

22         two numbers, to find out from him if he went to the

23         Burger King on the corner of 100, Old Kings, to

24         pick you up.

25
```

1    BY THE DEFENDANT:

2        Q    And what numbers were those?

3        A    338-8449, 265-7576.  Along with that, it also

4    involves Shaudrea Brooks, also contact Patty Smith,

5    employee at Burger King.

6             And then his response was, the rider attempted

7    to make contact with Caleb Barker several times, which

8    met with negative results.

9             So I had my investigator contact Caleb Barker,

10   number one.  Number two, I don't depose our witnesses.

11   I depose only State witnesses.

12       Q    Okay.  Okay.  I don't ever remember you

13   telling me you -- this is new news to me, that you --

14   when your investigator made contact with him, what

15   happened, was it to no avail, he called, cause do you

16   realize that 265-7576 is my phone number, wasn't

17   Caleb's?

18            Only the 844 line was his.  Those are two

19   separate cell phones.  So why would your investigator

20   call me if he wants to interview my brother or

21   investigate him?

22       A    Those are the two numbers you gave me.

23       Q    I didn't give you -- I gave you my address.

24       A    Which I put in my referral.

25       Q    Okay.  I gave you my brother's number.  To my

1    knowledge, to this day, I never ever heard of you even

2    attempting to at least look for my brother.  This is all

3    new news to me.  You've never even attempted and we're

4    talking 17 months here.

5         A    Okay.

6         Q    You mean out of that whole 17 months, you

7    never once -- I mean, I can get in touch with my

8    brother, why couldn't your investigator?

9              We know where he worked, we know where he

10   lived and we knew his phone number.

11             THE COURT:  Mr. Roland, Mr. Roland, you might

12        want to save that for your argument.  Okay?

13             THE DEFENDANT:  Okay.

14             THE COURT:  I understand your position, but

15        what you want to do now is focus on asking a

16        question.  If you have a question, go right ahead.

17             THE DEFENDANT:  Yes, sir.

18   BY THE DEFENDANT:

19        Q    Do you -- is it -- is it ordinary for you when

20   you representing someone and they tell you that they

21   want you to call a witness for them, is it ordinary for

22   you to give your like judgment on whether or not that

23   witness should be called on their behalf, whether it be

24   a family member or friend or someone they don't even

25   know?

84

1      A      Based on what they say.

2      Q      Based on what they say?

3      A      And based on what, in this situation, we --

4  let me backtrack.  Based on your motion, you said he was

5  an alibi.  My standard procedure is to disclose that to

6  the State Attorney as a alibi witness.  We didn't do

7  that because he wasn't an alibi.

8              THE COURT:  Who is he?

9              MS. NUNNALLY:  Caleb Barker.  My

10             understanding, based on what Mr. Roland told me,

11             that Mr. Barker was asleep and he went and ran,

12             took a run.

13             Caleb wouldn't know where you were, wouldn't

14             know what you were doing, you know, during that

15             time, cause he was at home and he was asleep, so

16             that's based on what you told me, Mr. Roland.

17             So Mr. Barker wouldn't have been a alibi as to

18             what you were doing when you left the house, and my

19             understanding, he came home, went to sleep, you

20             went, took a run, went to Burger King and we

21             already talked about that.

22             So Caleb Barker was never considered an alibi

23             witness based on what you told me, but I still made

24             an effort to contact him, and based on what I wrote

25             here, apparently you said something about him

85

1          picking you up from the Burger King.

2              So, I mean, we had this case for 17 months and

3          Mr. Barker, my investigators would leave their

4          information, leave a card and Mr. Barker never

5          contacted my office.

6              So I don't know -- I don't know what else to

7          say, but if a witness says something that's not

8          favorable or the witness may say something that was

9          not gonna help you, then, yes, I'll advise you that

10         witness is not proper.

11             If they say something that's gonna help you or

12         they say something that's going to make a

13         difference, then, yes, I would call that person as

14         a witness.

15     BY THE DEFENDANT:

16         Q     Are you aware that the State, not only the

17     State, but the detectives for the Flagler Sheriff's

18     Office, contacted my brother and made contact every

19     time?

20         A     No.

21         Q     You're not aware of that, are you?

22         A     So --

23         Q     What I'm saying is, I don't see -- how could

24     the State and sheriff's office make contact with my

25     brother and you couldn't?

86

```
 1      A    I can't answer that.  I can only tell you what
 2  my investigator did.
 3      Q    They had the same information that you have,
 4  the same phone number, the same address.  It was -- I
 5  mean, I knew the State would try to reach out to him
 6  just due to the fact that he was actually a part of the
 7  case, so they had no problem reaching him.
 8           I don't know what happened, what you told
 9  them, but every time I asked my brother did he hear from
10  you, he said, no, no, what lawyer do you have, what
11  lawyer do you have, no, I heard from this guy.
12           There was the original prosecutor, I can't
13  remember his name, he left.  I don't know if you
14  remember the first prosecutor we had before Mr. Price
15  came on.  He left and went to St. Augustine to be a
16  private attorney.
17           What was his name, kind of heavyset guy?
18           THE COURT:  What about that, Mr. Roland?
19      What's your point?
20  BY THE DEFENDANT:
21      Q    He made contact, but she's saying -- you're
22  saying, you never made contact in 17 months, nor did
23  your investigator.
24           Miss Nunnally, if I knew you never made
25  contact with my brother, why would I keep asking you to
```

1   call him?

2        A    You did not -- you did not tell me, you did

3   not say that, oh, my brother is waiting around.  If

4   you're talking to him then it make sense for you to tell

5   him to contact me, cause my lawyer is trying to contact

6   you, then you would tell him to contact me.

7             I never got any information from Mr. Barker.

8   I never did.

9        Q    The reason for that is because every time I

10  brung his name up, you told me, oh, the jury wouldn't

11  think this or this is your brother.

12       A    I never said that.

13       Q    Oh, my gosh.  Okay.

14            THE COURT:  Mr. Roland, I'll move on.  If you

15       cannot be --

16            THE DEFENDANT:  What am I doing wrong, Your

17       Honor?

18            THE COURT:  Here's what you're doing wrong.

19       You're rolling your eyes, you're arguing with the

20       witness.  That's not allowed.

21            I'll let you ask a question, but you don't

22       make comments about it.  All right?  So what's your

23       question?  You've made your point that you disagree

24       with her over that.

25            THE DEFENDANT:  This is why I asked you for

1        counsel.

2              THE COURT:  You're doing fine, but you got to

3        stop arguing with the witness.  Ask your question.

4              THE DEFENDANT:  Okay.

5   BY THE DEFENDANT:

6        Q    So you're saying -- so you're saying,

7   Miss Nunnally, at no point I never made it known to you

8   that I wanted you to call my brother as a alibi witness?

9              Regardless of what factors or you think you

10  may have heard or not heard, you're sitting here saying

11  that I never out of that whole time you represented me

12  called my brother as a witness and made it known to you?

13             You're saying I jogged to the Burger King.

14  Yes, I did, because my car broke down at the BP gas

15  station.  You don't remember that?  I drove a black 2000

16  Impala.

17       A    You didn't tell me about -- your story was not

18  that.  You told me about your brother.  Your brother's

19  information was in there.

20             If you didn't tell me about him, I wouldn't

21  have made an investigative referral to go look for him,

22  so we had to have talked about it, but if I hadn't any

23  information from him, I can't list him as any witness,

24  cause I don't know what he's going to say, and at this

25  point he was not an alibi witness, because you never

89

```
1    said that he saw you leave the house, he knew where you

2    were.  That was never told to me.

3         Q    But you just testified that I told you, he was

4    home, he went to sleep.  You just said that.  So now

5    you're saying that I never told you he saw me leave the

6    house.

7               Which one is it?

8         A    You said he came home, he went to sleep and

9    after he went to sleep, you went and took a run, and

10   here's what you have to understand a alibi witness is.

11   An alibi witness is an individual that knows exactly

12   what you did at a certain period of time.

13              If you -- if he went to sleep and you went and

14   ran and you went to Burger King, he can't attest what

15   you did when you left the house.  He can't talk about

16   what happened at that point in time.  He couldn't, he

17   was asleep, you were gone.

18        Q    Miss Nunnally --

19        A    That's my opinion.  That's how I felt at the

20   time.

21        Q    Right, it's your opinion, but I know what I

22   told you.

23              MS. OPSAHL:  Objection, he's testifying, Your

24        Honor.

25              THE COURT:  Mr. Roland, Mr. Roland, again,
```

1          focus on a question, okay, not what your argument

2          is.  What is your question of her?

3              THE DEFENDANT:  Can I say one thing, Your

4          Honor?

5              THE COURT:  What do you want to say?

6              THE DEFENDANT:  I understand what you're

7          telling me.  I'm trying so hard to stay in those

8          lines out of respect to the Court, but the same

9          thing you're telling me to do she's not doing.

10             THE COURT:  No.  Mr. Roland, here's the way

11         we're gonna proceed now.  She's a witness.  You're

12         now asking her questions.  At the point that you're

13         done asking her questions and you want to say

14         something more, I'll be happy to hear you then, but

15         not now.  You can't be testifying while you're

16         asking questions.

17             THE DEFENDANT:  Well, I mean, I'm asking her

18         questions and she's going to a hundred different

19         things and I don't want to just be ruling, oh, I

20         didn't ask you that question, cause you're saying

21         don't argue with her.

22             THE COURT:  So far she's answered every one of

23         your questions.

24             THE DEFENDANT:  Okay.

25             THE COURT:  I'm not sure what you're concerned

1      about.  You want to ask a question, she's answered
2      it.  That's okay.
3          THE DEFENDANT:  When I ask a question --
4          THE COURT:  What you can't do is argue with
5      her.  You can't do that.
6          THE DEFENDANT:  Can't go back and forth type.
7          THE COURT:  No.  What you can do is ask her a
8      question, and after she's done, if you want to be
9      heard again on some points, I'll be glad to hear
10     you.  Okay?
11         THE DEFENDANT:  Yes, sir.
12         THE COURT:  What's your next question?  We're
13     talking about Barker.  Anything else you have on
14     that?
15         THE DEFENDANT:  So she's saying --
16     (unintelligible).
17  BY THE DEFENDANT:
18     Q    Miss Nunnally, were you aware that when this
19  robbery took place at Burger King, the number, one of
20  the numbers called from Burger King was my brother?
21         Were you aware of that?  Were you ever aware
22  of that?
23     A    The 407 number?
24     Q    No.  No, ma'am, the 386-8449.  Were you aware
25  that that was my brother's phone, that that number, his

1   number, was actually called from the Burger King?

2        A    I mean, probably, if it matches up, yes.

3        Q    Probably, I mean, did you ever look into the

4   information that was in the discovery, the police

5   report, prior to me telling you this or you sending,

6   making your referral for an investigation?

7        A    When I met you at the jail, it was two days

8   after the arraignment.  I sent you copies of your

9   discovery soon thereafter.  I went to the jail and we

10  would discuss the discovery.

11            And so we most likely would have talked about

12  everything in there and you would have brought that to

13  my attention.  Probably that's part of -- another reason

14  why I did the investigative referral, to find out

15  Caleb's side of the story.

16       Q    Okay.

17       A    So I don't -- okay.

18       Q    What I'm asking you is, did you ever -- did

19  you ever review the contents of the paperwork prior --

20  prior to trial?

21       A    What paper?

22       Q    The discovery, the police report, anything

23  revolving around the fact that I made a phone call from

24  Burger King to my brother.

25       A    Yes.

1      Q      You did.  Okay.  Okay.  So then you -- you're

2    saying, okay, so I guess you're saying that you had

3    knowledge that he was in some shape or form a part of

4    the case?

5      A      You told me you called -- I believe you said

6    you called your brother and he didn't answer.

7      Q      I'm not talking about me, what I told you.

8    I'm asking you, did you review the contents?

9      A      I did.  I did.

10     Q      Okay.  So you knew that my brother had

11   something to do with this in some shape or form,

12   correct?

13     A      I don't understand your question.

14     Q      If you're saying -- you're saying you reviewed

15   everything and you see that his number was called and I

16   apparently made that number -- that call from the Burger

17   King, along with my own phone number, that would then --

18   if you reviewed it, you would have knew that, so you

19   would have knew my brother had something to do with this

20   in some shape or form.  That's what I'm asking you.

21            Did you know of my brother's involvement prior

22   to you speaking to me, to me letting you know?  Did you

23   review it on your own?  Did you even look at the

24   paperwork that you were given?

25     A      I said, yes, I looked -- I reviewed the

1    paperwork.  I reviewed it with you.

2         Q    And you never made that connection, cause it

3    says black and white that the detectives went and they

4    ran the Burger King's phone records and they came back

5    this line belongs to Caleb Barker and this line belongs

6    to Jaquez Roland.

7         So what I'm trying to -- what I'm trying to

8    ask you, I might not be asking it the right way.

9         A    Okay.

10        Q    I'm just trying to -- trying to stipulate if

11   you knew of my brother's involvement without me telling

12   you, because you're saying that I didn't tell you and

13   then you're saying that I told you he was home asleep,

14   but what I'm saying is, okay, we got -- if you knew of

15   his involvement in any way, regardless of what I had to

16   say, it was still your duty to call him in, because he

17   was almost a suspect.

18        Originally I think he was, until they figured

19   out through Patty Smith that he wasn't on the Burger

20   King tape, because they thought he was someone else, and

21   I had that in depositions, I had that in -- it's all in

22   black and white.

23        So what I'm saying is like, did you not know

24   of his involvement, cause from the questions I've asked

25   you, you act like you didn't know of his involvement

1   until I told you?

2        A    I don't understand what you mean involvement.

3   He was --

4        Q    Meaning his --

5        A    Involvement in what?

6        Q    Involvement meaning involved some sort of way,

7   involved due to the fact that I made a call from Burger

8   King to him.  That involved him right there.  He was

9   involved.

10           Meaning -- okay, and my next question is, once

11   -- that's why I had asked you that first, depending on

12   how you answer is gonna determine the question I ask you

13   next.

14           So if you did, I'll answer for you, if you say

15   yes then how come you didn't take it upon yourself to

16   put -- why did I have to let you know, cause you're

17   saying I didn't let you know.

18           Well, if he's part of this case, you're saying

19   you don't depo the State's witness, but he was my

20   witnesses and I needed him for an alibi.  Whether you

21   thought he was the State's or not, he still had

22   something to do with my case, so he should have been

23   called or something.

24           You never made attempt to subpoena him.

25   You're saying you made a referral, but to -- I guess a

96

1    referral came to no avail, but to what extent.

2             Was contact ever made?  Did he speak to him?

3    You haven't said any of that and those are the questions

4    I've asked you.

5             You're just saying that, I sent my

6    investigator out and he gave me this report type thing,

7    but you never said contact was made, that my brother

8    denies speaking to you or nothing and he was a part of

9    the case.

10            So I'm just trying to -- I'm just trying to

11   find out like, how familiar are you with the fact that

12   he was originally involved with this and he should have

13   been at least depo'd and investigated, but definitely

14   when I told you to call him, there should never have

15   been a problem with that.

16            Regardless of what I had to say, you should

17   have wanted to call him in for investigation, because

18   what if the State had done it, you would have been

19   unprepared and they would have hit you with a bombshell,

20   just because you went on your opinion that you're

21   thinking, okay, he's my brother, he may just say

22   something or whatever, but that's for the jury to

23   decide, it wasn't for you to decide.

24            THE COURT:  Mr. Roland.  Mr. Roland.

25            THE DEFENDANT:  Yes, sir.

97

1           THE COURT:  I've let you go quite a while now,

2      but you understand, I've not heard a question.  I

3      believe what you're asking is, why did your lawyer

4      not depose your brother Barker.

5           Is that what you're asking?

6           THE DEFENDANT:  Yes.

7           THE COURT:  All right.  Can you answer that

8      question.  Why did you not depose the witness?

9           MS. NUNNALLY:  I only depose State witnesses.

10      I don't take depositions of our witnesses.

11           THE COURT:  And why not?

12           MS. NUNNALLY:  Because generally if I -- I

13      generally have my investigator or I'll talk to them

14      personally, because I want to find out what my

15      witnesses are gonna say.

16           If I depose them, what happens that I would

17      disclose that information to the State and then the

18      State decided to do it, they could depose them, so

19      I never depose my own witnesses.

20           That's -- we only do that with adverse

21      witnesses.  That's never been my -- never been my

22      practice.

23           THE COURT:  What's your next question,

24      Mr. Roland?  If we're done with Barker, why don't

25      we move on to the failure to object to the

```
 1          surveillance and driver's license photo issue.

 2               THE DEFENDANT:  We can.  We can, Your Honor.

 3               THE COURT:  Okay.  Now, this one, the witness

 4          has already testified that the Burger King video

 5          had been lost by Burger King.  All right.

 6               Is there anything further you want to ask her

 7          about that?

 8               THE DEFENDANT:  Yeah, just one.

 9   BY THE DEFENDANT:

10      Q    Why didn't you object?

11      A    To?

12      Q    To law enforcement giving their own opinion of

13   what was on the tape and comparing it to a driver's

14   license photo.

15      A    I'm going by my recollection that it wasn't

16   just the officer that testified.  Patty Smith, she

17   testified.  The officers had already seen the video.

18           I'm not sure they introduced the DL picture

19   into the trial, so it might have been that objection

20   wasn't warranted at the time.

21           I mean, I can only --

22      Q    It says here --

23      A    And also, just to let you know, I did a motion

24   in limine to try to keep all that information out, so

25   the State -- the judge had already overruled it, so it's
```

99

1  already been preserved, so that's another reason why I

2  most likely didn't object.

3      Q    Okay.  Well, the motion in limine -- your

4  motion in limine was in reference to the videotape

5  itself not being there, correct?

6      A    Yes.

7      Q    Okay.

8      A    And any testimony about the videotape,

9  identification, what happened on the videotape and

10  whatnot.

11      Q    Right.  But what I'm saying here and what I'm

12  asking you is, why didn't you object to the law

13  enforcement.

14          Now, see, Patty Smith, she testified as to

15  what she saw on the video, but she never testified to

16  making an identification between my driver's license

17  photo and the videotape, however, the prosecutor did and

18  that's where you should have objected, and I'm asking

19  you, why didn't you?

20      A    I guess at the time --

21      Q    There wasn't a proper predicate set for it.

22          THE COURT:  Mr. Roland, just, again, to cover

23          one issue, so you're aware of it, on May 16, 2013,

24          the Court file reflects that Miss Nunnally did file

25          a motion in limine with six paragraphs, all

```
 1          addressed to this issue of the videotape, the use

 2          of the videotape, statements made by witnesses

 3          regarding identification on the videotape, so it

 4          looks like that all was handled before trial.  She

 5          did file such a motion.

 6               Did you say, Miss Nunnally, that the motion

 7          had been denied by the judge?

 8               MS. NUNNALLY:  It was.

 9               THE COURT:  Okay.  Anything else you want to

10          say?

11               THE DEFENDANT:  Yes.

12  BY THE DEFENDANT:

13     Q    Were you aware that if you would have -- had

14  you objected, that this issue would have been preserved,

15  even though it may have -- you may have put the motion

16  in limine for the video, as to the videotape, but as to

17  the lack of the proper predicate, were you aware that if

18  you object, you would have preserved it for direct

19  appeal?

20     A    I guess, I mean, in all fairness, I could have

21  objected to a lot of things in that trial and I could

22  have objected to it, but at that point I believe it

23  wasn't necessary, so, I mean, I could have objected to

24  it.

25     Q    So are you saying --
```

1          A      And the Court could have sustained it, the

2    Court could have overruled it.  I don't know what the

3    Court would have done, but that's -- I mean, I could

4    have objected and if I didn't then, you know, the law is

5    the law, but I didn't -- from my recollection, I didn't

6    most likely object at that time cause depending on when

7    whoever testified, we had already dealt with the issue

8    of, I made my objection on the record as to the motion

9    in limine, I made my objection as to any identification

10   issue, so that's probably why I didn't, but if I didn't

11   object, I could have, I mean, there's nothing stopping

12   me to do it.

13          I can object every five minutes if I felt like

14   it was something that was relevant to do, but at the

15   time, I guess, in the heat of the trial, it wasn't the

16   case, so I can't answer it no other better way.

17          Q    So you're saying that basically you didn't

18   make an objection cause you felt that you didn't felt

19   there was anything to object as to the lack of the

20   proper predicate by the law enforcement officer?

21          A    I didn't believe there was any lack of any

22   proper predicate.  That's most likely why I didn't

23   object.

24          If that's an error, that's an error, but I

25   didn't object at the time because I didn't feel that it

1    was warranted so...

2       Q    So when -- so you don't feel it's warranted by

3    law enforcement looking at a video that you don't have

4    and then referring it to a driver's license photo and

5    using their own recollection without the jury having a

6    weight issue?

7           You don't think that's necessary or warranted?

8    You think that's minor?

9       A    That's dealing with the weight of the

10   evidence, how much weight -- hold on -- how much weight

11   the State -- the jury is going to give evidence, and

12   that was part of the problem.  That's why I did the

13   motion in limine to object to any identification

14   whatsoever.

15          The fact that it came in, the jury would have

16   to determine how much weight they gonna give testimony

17   to that, because there was no video.  We don't know

18   exactly what they saw.

19          We know there was -- matter of fact, I think

20   one person claimed they saw the person wearing a

21   different color than the other person had a different

22   color, so I was working with those kind of like tidbits

23   and trying to put it all together.

24          So in argument I would have brought that to

25   the jury's attention, about the identification, they're

1    basing this on something we don't see, we don't know, we

2    heard inconsistencies about what was on the video.  That

3    was my approach.  That's what I did.

4         Q    Okay.  Let me see.  And you've been a trial

5    attorney how long, Miss Nunnally?

6         A    Since 2003.

7         Q    Saying, roughly, about 12 years, going on 13

8    years maybe?

9         A    Maybe, yes, sir.

10        Q    Okay.  So you had -- you got experience in

11   trials, you've sat on a lot of trials over -- we're

12   talking over a decade here.  You've sat at a lot of

13   trials.  It's cool to say that you got experience in

14   this.

15        A    Uh-huh.

16        Q    Okay.  So, I mean, I don't get this.  Let me

17   ask the question this way.  Your time -- as your time

18   being a public defender and representing people, you

19   never came across a point to where an opinion was raised

20   like the facts wasn't warrant on the facts?

21             It was an opinion.  It was from law

22   enforcement's point of view.  They had nothing to weigh.

23   Is that ordinary for you to do, because you're saying

24   you usually don't object if you feel -- so basically

25   you're objecting on your feelings of whether you should

1    object or should not, whether it's in the guidelines of

2    sufficient representation for your client.

3              THE COURT:  What's your question, Mr. Roland?

4              MS. NUNNALLY:  I'm not --

5              THE DEFENDANT:  I'm sorry.

6              MS. NUNNALLY:  I'm not sure what --

7              THE DEFENDANT:  I got a little off track on

8         that one.

9              MS. NUNNALLY:  I'm not sure what he's asking.

10             THE COURT:  Mr. Roland, I'll tell you what,

11        we're just about out of time.  I'll be concluding

12        the hearing, I'll have to continue it another day,

13        unless you would like to finish this today.

14             Any other questions you have?  You pretty much

15        covered that one.  I got your drift on that one.

16        We're all the way up now to number four of your

17        seven grounds.

18             The next one was failure to object to

19        prosecutor's inappropriate comments on the evidence

20        during closing argument.

21             THE DEFENDANT:  Okay.

22             THE COURT:  Looks like that had to do with

23        physical characteristics of the perpetrator.  Did

24        you want to ask her some questions about that?

25             THE DEFENDANT:  Yes, sir.

1    BY THE DEFENDANT:

2         Q     Let me go back to this.  Same thing, it's

3    like, how come you didn't object to when Mr. Fox made

4    that comment?

5              You know the -- through the whole trial my

6    skin color was like one of his strong points out of the

7    whole --

8         A     Uh-huh.

9         Q     You even used yourself as an example to get

10   the witness to determine what different skin tones and

11   stuff the color of the perpetrator was that she saw.

12             When the prosecutor made this comment, it was

13   the exact opposite of the testimony at trial, yet you

14   didn't object.

15        A     Right.

16        Q     How come?

17        A     Why didn't I object?

18        Q     Yes, ma'am.

19        A     Well, it's argument and during the closing

20   argument sometimes, you know, the State Attorney has an

21   opportunity to argue their side of the facts and that's

22   why Mr. -- I think Mr. Fox, cause I'm not sure whether

23   he did the opening, closing, I did the middle or he did

24   the closing, the rebuttal.

25             I'm not sure which one he did, but he made --

1    he made -- he made the comment to the jury that they

2    need to rely on their own recollection, which they have

3    to, and the judge says that.  She instructs them on

4    that.

5              I didn't object because most likely either it

6    was his argument about what he thought and he said,

7    well, you rely on your own recollection on this just in

8    case he's misinterpreting it, and that's what you do.

9    There was no reason for me to object on that, on that

10   issue.  It was already dealt with.

11             So I'm not sure if I came behind him with my

12   argument to show that you and I do not -- our colors do

13   not match.  That was our whole argument.

14             So I don't know whether he did it before I did

15   my closing or after.  I don't know which sequence it

16   was, but I didn't object cause I didn't think it was

17   warranted at the time.

18        Q    So a misstatement by counsel, even if it's the

19   exact opposite of the testimony, you don't find that's

20   -- that doesn't warrant you enough to want to object,

21   when we just went through a whole trial and he's in his

22   closing and he's instructing the jury something exact

23   opposite of the testimony, that hurts me.

24             If the victim said it was a very dark-skinned

25   male, that's what the victim said, correct?

1      A     Yeah.

2      Q     I have it here if you would like me to

3  recollect your recognition.  I have it here.

4      A     It's in the record as to what she said, but

5  you have to understand, Mr. Roland, the jury is also

6  looking at you --

7      Q     I understand.

8      A     -- as well as they're looking at me and the

9  State's argument, I don't want to get into Mr. Fox's

10  head and, like I said, what he said was what he said,

11  but it all goes back to the fact that, like I said

12  before, I could have objected.  I didn't object.

13          If that's an error, the judge will pick up on

14  it, the law will let me know, but at that time me not

15  objecting to what he said, I did not see it as a

16  misstatement of the facts.  It was his characterization.

17          He didn't say that the witness said that the

18  witness looked like the victim -- the defendant looked

19  like you, said it looked like me.

20          All right.  He didn't misquote what the woman

21  said.  He just made a comment and I didn't see that as a

22  misstatement.  I didn't.

23      Q     I'm gonna ask you a question here and I'm

24  gonna refer to exactly what he said, just to --

25      A     Okay.

108

1      Q    -- so you can reflect on that.

2      A    Yeah.

3      Q    Mr. Fox:  Also Miss Nunnally wants to present

4  telling you that people were saying that this was a

5  black-skinned, a dark-skinned male, you can check your

6  own recollection on this, but I recall Mr. Bouser saying

7  that the male that he saw was not as dark as

8  Miss Nunnally, I don't have Miss Crowley saying that he

9  was dark like Miss Nunnally or that just that he was a

10  black male.

11          Do you remember that?  Does that -- I know

12  this is some time ago, you might not remember every

13  word.

14      A    No, I don't.  I wouldn't.  I'm sorry.

15      Q    It's in the record.

16      A    Okay.

17      Q    Okay.  Now, this is at trial, so what I'm

18  asking you is, how come you didn't object when just in

19  that same trial, prior to Mr. Fox closing, Miss Crowley

20  did indeed say, yes, the person fit your description,

21  because that's also on record?

22          All the witnesses said that, yes, it was a

23  very dark-skinned male that they described.  For Mr. Fox

24  to get up there and say something the exact opposite, it

25  was a misstatement.

1          That's something that you should have -- I

2     feel you should have objected to.  That's why I was

3     asking you that.

4          Whether he's doing it, it shouldn't be up to

5     what Mr. Fox is doing, and I don't want to get into

6     argument thing here, but that's why I asked you that.

7          As far as you and your recollection and your

8     experience, do you think that that's sufficient

9     representation of counsel, to rely on the State to

10    make -- you know, put their little pictures together

11    and, hey, you know, if it's the law, it's the law, we'll

12    weigh it out type of thing?

13         THE COURT:  Mr. Roland, I think you're

14         correct, you are sort of arguing your point.  I

15         think you have made your point.  I understand your

16         point.  There's probably no more need to keep

17         beating this cat.  Okay.

18         THE DEFENDANT:  I'm sorry.  I'm sorry.

19         THE COURT:  I suggest we might want to move

20         on, make good use of your time by maybe talking

21         further about the next point, which was your

22         argument that comments were made by the bailiff in

23         the presence of the jury.

24         You want to ask her any questions about that?

25         THE DEFENDANT:  Yeah.

1   BY THE DEFENDANT:

2        Q    You remember me speaking to you about this,

3   calling you at your office about this shortly after my

4   trial was over?

5        A    I don't recollect, but if we did talk, I don't

6   recollect it, but you can refresh my memory.

7        Q    You don't remember also me writing to you?  I

8   sent you a letter in reference to this as well and you

9   responded?

10       A    What was my response?

11       Q    Your response -- hold on.

12            THE DEFENDANT:  Your Honor, this response that

13       she's speaking of, it might be still in my cell in

14       the jail.  It's in an envelope.

15            THE COURT:  Doesn't do me much good, does it?

16            THE DEFENDANT:  No.  I probably just missed

17       it.

18            THE COURT:  Why don't you just go ahead and

19       ask her a question while you can.  What's your

20       question?

21   BY THE DEFENDANT:

22       Q    Miss Nunnally, I can't show you that paper

23   right now, I'm gonna move past that, but you don't

24   remember me talking to you on the phone about this,

25   asking you about how come you didn't move for a

1   mistrial?

2       A    I don't remember that conversation.  What I

3   recall is that, when the deputy on here made that

4   comment to me, he made that to me, he didn't say it out

5   loud where everybody could hear it.  I don't remember

6   that.

7            I remember talking to your girlfriend.  I made

8   that comment to her.  I recall doing that.  I might have

9   -- I don't recall telling you, but I wouldn't have moved

10  for a mistrial if it was something that was done in

11  their presence where they could hear it and he was

12  telling me in my ear that he saw you looking like you

13  showing remorse so, and he said if he saw it, maybe the

14  jury did, but I don't -- I wouldn't move for a mistrial

15  on that cause he didn't make a statement in front of the

16  jury.  That's what you're saying he did.  He didn't.  He

17  said it to me.

18      Q    Miss Nunnally, you don't remember telling me

19  on the telephone that you could not move for a mistrial

20  because the ten days had expired?

21      A    You don't do mistrials in ten days.  That's a

22  motion for a new trial.

23      Q    That's what I'm talking about.  Okay.  Well,

24  motion -- I asked you to put in a motion for a new trial

25  on that ground.

1          Do you remember telling me that for the

2   purpose of the comment made by the bailiff?  Do you

3   remember telling me that?

4       A    No.  If you asked me for a motion for new

5   trial and if it was past that time, I told you I

6   couldn't do it because it was past the time.

7          I mean, I'm just putting bits -- based on what

8   you're telling me, if it's past the time, I can't do

9   something past that time so...

10          You never asked me for a mistrial.  I don't

11   remember mistrial.  I don't remember that.

12       Q    I asked, once again, do you remember me asking

13   you to put -- you're right, to put in a motion for a new

14   trial on grounds for a mistrial because of a comment

15   made in front of the jury?

16       A    No.

17       Q    You don't remember responding, oh, I only have

18   ten days to do that and it's past the ten days?  You

19   don't remember telling me that on the phone?

20       A    You're talking about the letter and the phone.

21   Are you talking about a conversation from the letter or

22   on the phone?

23       Q    I'm talking about -- I'm talking about both,

24   cause you responded the same thing in both, but I

25   definitely, I don't have the paperwork here, but I know

113

```
 1    I talked to you and I'm asking you, do you remember

 2    telling me this?

 3        A    Not about no mistrial.  We didn't discuss

 4    about a mistrial and we didn't discuss about him making

 5    a statement in front of the jury.  That never happened.

 6    We never had that conversation.

 7             You said you talked to your girlfriend about

 8    it on the phone, but -- about it, but I don't remember

 9    no mistrial about that.

10        Q    So --

11        A    All I recall -- we did a lot of calls and

12    talking on the phone about all kind of things --

13        Q    Yes, we did.

14        A    -- so I'm sorry if I'm not specific as to

15    everything, Mr. Roland, but I do not recall you asking

16    me to do a motion to -- a motion for new trial based on

17    a mistrial, that conversation, I don't recall that.

18        Q    As you just stated, I have no knowledge -- you

19    do know I have no knowledge of this comment until I was

20    told by Miss Whites.

21             Do you understand that?

22        A    I understand that now, yes.

23        Q    Upon her telling me that, I called you.  Once

24    I was told this --

25             MS. OPSAHL:  Objection, arguing with the
```

1        witness again.

2            THE COURT:  I'll let you complete your

3        question.  What's your question?

4            THE DEFENDANT:  I'm asking, I'm trying to get

5        her to remember if she can -- well, she says no

6        already.

7            THE COURT:  She's already said she doesn't

8        remember.

9            THE DEFENDANT:  She doesn't remember.

10           THE COURT:  What's your next question?

11           THE DEFENDANT:  Let me see.  Okay.  If she

12       says she doesn't remember, it's just gonna go on

13       and on.  I know I talked to her about it, but she's

14       saying she doesn't remember.  She doesn't remember

15       anything, so I'll move past that, Your Honor.

16           THE COURT:  All right.  Now, the defendant

17       indicates that he asked the attorney to file a

18       post-trial motion for mistrial.

19           Is that what you're saying?

20           THE DEFENDANT:  I was saying mistrial.  I want

21       her to -- maybe I told her to put in the wrong

22       thing, but it was because of that error, Your

23       Honor, and I told her to move for a mistrial.  I

24       put in a motion for a new trial.

25           I think she asked me, she was like, well, for

```
 1        what.  I was like, because this was said in front
 2        of the jury.
 3             When I asked her this, Your Honor, had there
 4        -- she never said that this guy whispered in her
 5        ear or it wasn't this.  She never said none of that
 6        that she's saying now.  She's saying she doesn't
 7        even remember me talking to her about it.
 8             If my girlfriend tells me this, why wouldn't I
 9        reach out to her about that?  I might not know law
10        that much, but I know if that was done, that's
11        wrong.
12             The jury is not even supposed to know that I
13        was in jail, in custody, at that time.  That's why
14        I had on a suit and stuff.
15             So for a bailiff to make that comment, you
16        don't know what the jury heard, and you're saying
17        he whispered in your ear, but that's not what you
18        said, what you told me.
19             You specifically told me that you could not
20        move for a motion for a new trial because the ten
21        days had expired.  I said to you, ten days, I never
22        knew that a motion only was a ten-day window
23        period.  I was thinking at least 30.
24             You was like, no, I only have ten days to move
25        for that.  So, okay, that's what you told me,
```

116

1        you're the lawyer, I'm not.

2             So and now you're saying you don't remember

3        that conversation, but with this information, why

4        wouldn't I come to you with it?

5             THE COURT:  Well, okay.  I think you've made

6        an argument there, Mr. Roland.  I think we're all

7        done with the questioning on that point.  Okay.

8             Let me try to get you through the last point

9        that you raise, which was your point number six,

10       which was that you believe that your trial counsel

11       was ineffective for failing to subject the

12       prosecution's case to a meaningful adversarial

13       testing by raising a misidentification defense.

14       Okay?

15            THE DEFENDANT:  Yes, sir.

16            THE COURT:  Do you have any questions you want

17       to ask her about that?

18            THE DEFENDANT:  No.  I'm gonna rely on the

19       record for that one, Your Honor.

20            THE COURT:  Okay.  Now, the last point being

21       your cumulative error point, as I think I mentioned

22       to you earlier, Mr. Roland, that's something I

23       would address after I have looked at the basis for

24       your other previous six grounds.

25            Okay?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Now, do you have any other

3     questions you'd like to raise while the witness is

4     on the witness stand?

5          THE DEFENDANT:  Miss Nunnally, no.

6          THE COURT:  Okay.  Let me see, Miss Nunnally,

7     if I had anything I wanted to raise to you.

8          MS. NUNNALLY:  Yes, sir.

9          THE COURT:  Miss Nunnally, I'd like to focus a

10    bit on this comment that was allegedly made by the

11    Court bailiff to you --

12         MS. NUNNALLY:  Okay.

13         THE COURT:  -- so I'm clear about what your

14    recollection of it is.  You indicated that the

15    Court bailiff approached you at the point that the

16    Court was recessing for deliberation.

17         Is that correct?

18         MS. NUNNALLY:  It wasn't during deliberation.

19         THE COURT:  It was as the Court was recessing

20    for deliberation.

21         MS. NUNNALLY:  It wasn't even -- we weren't at

22    deliberation stage.

23         THE COURT:  We're not yet at the deliberation

24    stage.

25         MS. NUNNALLY:  We were in the -- it was in the

```
 1          beginning of the case in chief, when the victim was
 2          testifying, and after her testimony and maybe we
 3          took a break at that point, I'm not sure, but I
 4          remember Deputy O'Leary coming to me and saying to
 5          me, Miss Nunnally, well, actually, Miss Nunnally,
 6          he said, your client, you know, let your client
 7          know he got to be careful what he's doing, because
 8          I saw him over there, he had bent down wiping his
 9          face like he was crying, like during the video,
10          when they were showing the video of the actual
11          robbery of the woman being yanked, taken all
12          around, a gun pointed at her, all that, and
13          Deputy O'Leary came to me after that testimony, not
14          during the trial itself, but after the recess or
15          whatever, that break, he talked to me about that.
16              So I might have -- I might have told Mr. -- I
17          can't recollect, I'm sorry, I can't remember if I
18          told Mr. Roland to be careful what he does, but
19          that would be something I would normally do, but I
20          did discuss it with the girlfriend.
21              The only way she knew is cause I told her.
22          She didn't overhear Mr. -- Officer O'Leary tell me
23          anything.
24              THE COURT:  At what level of voice did Officer
25          O'Leary give you this information?
```

```
 1          MS. NUNNALLY:  He whispered it.  He whispered,
 2     he said, Miss Nunnally, you know, Miss Nunnally, in
 3     my ear.  He said, I saw -- that's how he was
 4     talking.  He was speaking low.
 5          THE COURT:  He was speaking down, in a low
 6     tone of voice?
 7          MS. NUNNALLY:  A low tone of voice.
 8          THE COURT:  Into your ear.
 9          MS. NUNNALLY:  Into my ear.  He didn't say it
10     out loud where everybody can hear it.  That would
11     be improper on him.  He was looking after
12     Mr. Roland's interest.
13          THE COURT:  Did you have any concern at the
14     time that he talked to you that the jury could hear
15     his comment?
16          MS. NUNNALLY:  Oh, no.
17          THE COURT:  And you're suggesting that
18     Miss Whites, the witness that testified earlier,
19     you conveyed this information to her, that she
20     herself would not have heard what Officer O'Leary
21     said?
22          MS. NUNNALLY:  No, she would never have heard
23     it, cause if she was -- if I spoke to her, it had
24     to be a break time and I was telling her what was
25     going on and I told her that's what he told me.
```

1            He didn't speak it in front of the jury.  He

2       wouldn't -- the jury wasn't walking out when he was

3       yelling it.  I mean, I'm going by what I read in

4       the motion.  That never happened.

5            THE COURT:  All right.  Let me just see if

6       there's anything else I need to ask you,

7       Miss Nunnally.  I believe I've covered -- you've

8       covered everything I had to ask.

9            Does the State have any further redirect of

10      Miss Nunnally on these issues?

11           MS. OPSAHL:  No, Your Honor.

12           THE COURT:  Mr. Roland, do you have any

13      further questions of Miss Nunnally on these issues?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Go ahead.

16  BY THE DEFENDANT:

17      Q    On the issue about the comment, you stated

18  that it was gonna be -- at what time did Officer O'Leary

19  whisper this or tell you this?

20      A    It wasn't during deliberation.

21      Q    It wasn't during --

22      A    It was not during deliberation.  It wasn't

23  when the jury was leaving out to deliberation.  It would

24  have been when the jury was -- when we was breaking,

25  cause that testimony took a while, cause we had --

121

1       Q     Breaking for what?

2       A     A break.  You do a break during trial.

3    Everyone take a break.

4       Q     A recess --

5       A     A recess, yes.

6       Q     -- or lunch?  Just a recess?

7       A     A recess, a break.

8       Q     Okay.  And what did he -- he stated to you

9    that he was -- what did he say to you?

10      A     He said that during the playing of the video,

11   he looked over and saw what he believed was a reaction.

12   He said he saw your head down.  He said he saw you

13   wiping your face.

14           I didn't see that, cause I was concentrating

15   on the video, and during the break he came to me and he

16   said, tell your -- he said, I saw Mr. Roland doing -- he

17   said, let him know that, you know, he have to be careful

18   what he do at the table, cause the jury is watching him,

19   you know, so if I saw it, they might have seen it too.

20      Q     And did you let me know anything about that

21   comment in court?

22      A     I don't remember if I did.

23      Q     You don't --

24      A     I remember telling your girlfriend, but I'm

25   honestly, I don't -- I can't say if I did.

1        Q     So you're saying, you remember telling my

2   girlfriend, you remember hearing this from Officer

3   O'Leary, but you don't remember advising me of this at

4   all?

5        A     Of what he said, I don't remember, but I do

6   remember talking to you a lot at the table about how you

7   act at the table, make sure you don't do anything to

8   bring attention to yourself, but I don't -- I can't say

9   with one hundred percent certainty that I told you that.

10  I can't.  I can't really say.  I don't remember.

11              THE DEFENDANT:  Okay.  Nothing further, Your

12        Honor.

13              THE COURT:  That it?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  Okay.  Thank you, Mr. Roland.  All

16        right.  Miss Nunnally, thank you very much.  I'll

17        let you stand down now, ma'am.  Thank you.

18              MS. NUNNALLY:  Thank you.

19              THE COURT:  State, any further witnesses you

20        have at this time?

21              MS. OPSAHL:  No, Your Honor.

22              THE COURT:  And, Mr. Roland, anything further

23        you would like to present at this time?

24              THE DEFENDANT:  Well, let's see, I'll go

25        through the grounds.

1          THE COURT:  Well, I think you've done that

2     earlier.  I've gone over the grounds with you, but

3     if you have any additional testimony you want to

4     give to me, I'll be glad to take that.

5          THE DEFENDANT:  I mean, this all I can say is,

6     I mean, she's like, she doesn't remember anything

7     now, but I wouldn't have raised these grounds for

8     no reason.

9          I mean, why would I just pull out that an

10    officer of the Court walks over to her.  I would

11    have never knew that.  She say she didn't tell me.

12    She said he whispered in her ear, so, therefore, I

13    would have never knew of none of this.

14         She had to tell my girlfriend, which advised

15    me of this.  When I called her about that

16    particular ground, she told me it was too late to

17    put in for a motion for a new trial because the ten

18    days had expired.

19         I don't know if that's true as to the amount

20    of days or not, but that's what I was told, so I

21    left it alone at that point.  Through my research,

22    I raised it later on, but that's as far as that.

23         As to the driver's license photo, I do feel

24    that she had a duty to object to the opinion, the

25    said opinion by the officers, no matter -- no

1        matter even though they had -- Patty Smith wasn't

2        testifying when she had a duty to object and she's

3        saying that Patty this, said this.

4            Yes, she may have.  She may have identified me

5        on the videotape, but they didn't have that

6        videotape, and for law enforcement to make that

7        connection without being an expert, even knowing me

8        or being a witness to anything, I felt she had a

9        duty to object at least to preserve it for direct

10       appeal, which it wasn't preserved for direct appeal

11       as a result of receiving an Anders brief in the

12       whole appellate process on a direct appeal, so I

13       feel she should have objected to that as well.

14           She testified that, you know, she uses her

15       own, you know, recollection, and it's probably from

16       trial experience and being a public defender, I'm

17       sure some of that plays a part in it, but there has

18       to come a point to where you have to, I mean, to

19       represent a client sufficiently, that's where --

20       that's where your skill comes in at and it's in my

21       best interest, you're representing me, so don't

22       leave it up to the liberty -- well, I feel you

23       shouldn't leave it up to the liberty of the

24       prosecutor to.  If he's wrong, he's wrong and I

25       feel he was wrong.  I feel, yes, it prejudiced me

1    at trial.

2         As to the alibi witness, that definitely

3    prejudiced me, because I had no witnesses on my

4    behalf.

5         I can't say for a hundred percent sure what

6    the outcome of the trial would have been, but I

7    can't say that the jury definitely needed to hear

8    that testimony.

9         If they didn't think it was true or not,

10   that's up to the liberty of the jury to weigh and

11   the judge would have gave the jury the instructions

12   to do that prior to them going to deliberate.

13        What else -- and pretty much, I mean, that's

14   how -- on all the grounds, you tell me they're

15   gonna -- I want to take the stand.

16        You tell me, if you take the stand, which she

17   doesn't remember either, you tell me, if I take the

18   stand that they're gonna open -- they're gonna

19   reveal the fact to the jury that I have -- I've

20   been in prison for a burglary.

21        Me, I'm not knowing, because I don't want to

22   say ignorant to the law, but I just didn't have

23   knowledge of that part.

24        I thought when they -- I'm just thinking like

25   in general, when a prosecutor asks me, have I been

1    convicted felon, I have to say yes, and I'm

2    thinking, once I say yes, okay, well, what were

3    those type of things.  I didn't know at the time

4    that it didn't go, didn't work like that.  I found

5    out afterwards.

6         So I feel that definitely prejudiced me,

7    because if we could all turn back right now, now

8    what I know about that, I would definitely take the

9    stand.

10        There would have been nothing she could have

11   said to stop me from taking the stand.  She had to

12   grab me and pull me back in the chair and whisper

13   that into my ear, you know.  Of course, she doesn't

14   remember that either, but, like I said, that

15   prejudiced me.

16        I feel every ground I raised prejudiced me.  I

17   may not have argued it to the best of my ability at

18   this evidentiary hearing, but that's why I asked

19   for counsel, and some things I got caught up in the

20   arguing things because, you know, this is my life,

21   there's emotion behind it and this is serious,

22   there's a lot of time we're talking, and I don't

23   think that the shortcuts that she took should have

24   been to me.

25        You have a person you're representing.  This

1          is a robbery case, a grand theft, a false

2          imprisonment and all these errors are taking place.

3               How could you leave it up, say, oh, well, I

4          don't normally do this, but I just let -- if it's

5          the law, the judge will correct me on it, you know,

6          this is what she said and I'm just saying like, so

7          you never took this case, did you even know what

8          you were doing.

9               Out of respect to her, I didn't ask her that,

10         because she did fight for me.  Whether she knew,

11         did something right, she may not have known.  I

12         don't think she deliberately hung me out to dry,

13         but I'm just saying, these were errors and that's

14         what we're here to put on record and have you

15         weigh, the errors, yes, and they were harmless

16         errors, I believe so, yes, Your Honor.

17              I believe these errors were harmless.  Maybe

18         not all of them.  I don't know.  I don't know.

19         That's up to you.

20              THE COURT:  You meant to say was harmful,

21         right?

22              THE DEFENDANT:  I'm sorry, harmful.

23              THE COURT:  It's okay.  I understand what

24         you're saying.  You think you were harmed by her

25         actions is what you're saying.  All right.

1            THE DEFENDANT:  Yes, sir.

2            THE COURT:  Thank you, Mr. Roland.  Now,

3      Mr. Roland, what I will do, unless the State has

4      anything further -- I presumed you had nothing

5      further, State?

6            MS. OPSAHL:  No, Your Honor.

7            THE COURT:  What I will do, Mr. Roland, is

8      review my notes --

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  -- go through the record, prepare

11     an order on your motion.  It will take me a little

12     while to do that with the holiday, but I'll try to

13     address that as soon as I can.

14           THE DEFENDANT:  No problem.

15           THE COURT:  All right?  And I wanted to ensure

16     that you have all your matters addressed in my

17     order and but I will try to get that out as soon as

18     I can.

19           Now, Mr. Roland, the order of transport showed

20     that you are currently housed at the Mayo

21     Correctional Institution.

22           Is that correct?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  Is that where you want to go back

25     to?

1           THE DEFENDANT:  Yes, sir.  Do I have to stay

2      for this?

3           THE COURT:  No.  You have to go back.

4           THE DEFENDANT:  Okay.  I'm ready to go, yes,

5      sir.

6           THE COURT:  You would get whatever gain time

7      you'd be entitled to.  So I'm going to close the

8      hearing now.

9           THE DEFENDANT:  So, excuse me, Your Honor --

10           THE COURT:  Sure.

11           THE DEFENDANT:  -- one thing.  How would I

12      receive your ruling, by mail?

13           THE COURT:  Yes, you'll get it by mail.  I'll

14      enter an order and you'll get a copy of that order

15      and I'll send it directly to the address we have

16      for you on record.

17      Okay?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  Likely would be within the next

20      four weeks, but I can't tell you exactly when.

21      Okay?

22           THE DEFENDANT:  That's fine.

23           THE COURT:  Mr. Roland, I didn't mean to be

24      critical of you.  I thought you did quite a

25      presentable job today.

1            THE DEFENDANT:  Thank you.

2            THE COURT:  You presented your position, your

3      motion is well written, I understand all the issues

4      that you're raising, but as I noted, there's

5      certain rules we have to follow as to questioning,

6      which that's what I was talking about, but I

7      thought otherwise you did a credible job today.

8            All right?

9            THE DEFENDANT:  Thank you.

10           THE COURT:  Thank you.  With that, Madam

11     Clerk, we'll have the defendant transported back to

12     his facility and thank you very much.  Stand

13     adjourned.

14           THE DEFENDANT:  Bye, Miss Nunnally.

15           MS. NUNNALLY:  Bye, Mr. Roland.

16           THE COURT:  All right.  Anything further,

17     Madam Clerk?  That it for today?

18           THE CLERK:  Yes, sir.

19           THE COURT:  All right.

20                    (end of audio)

21

22

23

24

25

131

```
 1                    REPORTER'S CERTIFICATE

 2

 3    STATE OF FLORIDA  )

 4    COUNTY OF VOLUSIA )

 5

 6         I, SUSAN LEE PARKINSON, RPR, RMR, certify that

 7    I was authorized to and did stenographically report

 8    the foregoing proceedings via digital recording and

 9    that the transcript is a true and complete record of

10    my stenographic notes to the best of my ability.

11         I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the

13    parties, nor am I a relative or employee of any of

14    the parties' attorney or counsel connected with the

15    action, nor am I financially interested in the

16    action.

17         Dated this 23rd day of February, 2016.

18

19
                         s/Susan Lee Parkinson, RPR, RMR
20                       Court Reporter
                         Volusia Reporting Company
21                       432 South Beach Street
                         Daytona Beach, FL  32114
22                       (386)255-2150

23

24

25
```

L

RECEIVED

AUG 29 2016

DISTRICT COURT OF APPEAL
FIFTH DISTRICT

**IN THE DISTRICT COURT OF APPEAL
FIFTH DISTRICT, STATE OF FLORIDA**

PROVIDED TO GULF CI
MAILROOM

AUG 15 2016

FOR MAILING
INMATE'S INITIALS ᴏ͞ᴿ

JAHQUEZ ROLAND,
    Appellant,

v.                                  Case No. 5D16-438

STATE OF FLORIDA,
    Appellee
_____/

**APPELLANT'S INITIAL BRIEF**

ON APPEAL FROM THE SEVENTH
JUDICIAL CIRCUIT COURT IN AND FOR
FLAGLER COUNTY, FLORIDA

Submitted by:

Jahquez Roland, pro se
DC # L03988
Gulf C. I. Annex
699 Ike Steele Road
Wewahitchka, Florida 32465

## TABLE OF CONTENTS

Table of Authorities..................................................................iii

Preliminary Statement..............................................................iv

Statement of Case and Facts..................................................1-18

Summary of Argument.............................................................19

Argument-Point One.................................................................20

> THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING
> APPOINTMENT OF POSTCONVICTION COUNSEL

Argument-Point Two.................................................................25

> THE TRIAL COURT REVERSIBLY ERRED IN DENYING RELIEF
> ON GROUNDS ONE,TWO, THREE, SIX, & SEVEN AFTER THE
> EVIDENTIARY HEARING WHERE THERE IS NO COMPETENT
> SUBSTANTIAL EVIDENCE TO SUPPORT THE FACTUAL
> FINDINGS, AND/OR THE LEGAL CONCLUSIONS ARE
> UNREASONABLE

Conclusion.............................................................................34

Certificate of Service...............................................................34

Certificate of Compliance.........................................................34

# TABLE OF AUTHORITIES

## Cases

*Cherry v. State*, 659 So. 2d 1069 (Fla. 1995).............................................................. 33

*Ford v. State*, 955 So. 2d 550 (Fla. 2007) ................................................................. 25

*Graham v. State*, 372 So. 2d 1363 (Fla. 1979)................................................... 20, 22

*Harvard v. State*, 998 So. 2d 676 (Fla. 4th DCA 2009)........................................... 22

*Harvey v. Dugger*, 656 So. 2d 1253 (Fla. 1995)....................................................... 33

*Hylleberg v. State*, 729 So. 2d 409 (Fla. 5th DCA 1999) ........................................ 20

*Lee v. State*, 801 So. 2d 1022 (Fla. 2d DCA 2001).................................................... 21

*Montes v. State*, 907 So. 2d 1243 (Fla. 3d DCA 2005)............................................. 20

*O'Connell v. State,* 733 So. 2d 556 (Fla. 5th DCA 1999)........................................ 32

*Schwab v. State*, 814 So. 2d 402 (Fla. 2002).............................................................. 25

*State v. Gunsby*, 670 So. 2d 920 (Fla. 1996).............................................................. 33

*State v. Weeks*, 166 So. 2d 892 (Fla. 1964)................................................................. 20

*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)............................ 25

*Thomas v. State*, 846 So. 2d 634 (Fla. 1st DCA 2003) ............................................ 20

*Urquhart v. State*, 676 So. 2d 64 (Fla. 1st DCA 1996)............................................. 33

*Waterhouse v. State,* 522 So. 2d 341 (Fla. 1988)...................................................... 32

*Williams v. State*, 472 So. 2d 738 (Fla. 1985)............................................... 20, 21, 22

## PRELIMINARY STATEMENT

Jahquez Roland was the Defendant in this case and will be referred to by name, as Defendant, or as Appellant.  The State of Florida was the Plaintiff in this case and will be referred to as the State, or as the Appellee.  The Seventh Judicial Circuit Court in and for Flagler County, Florida was the trial court who presided over the proceedings under review and will be referred to as the trial court.

The instant appeal deals with reviewing allegations of ineffective assistance of counsel during trial proceedings.  Regina Nunnally, A.P.D., was defense counsel in those proceedings and will be referred to by name or as defense counsel.

There are two volumes of record on appeal.  The first volume consists of the postconviction pleadings and orders under review.  The second volume consists of the evidentiary hearing transcripts.  Reference to the record contained in the first volume will be cited as: (R    ), and will include the appropriate page number.  Reference to the evidentiary hearing record contained in the second volume will be cited as: (EH   ), and will include the appropriate page number.

## STATEMENT OF CASE AND FACTS

This is an appeal from the denial of a 3.850 motion for postconviction relief after an evidentiary hearing. The case under review originated when the State charged Roland with Robbery with a Firearm (count one); Grand Theft (count two); False Imprisonment (count three); and Battery (count four) (R 1-2). Roland proceeded to trial by jury and was found guilty as charged on all counts (R 2). Roland was sentenced to 30-years in prison on count one, 5-years in prison on counts two and three, and 11 months 29 days on count four (R 2). The sentences on counts one through three were imposed under the Prison Releasee Reoffender Act, and they were ran consecutive (R 2).

After this Court affirmed the judgments and sentences on direct appeal, Roland timely filed a 3.850 motion for postconviction relief (R 1-50). The motion contained a summary of the facts of the case, explaining that the charges came about from a robbery that occurred at Sharpes Liquors in Flagler County. At the time of the robbery, Roland and his brother, Caleb Barker shared a duplex located in Palm Coast. Mr. Barker had just come home from working his 12:00-8:00 a.m. shift as a correctional officer. It took anywhere from 45-minutes to an hour for Mr. Barker to drive home from his job (R 6).

When Mr. Barker arrived home, he showered and then sat in the living room. Roland made breakfast and they ate. The two then began to discuss their

afternoon plans which included a visit to a local sports bar to visit with friends and watch football (R 6).

A short time later, Roland received a phone call from a friend who informed him that he needed a ride. The friend told Roland that he and his girlfriend were in trouble and asked Roland to hurry over to the Burger King in front of the Flagler Plaza. The friend did not describe the trouble they were in (R 6).

Roland left his home in a hurry and forgot his cell-phone that was being charged. The Flagler Plaza is about a ten-minute drive from Roland's home. On the way to Burger King, Roland's vehicle broke down with transmission problems. This occurred in front of a BP gas station. Roland coasted into the gas station parking lot and was going to call his brother and his friend. It was then that he realized he did not have his cell-phone (R 6-7).

As the Burger King was only a few minutes away, Roland decided to jog there and meet his friends. In a rush to get out of his home and go help his friend, Roland put on a pair of sweatpants over his shorts and grabbed his wallet, keys, and a ten dollar bill for gas (R 7).

When Roland arrived at the Burger King, he was sweaty, out of breath, and upset because his car broke down. He entered the Burger King and went looking for his friend. Roland did not see him, so he went to the counter and asked for a cup of water. Roland got water and went to the restroom to clean up. Roland

removed his sweatpants, which were sweaty, old, and worn, and threw them away in the bathroom. Roland then went back to the front counter where he asked if Patty was working and was told that she was not. Patty was a neighbor of Roland's girlfriend and had seen him at her apartment many times. Roland then asked to use Burger King's phone. He was provided a cordless phone and went to sit in a booth to make a call. Roland first called his own cell-phone number hoping that Mr. Barker would answer. The call went unanswered leading Roland to call Mr. Barker's cell phone. Mr. Barker had fallen asleep and did not answer (R 7-8).

Roland then returned the phone to the counter. It was then Roland remembered that he had a ten-dollar bill with him and must have dropped it in the restroom when he was cleaning up and throwing away the worn sweatpants. Roland went back to the restroom to find a Burger King employee cleaning the area with the door propped open. Roland told the employee that he needed to get into the bathroom. After searching the floor and not seeing the money, Roland confronted the employee and asked him where his money was at, as he assumed the employee had picked up the ten-dollar bill. The employee spoke little English but denied finding the money (R 8).

Roland was unable to call his friend because he only had the number on his cell-phone that was left at home. He sat down for a time in the Burger King and eventually, his friends showed up and the three left together (R 8).

The three walked back to the BP gas station where Roland secured his vehicle and informed a BP employee that he would be back to get his car as soon as he could.  Roland's friend called someone else that Roland did not know, who came to the BP and picked them up.  Roland was then provided a ride back to his home in Palm Coast (R 8).

At the time, Roland was unaware that a robbery had occurred at Sharpes Liquors, and still is unaware of his friend's involvement, or lack thereof (R 9).

Weeks prior to these events, Roland's same friend had been at Roland's home the day that Roland sold his dirt-bike.  The friend had asked Roland what he was going to do with his riding gear and offered to buy it for $100.00.  As Roland had no further use for the riding gear, he agreed to sell it.  His friend purchased the riding gear and took it with him that day.  Months later, Roland was arrested at his home and charged with the crimes under review (R 9).

After the foregoing summary of facts were established, Roland alleged seven grounds of ineffective assistance of counsel for (1) misleading Roland on his right to testify, and further by advising Roland not to testify, (2) for failing to investigate and present an alibi witness, (3) for failing to object to improper testimony from law enforcement, (4) for failing to object to the State's improper comments, (5) for failing to move for mistrial based on an improper comment, (6) for failing to

4

subject the State's case to meaningful adversarial testing, and (7) a cumulative effect error (R 10-50).

In ground one,[1] Roland alleged counsel was ineffective for misleading him on his right to testify, and further by advising him not to testify on his own behalf. In support Roland alleged the State's case established that Roland's DNA was found on clothing allegedly worn during the robbery and that Roland was seen shortly thereafter at a Burger King located close to where the robbery occurred (R 10).   However, Roland had a reasonable hypothesis of innocence that was not inconsistent with the State's circumstantial evidence. Specifically, defense counsel had been informed how Roland's DNA was found on the clothing. Roland owned the clothing at one time, but had recently sold it to his friend. Additionally, Roland had a reasonable hypothesis of innocence regarding his presence and use of the phone at Burger King, along with his seemingly unusual behavior (R 10-11).

Roland specifically alleged that not only did he have a reasonable hypothesis of innocence, but such a defense would have been consistent with other evidence presented at trial, such as the fact that Roland did not meet the physical description

---

[1] In respect to this Court's limited time and resources, Roland is only referring to the allegations contained in grounds one, two, three, six, and seven, as, for purposes of this appeal, he is abandoning any further argument on grounds four and five. However, upon remand, Roland would seek an opportunity to relitigate all seven grounds with appointment of postconviction counsel.

5

of the robbery suspect; the robbery suspect had a phone clipped to his belt; and the K-9 dog tracked the suspect away from the Burger King (R 10-18).

When considering the facts of this case, Roland knew his testimony was vital to rebut the State's case and establish a viable defense. Defense counsel knew of Roland's wishes but advised against him taking the stand in his own defense (R 10-18).

Notably, when asked of his intentions during trial, Roland nodded his head in response to the trial court's inquiry indicating that he did indeed want to take the stand in his own defense (R 10-18). From there, defense counsel grabbed Roland by his arm, pulled him aside, and told him it was a very bad idea to testify because the State had his DNA, and the jury would learn of his prior burglary conviction, along with the fact that he recently served ten years in prison for burglary (R 13).

This in itself was misadvice where Roland later learned that the jury would not have been able to hear the *specific nature* of his prior crimes, nor the amount of time he had served in prison (R 13).

Further, defense counsel's advice was deficient where it ultimately denied Roland his constitutional right to testify and his testimony was the only evidence available to support a reasonable hypothesis of innocence. Roland also specifically alleged what his testimony would have been, and how it would have changed the outcome of the trial (R 10-18).

6

In ground two, Roland alleged counsel was ineffective for failing to investigate and present an alibi defense. In support Roland alleged that prior to trial he had advised defense counsel that he did not commit the crime, and, in fact, he was at home with his brother during the time the crime was committed (R 19).

Roland went on to detail what his brother's testimony would have been and how it would have created reasonable doubt on the State's theory of prosecution (R 19-24).

In ground three, Roland alleged counsel was ineffective for failing to object to law enforcement providing personal opinion testimony. In support Roland pointed out the specific testimony complained of and how it prejudiced his case (R 25-28).

In ground six, Roland alleged counsel was ineffective for failing to subject the State's case to meaningful adversarial testing. In support Roland first summarized the circumstantial evidence against him and then argued that defense counsel's theory of defense attempted to cast doubt on Roland's presence at the Burger King rather than concede the fact and provide a logical explanation (R 39-40). As it was, defense counsel's idea of a defense was no defense at all where the evidence clearly established Roland was present at the Burger King in question. Roland further alleged that his presence at Burger King should have been evident through discovery, disarming defense counsel's frivolous strategy. Not only did

7

the frivolous defense make Roland look like a fool for asking the jury to disbelieve a clearly established fact, it also evaded a logical defense of conceding Roland's presence, and explaining it with a reasonable hypothesis of innocence. Notably, no crime was committed at Burger King, leaving one to ask, "What was defense counsel thinking with trying to persuade the jury that Roland was not present at the Burger King?" (R 41-46).

In ground seven, Roland alleged counsel was ineffective based on the cumulative effect of errors (R 47-49).

Roland also filed a motion for appointment of postconviction counsel wherein he alleged he should be afforded counsel based on his meritorious claims warranting an evidentiary hearing, which would be adversarial in nature, the complexity of the proceedings, and the need for substantial legal research. Roland also alleged that he lacked the education and sophistication required to meet the technical requirements of going forth with his litigation. Roland further alleged that he lacked the necessary skills to properly present evidence/testimony and to cross-examine the witnesses (R 68-69).[2]

The trial court denied appointment of postconviction counsel (R 70).

---

[2] It should also be noted that Roland's postconviction pleadings were prepared by an inmate law clerk as Roland did not have the ability to sufficiently plead his arguments.

8

The trial court did however grant an evidentiary hearing on the foregoing claims of ineffective assistance of counsel. The hearing was held on December 11, 2015 (EH 1-131).

At the beginning of the hearing, the trial court stated that the issues under review were primarily factual, thus the reason for denying appointment of postconviction counsel (EH 5). The trial court then instructed Roland that the burden of proof was on him to establish entitlement to relief (EH 5).

From there the trial court identified ground one and gave Roland the reins (EH 7-8). Roland testified that many times he made defense counsel aware of the fact that he wanted to take the stand, as it was the only way to establish a defense (EH 8). When Roland attempted to take the stand, defense counsel grabbed him, telling him "no" because of his prior burglary and prison sentence; and that the jury would not believe he did not commit this robbery (EH 8).

At the time, Roland was unaware of the law prohibiting the State from eliciting the specific nature of his priors. He was simply under the belief that it was common practice. The impact of being led to believe this would happen is what ultimately led Roland to "sit down" (EH 15). Not being familiar with his burden of proof, Roland did not present evidence of what his testimony would have been, nor how it would have helped his case.

9

The trial court then moved on to ground two, identifying it as a claim of failing to investigate and present an alibi defense (EH 16). Roland testified that his brother, Caleb Barker was his alibi (EH 16). Roland told defense counsel about Mr. Barker way before trial (EH 17). Additionally, Mr. Barker's name was all in the discovery of the case because his phone number had been called by Roland (EH 18, 20).

Mr. Barker would have testified that Roland was at home with him during the time frame the robbery was committed (EH 18). Still, defense counsel did not perform any type of investigation on the alibi defense (EH 19). Defense counsel's reasoning for the inaction was that the jury would never believe Mr. Barker because he was Roland's brother (EH 19). In contrast, Roland believed his brother was credible because he was a State Correctional Officer (EH 20). Roland believed his brother would have definitely been more credible than himself in establishing an alibi defense and explaining the details surrounding the case (EH 21). Mr. Barker's testimony "would have been so powerful" (EH 22).

The trial court then instructed Roland to move on to ground three regarding defense counsel's failure to object to law enforcement's personal opinion testimony (EH 23). The trial court instructed Roland to explain, "exactly what video surveillance you're referring to" (EH 23). Roland responded by telling the trial court this was a main ground he needed appointment of counsel for because it

10

is "a failure to object and I'm not a lawyer" (EH 23). Roland believed that appointed counsel could present the claim sufficiently, and he did not feel comfortable going into this because "it's a bit - - I had help with this ground, I had help with this whole motion...I don't believe I have the ability today to actually give it to you the way I wanted to get the meaning across" (EH 23-24).

The trial court then began reciting from the motion, acknowledging "it was not really clear" (EH 24-25). Nonetheless, the trial court asked Roland to explain (EH 25). Roland attempted to argue that law enforcement had no business opining he was the one at the scene based on a comparison of a video tape to Roland's driver's license photo (EH 25-26). Under the circumstances, Roland believed defense counsel should have objected (EH 26). Roland then went to reciting from his motion, attempting to get his argument across (26-31).

The trial court moved Roland along.[3] The trial court acknowledged the allegations in ground six and told Roland to explain what defense counsel did that was deficient (EH 60-61). This was another ground Roland needed help with (EH 61). Without presenting any evidence or argument, Roland simply stated that his claim is in the motion (EH 61).

---

[3] Because grounds four and five are abandoned for purpose of this appeal, Roland will jump ahead to where ground six was addressed.

11

Roland's cumulative effect argument was also mentioned without further comment (EH 61-63).

The State then called defense counsel to the stand. Counsel acknowledged that she had conferred with Roland about him testifying on his own behalf (EH 65). She never told Roland the jury would learn of his priors (EH 65).

In regard to the alibi defense, counsel testified that she did try to find Mr. Barker through an investigator (EH 67). There were several attempts made, with no success (EH 67). The State then showed defense counsel what was marked as Composite Exhibit A. Counsel recognized it as the investigator's referral regarding the alibi witness (EH 67-68). Upon seeing the exhibit, Roland objected to its introduction based on relevance, stating that it "has nothing to do with my brother" (EH 68). Roland argued that the victims in the exhibit were even different (EH 68). In sum, the exhibit was "not a part of this robbery case at all" (EH 68). The trial court overruled the objection and admitted the exhibit as number one for the State (EH 69).

The State then proceeded on to ground three. Defense counsel acknowledged that law enforcement had viewed the video. She then testified that she filed a motion in limine objecting to any mention of what was in the video (EH 71).

Jumping now to ground six, the State addressed it as "kind of a catchall," that defense counsel was ineffective in the defense that was presented (EH 74). According to defense counsel, Roland never told her of any other defense (EH 74).

On cross-examination, defense counsel recalled discussing Roland testifying on his own behalf. She remembered advising Roland that the decision was up to him (EH 75). Roland then interrupted defense counsel and was directed by the trial court to let her finish (EH 76). Roland then went on for a full page summing up his dissatisfaction with counsel until finally he asked her if she remembered pulling him to her when he tried to express his willingness to testify. She said, "no" (EH 77-78). Roland then stated, "That's on camera. It will show that" (EH 78). But Roland's pro se status prevented him from being ready to present the camera evidence.

At that time the trial court admonished Roland, telling him not to argue with defense counsel, and only ask her questions (EH 78). Defense counsel then responded to Roland's rant by stating it made no sense for him to testify on his own behalf when people were already placing him at the scene, and she did not recall hearing anything about his car breaking down, and then him jogging on to Burger King (EH 79-80). From there the trial court interrupted and told Roland that he covered the issue, and to move on (EH 80).

13

In asking defense counsel about investigating the alibi witness, counsel referred to the State's Exhibit-1, of which Roland had objected to as unrelated to this case (EH 81). According to defense counsel, the referral revealed several attempts to get in touch with Mr. Barker, to no avail (EH 82-83). Roland was surprised. He never heard this before. Further, he was astonished how he could get in touch with Mr. Barker anytime (EH 82-83). Again, the trial court had to admonish Roland and tell him to save it for argument; what Roland needed to do was focus on a question (EH 83). Defense counsel answered the next question by opining Mr. Barker was not an alibi witness because he was asleep when Roland went out that morning (EH 84). Nonetheless, counsel still made an effort to contact Mr. Barker (EH 84).

Defense counsel was unaware that not only the State, but the detectives for the Flagler County Sheriff's Office made contact with Mr. Barker on every attempt (EH 85). Roland went on another tangent with the trial court stopping him and asking, "What's your point?" (EH 86). During his next question the trial court interrupted again stating:

> Court: Mr. Roland, I'll move on. If you cannot be - -
>
> Roland: What am I doing wrong, Your Honor?
>
> Court: Here's what you're doing wrong. You're rolling your eyes, you're arguing with the witness. That's not allowed.

14

I'll let you ask a question, but you don't make comments about it. All right? So what's your question? You've made your point that you disagree with her over that.

Roland: This is why I asked you for counsel.

(EH 87-88).

In asking whether or not defense counsel recalled discussions about calling Mr. Barker as an alibi, counsel once again mentioned the investigative referral in justifying why she did not call him (EH 88). Soon after, the State objected to Roland testifying and the trial court again told Roland to focus on the question, not an argument (EH 89-90). From there, the following was recorded:

Roland: Can I say one thing, Your Honor?

Court: What do you want to say?

Roland: I understand what you're telling me. I'm trying so hard to stay in those lines out of respect to the Court, but the same thing you're telling me to do she's not doing.

Court: No. Mr. Roland, here's the way we're gonna proceed now. At the point that you're done asking her questions and you want to say something more, I'll be happy to hear you then, but not now. You can't be testifying while you're asking questions.

Roland: Well, I mean, I'm asking her questions and she's going to a hundred different things and I don't want to just be ruling, oh, I didn't ask you that question, cause you're saying don't argue with her.

Court: So far she's answered every one of your questions.

Roland: Okay.

> Court: I'm not sure what you're concerned about. You want to ask a question, she's answered it. That's okay.
>
> Roland: When I ask a question - -
>
> Court: What you can't do is argue with her. You can't do that.

(EH 90-91).

Afterwards, defense counsel again referred to her investigative referral in support of her lack of reasonable investigation (EH 92). Roland then went on rambling for several pages until the trial court once again interrupted him, letting him know that he had been going on for quite a while without a question (EH 97). The trial court then suggested they move on to the next claim (EH 97).

In regard to failing to object to law enforcement's opinion testimony, defense counsel testified that it was her recollection that it was not just an officer that testified to this (EH 98). She also filed a motion in limine to keep "all that information out" (EH 98). Roland reminded counsel that the motion in limine was based on the videotape itself not being there (EH 99). At that time, the officer had not offered his opinion testimony. The trial court again advised Roland to cover one issue at a time (EH 99).

Defense counsel finally stated that she did not object to the officer's testimony because at the time, she did not feel an objection was warranted (EH 101-102).

16

Roland went on another rant until the trial court interrupted and asked, "What's your question, Mr. Roland?" (EH 102-104). The trial court then advised that they were running out of time and would have to conclude the hearing until another day unless Roland was ready to finish (EH 104).

They proceeded on to ground four where the trial court again had to interrupt and tell Roland that he was arguing, and, "There's probably no more need to keep beating this cat" (EH 109). The trial court suggested once again that Roland move on to the next ground (EH 109).

In addressing ground five, Roland advised the trial court that he had inadvertently left evidence in his jail cell. The trial court stated, "Doesn't do me much good, does it?" (EH 110). Soon after, the trial court advised Roland that he made his point, and to move on to ground six (EH 116). Beaten down through the whole process of trying to perform the work lawyers go to school for years to learn how to do, never mind the pressure he felt from being interrupted, admonished and rushed throughout the proceedings, Roland dropped the ball and told the trial court, "I'm gonna rely on the record for that one, Your Honor" (EH 116).

From there Roland argued defense counsel should have objected to law enforcement's opinion testimony (EH 124). She should have investigated the alibi defense (EH 125). It was Roland's understanding that if he took the stand on his own behalf, the specifics of his priors would come forth (EH 125-126). Roland

17

felt every ground he raised prejudiced him (EH 126). He may not have argued them properly, but that is why he asked for counsel (EH 126). Still unfamiliar with legal terminology, Roland stated that he raised "harmless errors" (EH 127). That was not very helpful to his cause.

On January 13, 2016, the trial court entered an order denying postconviction relief (R 84). Roland timely appealed. Several motions for extension of time were filed and granted. The very last required the initial brief to be filed by August 15, 2016. The instant brief follows and is therefore timely.

18

## SUMMARY OF ARGUMENT

**Point one**:  The trial court abused its discretion in denying appointment of postconviction counsel where Roland met the *Graham* factors.   The remedy is reverse and remand for a new evidentiary hearing with appointment of postconviction counsel.

**Point two**:  Alternatively,[4] the trial court reversibly erred in denying relief on grounds one, two, three, six and seven after the evidentiary hearing where there is no substantial evidence to support the factual findings, and/or the legal conclusions are unreasonable.  Accordingly, reverse and remand for a new trial is warranted.

---

[4]  Roland raises this claim "alternatively" because granting relief on point one will render point two moot.

## ARGUMENT-POINT ONE:

THE TRIAL COURT ABUSED ITS DISCRETION IN
DENYING APPOINTMENT OF POSTCONVICTION
COUNSEL

**Standard of Review**. Decisions denying postconviction counsel are
reviewed for an abuse of discretion. See, *Thomas v. State*, 846 So. 2d 634 (Fla. 1st
DCA 2003).

**Merits**.   Roland is aware that he has no absolute right to counsel in
postconviction proceedings and that the decision rests in the sound discretion of the
trial court. See, *Montes v. State*, 907 So. 2d 1243 (Fla. 3d DCA 2005).  However, a
trial court abuses this discretion when, under the circumstances of a particular case,
"the assistance of counsel is essential to accomplish a fair and thorough
presentation" of a defendant's claim(s) for collateral relief.  See, *State v. Weeks*,
166 So. 2d 892, 897 (Fla. 1964); see also, *Hylleberg v. State*, 729 So. 2d 409, 410
(Fla. 5th DCA 1999).

In determining whether to appoint counsel to assist an indigent defendant in
postconviction proceedings, trial courts should consider four factors: (1) the
adversary nature of the proceeding; (2) its complexity; (3) the need for an
evidentiary hearing; and (4) the need for substantial legal research. See, *Williams
v. State*, 472 So. 2d 738, 740 (Fla. 1985) (quoting *Graham v. State*, 372 So. 2d
1363, 1366 (Fla. 1979). Any doubts should be resolved in favor of the appointment

of counsel for the defendant. *Graham*, 372 So. 2d at 1365.

The determination that an evidentiary hearing is necessary in itself implies that three of the four elements are involved. *Williams*, 472 So. 2d at 740 (stating, "[e]videntiary hearings are adversarial in nature, and the rules of evidence and procedure are mystifyingly complex to all but the most sophisticated non-lawyers.").

In *Lee v. State*, 801 So. 2d 1022 (Fla. 2d DCA 2001), the defendant, Mr. Lee appealed the denial of his postconviction claim of ineffective assistance of counsel following an evidentiary hearing. Because counsel should have been appointed to represent Mr. Lee at the evidentiary hearing, the Second District reversed the order denying postconviction relief and remanded for appointment of counsel and a new evidentiary hearing. This reversal was based on reasonable logic.

Particularly, following an appellate remand, Mr. Lee appeared before the trial court for an evidentiary hearing. At that hearing, Mr. Lee expressed some concerns about the purpose of the hearing and his desire for counsel. The circuit judge glossed over Mr. Lee's concerns and held the hearing. Over a year later, an order was entered stating, "After having heard testimony from [trial defense counsel] and the defendant, the court finds that the failure to call witness was a matter within 'trial strategy' of counsel and, therefore, the defendant's claim for postconviction relief is denied." *Id*.

21

Referring to the holding in *Graham*, the Second District held that Mr. Lee's concern over the purpose of the hearing, his failure to properly cross-examine [trial defense counsel], and his request for counsel, supported Mr. Lee's need for the assistance of counsel. Accordingly, the case was reversed and remanded with directions to the trial court to appoint counsel for Mr. Lee and hold a new evidentiary hearing. *Id*.

In *Harvard v. State*, 998 So. 2d 676 (Fla. 4th DCA 2009), a similar ruling was entered. In that case, Mr. Havard appealed the trial court's denial of his rule 3.850 motion for postconviction relief that was entered after an evidentiary hearing. The Fourth District held that, as a matter of due process, all doubts must be resolved in favor of the defendant in the appointment of counsel in postconviction proceedings. *Id*. at 1365-66; *Williams v. State*, 472 So. 2d 738, 740 (Fla. 1985). In *Harvard*, the *Graham* factors were met as an adversarial evidentiary hearing was scheduled based upon a colorable claim; Mr. Harvard was obviously confused and unable to articulate his positions or comply with the correct procedures, including the subpoenaing of witnesses necessary to his allegations. *Graham*, 372 So. 2d at 1366. See also, *Williams*, 472 So. 2d at 740 (determining that appointment of counsel is necessary where the defendant's lack of sophistication make clear that he was unable to meet the technical requirements of going forward with the burden of proving his initial allegations, irrespective of

22

the merits of those allegations).

The facts of the instant case require the same remedy.   Specifically, Roland had no idea how to sufficiently present evidence and establish entitlement to relief on his claims.   He continuously blundered and instead of asking defense counsel questions, he was all over the board arguing with her and expressing his dissatisfaction with her performance.

Additionally, Roland did not have the ability to have his brother available to be called as a witness; he left evidence in his jail cell; he simply recited most of his claims from the motion, expressing the need for postconviction counsel throughout the hearing, and in addressing several issues, Roland improperly relied solely on the facts contained in his motion.   This was highly irregular when considering an evidentiary hearing requires a movant to present evidence.

In sum, Roland's evidentiary hearing was a farce.   It may have been good enough to appease the trial court in order to get the 3.850 motion behind them, but it hardly served in meeting Roland's due process rights to a full and fair evidentiary hearing.

Accordingly, the *Graham* factors were met in this case where (1) an adversarial evidentiary hearing was scheduled based upon colorable claims; (2) Roland made specific requests for appointment of counsel; (3) Roland was obviously confused and unable to articulate his positions or comply with the

correct procedures of cross-examining and presenting evidence; and (4), Roland had no idea how to proceed in subpoenaing witnesses necessary to establish his allegations.

Consequently, reverse and remand is warranted for appointment of postconviction counsel and a new evidentiary hearing.

## ARGUMENT-POINT TWO:

THE TRIAL COURT REVERSIBLY ERRED IN
DENYING RELIEF ON GROUNDS ONE TWO, THREE,
SIX, & SEVEN AFTER THE EVIDENTIARY HEARING
WHERE THERE IS NO COMPETENT SUBSTANTIAL
EVIDENCE TO SUPPORT THE FACTUAL FINDINGS,
AND/OR THE LEGAL CONCLUSIONS ARE
UNREASONABLE

**Standard of Review**. In *Schwab v. State*, 814 So. 2d 402, 408 (Fla. 2002),

the supreme court discussed the two-prong test set forth in *Strickland v.*

*Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is

used to analyze claims of ineffective assistance of counsel. First, "the defendant

must show that counsel's representation fell below an objective standard of

reasonableness" based on 'prevailing professional norms.' *Id.* (quoting *Strickland*,

466 U.S. at 688). Next, "[t]he defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694).

Because both prongs of the *Strickland* test present mixed questions of law and fact,

this Court should employ a mixed standard of review, deferring to the trial court's

factual findings that are supported by competent, substantial evidence but

reviewing the trial court's legal conclusions de novo. See, *Ford v. State*, 955 So.

2d 550, 553 (Fla. 2007). Under this standard of review, Roland will now show

entitlement to relief as follows:

25

**Merits on Ground One**.  Adopting the foregoing statement of case and

facts in support of this claim, the record in this case reveals specific allegations of

ineffective assistance of counsel for misleading Roland on his right to testify, and

further by advising Roland not to testify on his own behalf (R 10-18). Although

maybe not up to professional standards, Roland did his best to prove this claim at

the evidentiary hearing.  However, the trial court denied relief, finding:

> During the evidentiary hearing, Defendant admitted that he voluntarily agreed with Ms. Nunnally not to take the stand; however, he emphasized that he had advised Ms. Nunnally many times prior to trial that he wanted to testify. Defendant argued that Ms. Nunnally advised him that if he took the stand, then the jury would be able to hear about his prior conviction for burglary. Defendant wanted to testify to tell the jury that he jogged to Burger King that day to assist a friend with a broken down car, and while at Burger King, he asked to use the phone to call his brother, who then came to the Burger King to help him push the car.
>
> Ms. Nunnally testified at the evidentiary hearing that she advised defendant not to testify and informed him that if he did testify, the State could inquire about the number of convictions he has.  She testified that she advised him that if he stated an incorrect number of convictions, then the "door was opened," and the State could inquire about the nature of those convictions.  She stated that Defendant told her that something different had occurred the day of the robbery, and she had never heard about a friend, a car breaking down, or pushing the car somewhere. She said that because Defendant's main defense was misidentification, it made no sense for Defendant to testify that he was at the Burger King that day.
>
> The Court finds Ms. Nunnally's testimony to be reliable and credible.  She has worked as a public defender since September 2003, and the Court finds it credible that she would have correctly advised defendant regarding the law.

> Further, the Court finds competent, substantial evidence that Defendant knowingly and voluntarily decided not to testify because of Ms. Nunnally's competent advice regarding trial strategy and the risks involved in taking the stand.
>
> Defendant fails to establish both deficient performance and prejudice. Therefore, Ground One is denied.

(R 76-78).

Roland respectfully disagrees with the trial court's findings where there is no competent substantial evidence to support the factual findings, and/or the legal conclusions are unreasonable under the facts of this case. This is shown where, save arguendo, even if defense counsel's testimony was more credible than Roland's on the specific nature of his priors being elicited, it was simply unreasonable to dissuade Roland against testifying on his own behalf. As detailed in his 3.850 motion, Roland's testimony would have provided a reasonable hypothesis of innocence that would have warranted granting a motion for judgment of acquittal, or at minimum would have created reasonable doubt, resulting in the jury finding Roland not guilty.

Accordingly, Roland should be entitled to a new trial based on this claim of ineffective assistance of counsel.

**Merits on Ground Two**.  Adopting the foregoing statement of case and facts in support of this claim, the record in this case reveals specific allegations of ineffective assistance of counsel for failing to investigate and present an alibi

27

witness (R 19-24). Although maybe not up to professional standards, Roland did

his best to prove this claim at the evidentiary hearing. However, the trial court

denied relief, finding:

> Ms. Nunnally testified that she attempted to contact Mr.
> Barker through an investigator. The investigator referral
> and investigator's report were introduced as State's
> Composite Exhibit 1. Ms. Nunnally pointed out that the
> investigation referral had two phone numbers and an
> address for Mr. Barker. The investigator's report showed
> that he tried to contact Mr. Barker "several times".
> Normally, her investigator would leave his contact
> information, and she testified that she did not receive a call
> from Mr. Barker at any time. She questioned why
> Defendant did not tell his brother, with whom he was in
> contact, that his counsel would like to speak with him. Ms.
> Nunnally was unequivocal about the fact that she does not
> depose defense witnesses for tactical reasons. Therefore, the
> Court finds no deficient performance by Ms. Nunnally
> because she attempted to locate Mr. Barker, but was unable
> to do so.
> In addition, based upon the testimony she heard at the
> evidentiary hearing, Ms. Nunnally doubted that Mr. Barker
> was an alibi witness because he was asleep and could not
> have testified as to where Defendant was that day. The
> Court agrees and finds that Defendant has not established
> prejudice. Therefore, the Court finds that Defendant has
> not established either deficient performance or prejudice,
> and Ground Two is denied.

(R 76-78).

Roland respectfully disagrees with the trial court's findings where there is no

competent substantial evidence to support the factual findings, and/or the legal

conclusions are unreasonable. Precisely, reliance on an alleged relevant

investigator's referral to support denial of relief is misplaced where, conveniently, the Exhibit was not provided in the record on appeal for this Court's review and verification. Review of the alleged investigative referral is critical to Roland's cause because he objected to its introduction on the grounds of it being wholly unrelated to this case, as seen in part where it even named different victims (EH 68). The trial court overruled the objection, permitting defense counsel to rely on it throughout the evidentiary hearing, and then the trial court relied on it in support of denying relief on the claim. But, if this Court were able to review the alleged referral, the Court would see that defense counsel provided false testimony with highly prejudicial and misleading implications during the hearing, effectively discrediting defense counsel's credibility in not just this claim, but in all the claims. Nonetheless, failure to provide the Exhibit in the record on appeal shows there is no competent, substantial evidence to support defense counsel's testimony, nor the trial court's findings in the order denying relief.

Additionally, defense counsel doubting Mr. Barker was an alibi witness unreasonably defies the factual allegations contained in Roland's motion, as well as the factual basis in support that was introduced during the evidentiary hearing.[5]

Accordingly, Roland should be entitled to a new trial based on this claim of

---

[5] It should be noted that had postconviction counsel been appointed, Mr. Barker's presence would have been secured, eliminating any argument that his testimony would not have supported an alibi defense. Just one more reason for reverse and remand for a new evidentiary hearing with appointment of counsel.

ineffective assistance of counsel.

**Merits on Ground Three**.  Adopting the foregoing statement of case and

facts in support of this claim, the record in this case reveals specific allegations of

ineffective assistance of counsel for failing to object to improper testimony from

law enforcement (R 25-28).  Although maybe not up to professional standards,

Roland did his best to prove this claim at the evidentiary hearing.  However, the

trial court denied relief, finding:

> During the evidentiary hearing, Ms. Nunnally testified
> that she filed a motion in limine prior to trial that would
> have excluded the video from Burger King and all
> testimony associated with that video because the video had
> been lost by Burger King. *See* Exhibit E. The Court denied
> the motion. Composite Exhibit F. The Court's decision was
> appealable.  Further, Ms. Nunnally objected to the video
> during the trial. Exhibit G, Trial Transcript ("T.T") at 216.
> The Court finds no deficient performance by Ms. Nunnally
> in attempting to exclude all evidence related to the Burger
> King video.
> Defendant also fails to establish that he was prejudiced.
> During his testimony in the evidentiary hearing, Defendant
> admitted that he was present at Burger King. Patti Smith, a
> Burger King employee who was acquainted with
> Defendant, also testified that she saw the video and
> Defendant was the person in the video. T.T. at 216.
> Therefore, the evidence established that Defendant was
> present at the Burger King the day of the robbery, and that
> Corporal Davis's testimony was not dispositive of the fact.
> Because Defendant failed to prove either deficient
> performance or prejudice, Ground Three is denied.

(R 78-79).

Roland respectfully disagrees with the trial court's findings where there is no competent substantial evidence to support the factual findings, and/or the legal conclusions are unreasonable. Particularly, both defense counsel and the trial court have misinterpreted the claim as an attack on the missing video. In contrast, Roland specifically alleged counsel was ineffective for failing to object to law enforcement's trial testimony where he offered his personal opinion testimony in support of an identification. In sum, the specific allegations and evidence in support has been disavowed, with no competent, substantial evidence to support denial of relief.

Accordingly, Roland should be entitled to a new trial based on this claim of ineffective assistance of counsel.

**Merits on Ground Six**. Adopting the foregoing statement of case and facts in support of this claim, the record in this case reveals specific allegations of ineffective assistance of counsel for failing to subject the State's case to meaningful adversarial testing (R 39-46). Although maybe not up to professional standards, Roland did his best to prove this claim at the evidentiary hearing. However, the trial court denied relief, finding:

> The Court finds that Ms. Nunnally did subject the State's case to meaningful adversarial testing: she filed a motion in limine to exclude evidence (Exhibit E; Composite Exhibit F); she cross-examined each State witness (*see* T.T. at 3, 109, 209); she made timely and appropriate objections during the trial (*see, e.g.,* T.T. at 183-84); and she presented

> the defense of misidentification during closing argument
> (T.T. at 346-47, 366). A defendant is entitled to reasonably
> effective counsel, not to perfect counsel. *O'Connell v. State,*
> 733 So.2d 556, 558 (Fla. 5th DCA 1999), *citing*
> *Waterhouse v. State,* 522 So.2d 341 (Fla. 1988). The Court
> finds that Ms. Nunnally's performance was effective.
>
> Further, Ms. Nunnally testified during the evidentiary
> hearing that Defendant never proposed any defense other
> than misidentification prior to trial. She testified that, in her
> opinion, misidentification was the strongest defense. The
> Court finds Ms. Nunnally's testimony to be reliable and
> credible, and further finds no deficient performance by Ms.
> Nunnally. Ground Six is denied.

(R 82-83).

Roland respectfully disagrees with the trial court's findings where there is no

competent substantial evidence to support the factual findings, and/or the legal

conclusions are unreasonable. Although Roland, because of his pro se status,

failed to present evidence or argument in support of this claim, he did rely on the

facts alleged in his motion, and it appears the trial court accepted that as sufficient.

Based on those facts, defense counsel's actions/inactions were wholly

unreasonable.

In sum, defense counsel presented a defense that defied logic and insulted

the jury's intelligence, and counsel did so in the face of a viable defense that would

have created reasonable doubt, explaining a reasonable hypothesis of innocence,

resulting in an acquittal. This amounted to failure to subject the State's case to

meaningful adversarial testing that has an innocent man in prison for crimes he did

32

not commit.

Accordingly, Roland should be entitled to a new trial based on this claim of ineffective assistance of counsel.

**Merits on Ground Seven**.  In support of this claim, Roland alleged counsel was ineffective based on the cumulative effect of errors (R 47-49).  In denying relief on the claim the trial court simply found, "Defendant fails to demonstrate multiple counsel errors...Therefore, the Court's confidence in the verdict and sentence are not undermined, and Ground Seven is denied" (R 83).

Roland contends the trial court's finding on this claim is reversible error when considering the facts of this case and applicable law.  See, *Urquhart v. State*, 676 So. 2d 64 (Fla. 1st DCA 1996) (establishing the cumulative effect of numerous errors or omissions in a counsel's performance may constitute prejudice. Citing, *State v. Gunsby*, 670 So. 2d 920 (Fla. 1996); *Cherry v. State*, 659 So. 2d 1069 (Fla. 1995); *Harvey v. Dugger*, 656 So. 2d 1253 (Fla. 1995).

Consequently, Roland should be entitled to a new trial based on the cumulative effect of counsel's deficient performance and prejudice rendered.

## CONCLUSION

WHEREFORE, Roland prays this Honorable Court will find the trial court reversibly erred in denying relief on the foregoing claims, vacate the judgments and sentences, reverse and remand for further proceedings, or grant any other appropriate relief.

Respectfully submitted,

Jahquez Roland
DC # L03988
Gulf C. I. Annex
699 Ike Steele Road
Wewahitchka, Florida 32465

## CERTIFICATE OF SERVICE

I certify that I placed this document in the hands of Gulf C. I. Annex Prison Officials for mailing to: Office of Attorney General, 444 Seabreeze Blvd., Suite 500, Daytona Beach, Florida 32118, on this _12th_ day of August 2016.

Jahquez Roland

## CERTIFICATE OF COMPLIANCE

I certify that the instant brief complies with the font requirements of Fla. R. App. P. 9.210(a)(2).

Jahquez Roland

34



IN THE DISTRICT COURT OF APPEAL
FIFTH DISTRICT OF THE STATE OF FLORIDA

JAQUEZ ROLAND,

      Appellant,

vs.                          Case No. 5D16-0438

STATE OF FLORIDA,

      Appellee.

_____/

ON APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR FLAGLER COUNTY, FLORIDA

**AMENDED ANSWER BRIEF OF APPELLEE**

PAMELA JO BONDI
ATTORNEY GENERAL

ALLISON LEIGH MORRIS
ASSISTANT ATTORNEY GENERAL
Fla. Bar #931160
444 Seabreeze Blvd.
Fifth Floor
Daytona Beach, FL  32118
(386) 238-4990
(386) 238-4997
COUNSEL FOR APPELLEE

Email:
CrimAppDAB@MyFloridaLegal.com
Allison.Morris@MyFloridaLegal.com

RECEIVED, 1/10/2017 9:52 AM, Joanne P. Simmons, Fifth District Court of Appeal

<u>TABLE OF CONTENTS</u>

<u>PAGES</u>

TABLE OF AUTHORITIES........................................ ii

STATEMENT OF THE CASE AND FACTS.............................. 1

SUMMARY OF THE ARGUMENT...................................... 4

ARGUMENT

    <u>POINT I</u>

    THE TRIAL COURT DID NOT ABUSE IT
    DISCRETION BY DENYING APPELLANT'S
    REQUEST FOR APPOINTMENT OF POST-
    CONVICTION COUNSEL...................................... 3

    <u>POINT II</u>

    THE TRIAL COURT DID NOT ERR IN DENYING
    APPELLANT'S MOTION FOR POST CONVICTION
    RELIEF AFTER CONDUCTING AN EVIDENTIARY
    HEARING................................................ 6

CONCLUSION..................................................12

CERTIFICATION OF SERVICE....................................13

CERTIFICATION OF FONT.......................................13

I

<u>TABLE OF AUTHORITY</u>

<u>CASES</u>

<u>Cave v. State</u>,
     529 So. 2d 293 (Fla. 1988)................................ 8

<u>Demps v. State</u>,
     761 So. 2d 302 (Fla. 2000)............................... 6

<u>Henderson v State</u>,
     883 So. 2d 891 (Fla. 5th DCA 2004)...................... 3

<u>Melendez v. State</u>,
     718 So. 2d 746 (Fla. 1998)............................... 6

<u>Mullis v State</u>,
     864 So. 2d 1246 (Fla. 5th DCA 2004)..................... 3

<u>Rosado v State</u>,
     927 So. 2d 979 (Fla. 5th DCA 2006)...................... 3

<u>Strickland v. Washington</u>,
     466 U. S. 688 (1984)................................. ibid.

<u>Swaford v. State</u>,
     828 So. 2d 966(Fla. 2002)................................ 6

II

<u>STATEMENT OF THE CASE AND FACTS</u>

On May 22 and 23, 2013, Appellant was convicted by a jury o (I) robbery with a weapon, (II) grand theft, (III) false imprisonment, and (IV) battery.  (V. 1, p. 74).  He was sentenced to 30 years in state prison for count I, followed by five years for count II and five years for count III.  (V. 1, p. 74).  On October 24, 2014, Appellant filed a motion for post conviction relief alleging the following claims of ineffective assistance of counsel: 1) Trial counsel advised him not to testify, 2) Counsel failed to investigate and present his alibi, 3) Counsel failed to object to law enforcement's testimony regarding his driver's license photograph matching the person in the surveillance video, 4) Trial counsel failed to object to the prosecutor's inappropriate comments during closing, 5) Trial counsel failed to move for a mistrial after the jury heard a comment by a bailiff, 6) Trial counsel failed to subject the State's case to meaningful adversarial testing, and cumulative error. (V. 1, p. ).  He filed a motion for appointment of counsel which the trial court denied. (V. 1, p. 68-70).  The trial court conducted an evidentiary hearing on December 11, 2015.  (V. 1, p. ).  On January 13, 2016, the trial court denied the motion.

1

## SUMMARY OF THE ARGUMENT

The trial court did not err in denying Appellant's motion for post conviction relief.  The trial court held an evidentiary hearing and found that defense counsel's testimony was more credible.  Appellant has not demonstrated that defense counsel's performance was deficient or that Appellant was prejudiced by it.

Appellant received a full and fair hearing on his claims. He was ably to present his claims, questions witnesses and make his arguments.  The issues presented were not complex or required a lot of legal research.  Therefore, the trial court did not abuse its discretion in denying his request for appointment of post conviction counsel.

2

<u>ARGUMENT</u>

<u>POINT I</u>

THE TRIAL COURT DID NOT ABUSE IT
DISCRETION BY DENYING APPELLANT'S
REQUEST FOR APPOINTMENT OF POST-
CONVICTION COUNSEL.

Appellant filed a motion for appointment of counsel to represent him on his motion for post conviction relief. (V. 1, p. 68-69). The trial court denied the motion in a written order without comment. (V. 1, p. 70). On appeal, he argues that this was in error. The appellate court reviews an appellant's claim that he should have been appointed counsel on an abuse of discretion standard. <u>Mullis v State</u>, 864 So. 2d 1246 (Fla. 5th DCA 2004). However, a review of the evidentiary hearing conducted on the motion for post conviction relief demonstrates the trial court did not err in denying appointment of post conviction counsel.

This Court has summarized:

> There is no absolute right to appointed counsel in a post-conviction proceeding. Appointed counsel may be necessary if the issues are complex or require substantial legal research.

<u>Rosado v State</u>, 927 So. 2d 979 (Fla. 5th DCA 2006), citations omitted; <u>Henderson v State</u>, 883 So. 2d 891 (Fla. 5th DCA 2004).

3

The nature of the proceeding, its complexity, the difficulty of handling an evidentiary hearing, the need for substantial research are all factors which may indicate appointment of counsel is necessary to protect a defendant's rights.  <u>Graham v State</u>, 372 So. 2d 1363 (Fla. 1979).

Presently, Appellant asserts that due to the complexity of the issues and the hearing, he required appointment of post conviction counsel.  However, a review of the transcript demonstrates that he ably and competently set forth his claims, and that those claims got a full airing.  The trial court went through all seven of his claims, one by one, and ensured that it understood Appellant's position.  Appellant was able to develop the nuances of each claim.  For example, he was able to explain to the trial court why he should have been able to testify despite the fact that he told the court at trial he was willingly giving up this right.  He was also able to explain why he believed his counsel was ineffective for failing to object to a law enforcement's identification of appellant.  His claimed he did not present the testimony of his brother, Caleb Baker, because he was unskilled in the legal process. However, he was able to present another a witness, and ably questioned her.  When he cross-examined his trial counsel, he disputed various issues of fact with her.  He was well-versed in the parlance of the court system.

4

Further, the issues that were presented were uncomplicated. They had to do primarily with presenting different versions of facts to the trial court.  Again, Appellant ably did this at the evidentiary hearing.

The trial court did not abuse its discretion in denying appointment to counsel.  The issues presented were not novel, complex or required a great deal of legal research.  Appellant proved himself adept at presenting his claims and evidence at the evidentiary hearing.  In fact, the trial court complimented Appellant at the evidentiary hearing, and told him he presented his position, his motion was well written, and it understood the issues that he raised.  (H.T., p. 130).  He did not require appointment of counsel for a full and fair hearing of his post conviction claims.  The trial court did not abuse its discretion by denying his motion.

<u>POINT II</u>

THE TRIAL COURT DID NOT ERR IN DENYING
APPELLANT'S MOTION FOR POST CONVICTION
RELIEF AFTER CONDUCTING AN EVIDENTIARY
HEARING.

In reviewing the denial of a post-conviction motion after an evidentiary hearing, an appellate court cannot disturb findings of the trial court which are supported by competent, substantial evidence. <u>Cf.</u> <u>Swaford v. State</u>, 828 So. 2d 966, 977 (Fla. 2002) (after 3.850 evidentiary hearing, where trial court's findings are supported by competent, substantial evidence, appellate court will not substitute its judgment for that of the trial court on questions of fact). This standard applies to the credibility of the witnesses as well as the weight to be given to the evidence by the trial court. <u>Id.</u> (quoting <u>Melendez v. State</u>, 718 So. 2d 746, 747-748 (Fla. 1998)). A trial court's ruling on a pure question of law is subject to <i>de novo</i> review. <u>Demps v. State</u>, 761 So. 2d 302, 305 (Fla. 2000).

The United States Supreme Court set out the standards for evaluating an ineffective assistance of counsel claim in <u>Strickland v. Washington</u>, 466 U. S. 688 (1984). Under <u>Strickland</u>, a claimant asserting ineffective assistance of counsel faces a heavy burden.

He must first identify the specific omission
and show that counsel's performance falls

6

> outside the wide range of reasonable
> assistance. In determining whether this has
> occurred, courts must eliminate the distorting
> effects of hindsight by evaluating the
> performance from counsel's perspective at the
> time and must grant a strong presumption that
> counsel rendered adequate assistance and made
> all significant decisions in the exercise of
> reasonable professional judgment. The burden is
> on the claimant to show that counsel was
> ineffective. Having demonstrated inadequate
> performance, the claimant must then show an
> adverse effect so severe that there is a
> reasonable probability that the results would
> have been different except for the inadequate
> performance.

Cave v. State, 529 So. 2d 293, 297 (Fla. 1988).

The first appellate claim is that trial counsel was ineffective for advising Appellant not to testify on his own behalf.  He asserted that he felt he needed to take the stand in regard to support his defense of misidentification.  He further stated that defense counsel misadvised him the jury would find out he had just gotten out of prison for burglary.  (H.T., p. 8).  However, a review of the evidentiary transcript shows that his claims are either refuted or without merit.

At the hearing, he acknowledged that he stated on the trial record that was his decision not to take the stand and no one forced him to make this decision.  (H.T., p. 13-15).  His attorney testified:

> Question: Did you ever tell him that the jury
> would find out the specifics and he
> nature of his prior offenses if he
> were to take the stand?

7

Answer:   I never told him that.

(H.T., p. 65).  She further explained that she discussed the possibility of opening the door to the information if he disputed the number of his prior offenses.  Finally, defense counsel explained that the defense was misidentification.  Apparently, Appellant would have asserted that he had stopped by the Burger King about the same time it was robbed.  She reasoned that it would not be wise to place yourself at the crime scene, especially given the different versions of why one was there, when your defense was misidentification.  (H.T., p. 77).

Based on the testimony of adduced at the evidentiary hearing, the trial court accepted defense counsel's testimony as more credible, and found that she was not ineffective:

> The Court finds Ms. Nunnally's testimony to be reliable and credible.  She has worked as a public defender since September 2003, and the Court finds it credible that she would have correctly advised the Defendant regarding the law.  Further, the Court finds competent, substantial evidence that Defendant knowing and voluntarily decided not to testify because of Ms. Nunnally's competent advice regarding trial strategy and the risks involved in taking the stand.

(V. 1, p. 78).  Thus, the trial court's ruling is supported by substantial, competent evidence, and supports its conclusion that Appellant has demonstrated neither deficient performance or resulting prejudice.

Appellant's second claim is that trial counsel failed to

8

present an alibi by failing to call Caleb Barker, Appellant's

brother.  The trial court summarized Barker's proposed testimony:

> Both he and his brother were home when
> Defendant received a call, his brother was
> asleep, Defendant left home to help a friend,
> his car broke down, and Defendant ran to Burger
> King to call his brother who came and helped
> him push the car.

(V. 1, p. 78).  Appellee would also note that this is different

than that set forth in the Rule 3.850 motion where he stated he

had been out jogging and stopped by the Burger King for water.

The trial court accepted defense counsel's testimony that

she sent her investigator to talk to Appellant's brother, and

they were unable to contact him despite repeated attempts.  It

also agreed with defense counsel that Appellant could have

contacted his brother himself since he was in contact with him.

(V. 1, p. 78).  The court concluded, "Therefore, the Court finds

no deficient performance by Ms. Nunnally because she attempted to

locate Mr. Barker, but was unable to do so."  (V. 1, p. 78).  As

to Appellant's contention that the investigator's report was

irrelevant, it demonstrates that defense counsel was

investigating numerous witnesses. It appears that Appellant was

facing charges in a number of different cases, and most likely,

the defense counsel was attempting to contact Appellant's brother

in all of the cases.

The trial court also found no prejudice.  The witness would

testify that he was sleeping and could not have testified as to

where Appellant was that day.  Thus, he was not actually an alibi witness. The court ruled, "The Court agrees and finds that Appellant has not established prejudice." (V. 1, p. 79).

Appellant third claim is that defense counsel erred in failing to object to a law enforcement's identification of Appellant's driver's license to the video taken at the Burger King.  Specifically he argued that the officer lacked a proper predicate because the video was not in evidence.  The trial court found that defense counsel repeatedly tried to have the video, and all testimony associated with the video, excluded because Burger King had lost the video.  She filed a motion in limine and objected at trial, both times unsuccessfully.  (V. 1, p. 79).

The trial court also found no prejudice.  The officer, Corporal Davis, was not the dispositive identification of Appellant.  Another witness also identified Appellant, and he admitted at the evidentiary hearing that he had been at the Burger King.  The trial court ruled:

> During his testimony at the evidentiary hearing, Defendant admitted that he was present at Burger King.  Patti Smith, a Burger King employee who was acquainted with Defendant, also testified that she saw the video and Defendant was the person in the video. T.T. at 216.  Therefore, the evidence established that Defendant was present at Burger King the day of the robbery, and that Corporal David's testimony was not dispositive of that fact.

(V. 1, p. 79).

Appellant's next claim, (sixth claim in the post conviction

10

motion), was that defense counsel failed to conduct meaningful, adversarial testing of Appellant's case.  The trial court found that the trial transcript and the evidentiary hearing testimony refuted this claim on its face:

> [S]he filed a motion in limine to exclude evidence; she cross-examined each State witness; she made timely and appropriate objections during the trial; and she presented the defense of misidentification during closing argument.

(citations omitted)(V. 1, p. 82). The trial court attached the portions of the records showing that defense counsel did each of the foregoing things.  Further, the trial court noted that Appellant never proposed any defense other than misidentification prior to trial, and that in her professional opinion, it was the strongest defense.  (V. 1, p. 83).  This was the defense presented at trial.  Thus, the record supports the trial court's conclusion that defense counsel was effective.

Appellant's final claim, (seventh claim in the post conviction motion) was cumulative error. Finally, as the trial court concluded, as there was no deficient performance or resulting prejudice at all, there cannot be cumulative error. (V. 1, p. 83).

<u>CONCLUSION</u>

Based on the arguments and the authorities presented herein, the Appellee respectfully prays this Honorable Court affirm the trial court's order denying Appellant's motion for post conviction relief.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL
<u>/s Allison Leigh Morris</u>
ALLISON LEIGH MORRIS
ASSISTANT ATTORNEY GENERAL
Fla. Bar #931160
444 Seabreeze Blvd.
Fifth Floor
Daytona Beach, FL  32118
(386)238-4990
(386)238-4997 (fax)
COUNSEL FOR APPELLEE

<u>DESIGNATION OF E-MAIL ADDRESS</u>

The State designates <u>crimappdab@myfloridalegal.com</u> as its primary email address and <u>allison.morris@myfloridalegal.com</u> as its secondary address.


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Amended Answer Brief of Appellee has been sent via U.S. Mail to Jaquez Roland, pro se, DOC #L03988, Cross City C.I., 568 NE 255th Street, Cross City, FL 32628 this 10th of January, 2017.

<u>/s/ Allison Morris</u>
Allison Leigh Morris
Of Counsel


<u>STATEMENT CERTIFYING FONT</u>

The undersigned certifies that this brief is printed using Courier New Font, 12 point type.

<u>/s/ Allison Morris</u>
Allison Morris

13




PROVIDED TO
CROSS CITY CI. ON
MAR 15 2017
FOR MAILING

IN THE DISTRICT COURT OF APPEAL
FOR THE FIFTH DISTRICT
STATE FLORIDA

JAHQUEZ ROLAND,

     Appellant,

vs.

STATE OF FLORIDA,

     Appellee.

DCA Case No.: 5D16-0438

Appeal From The Circuit Court Of The Seventh Judicial Circuit
In And For Flagler County, Florida

REPLY BRIEF OF APPELLANT

RECEIVED

MAR 2 0 2017

DISTRICT COURT OF APPEAL
FIFTH DISTRICT

Jahquez Roland, DC# L03988
Cross City Correctional Institution
568 N.E. 255th Street
Cross City, Florida 32628

Appellant *pro se*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF CITATIONS ............................................................. ii

REBUTTAL FACTS ................................................................... 1

ARGUMENT ............................................................................. 3

    **I.**    THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPOINTMENT OF POSTCONVICTION COUNSEL ........................................................................ 3

    **II.**   TRIAL COURT REVERSIBLY IN DENYING POSTCONVICTION RELIEF AFTER THE EVIDENTIARY HEARING .......................................................................... 5

CONCLUSION ......................................................................... 10

CERTIFICATE OF SERVICE ................................................. 11

CERTIFICATE OF COMPLIANCE ........................................ 11

## TABLE OF CITATIONS

**Cases**

Bynum v. State,
    932 So. 2d 361 (Fla. 2nd DCA 2006) ........................................................ 4

Davis v. State,
    499 So. 2d 24 (Fla. 4th DCA 1986) .......................................................... 4

Edwards v. State,
    583 So. 2d 740 (Fla. 1st DCA 1991)................................................... 4, 7, 9

Evans v. State,
    177 So. 3d 1219 (Fla. 2015)...................................................................... 9

Hardwick v. Crosby,
    320 F.3d 1127 (11th Cir. 2003).................................................................. 7

Harrell v. State,
    894 So. 2d 934 (Fla. 2005)........................................................................ 6

Henderson v. State,
    919 So. 2d 652 (Fla. 1st DCA 2006).......................................................... 3

Hunter v. State,
    87 So. 3d 1273 (Fla. 1st DCA 2010)........................................................... 5

Johnson v. Williams,
    133 S.Ct. 1088 (2013) ............................................................................... 5

Ruffin v. State,
    549 So. 2d 250 (Fla. 5th DCA 1989) ............................................... 3, 4, 5, 7

Smith v. State,
    41 Fla. L. Weekly D85 (Fla. 5th DCA December 30, 2016)...................... 7

Victorino v. State,
    127 So. 3d 478 (Fla. 2013)........................................................................ 7

Wade v. State,
    156 So. 3d 1004 (Fla. 2014)...................................................................... 7

**Rules**

Florida Rules of Appellate Procedure
    Rule 9.210(a)(2) ........................................................ 11

Florida Rules of Criminal Procedure
    Rule 3.850((f)(8)(A) .................................................... 5


**Other Authorities**

Florida Standard Jury Instruction (Criminal) 3.7 ......................................... 10

## REBUTTAL FACTS

Prior to trial, defense counsel filed a motion in limine to prohibit (1) Patti Smith's opinion as to **identification** from a Burger King video not in evidence on the ground that the video is the best evidence and opinion testimony invades the province of the jury and (2) testimony from Dorothy Edmonds, Corporal Kim Davis, Detective Spires and Patti Smith regarding the **contents** of the Burger King video not in evidence on the ground that the video is the best evidence (R 126). The trial court denied relief on these issues because 90.954 does not preclude testimony from witnesses as to the content of the Burger King video (R 128).

When the issue of the video came up during Patti Smith's trial testimony, based on the motion in limine, trial counsel did "renew" her objection to the video evidence, which the trial court overruled (R. 115, 140).

The undisputed evidence is that Corporal Kim Davis did not know Appellant prior to the crime and did not witness the crime; although not an expert, Davis made an opinion based identification that placed Appellant in the Burger King (EH 25-27, 29-30, 79). Law enforcement's positive identification was a "key feature" of the prosecution's case (R 27-28; EH 28). Even though misidentification was the primary defense strategy (R 28; EH 29), defense counsel failed to object to Corporal Davis' opinion based identification testimony (EH 27).

1

At the evidentiary hearing counsel testified that her approach was to argue the inconsistencies in identification and inconsistencies about what was on the video (EH 102:19-103:3). Counsel claimed that the motion in limine was to object to "any identification whatsoever" and that "I made my objection as to any identification issue" (EH 102). Nevertheless, counsel ultimately conceded that she did not object to the law enforcement's opinion testimony because she did not feel it was warranted (EH 101-102).

<u>ARGUMENT</u>

**I.**

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING
APPOINTMENT OF POSTCONVICTION COUNSEL

Appellant was not able to, nor did he, competently set forth his claims and

his claims did not receive a full hearing. See <u>Amended Answer Brief</u>, pp. 4.

Claim Three of Appellant's 3.850 motion alleged that trial counsel was

ineffective for failing to object to law enforcement testimony identifying Appellant

in a Burger King surveillance video based on the officer's comparison of

Appellant's drivers license photo to the person in the surveillance video (R. 25-28).

This clearly inadmissible opinion evidence[1] bolstered the prosecution's case

because it was used to link Appellant to the robbery.

The "rules of evidence and procedure are mystifyingly complex," <u>Henderson</u>

<u>v. State</u>, 919 So. 2d 652, 655 (Fla. 1st DCA 2006), and Appellant expressed his

need for a lawyer to represent him on this rules-of-evidence based issue (EH 23-

24). Appellant's lack of understanding on how to go forward with the burden of

proving this claim (EH 23-32) demonstrates the complexity of the rules of

evidence involved and the need for legal research. <u>Id</u>. Even after reading directly

---

[1]: See <u>Ruffin v. State</u>, 549 So. 2d 250, 251 (Fla. 5th DCA 1989) (holding
police officer's identification of defendant as man in videotape was error where
officers did not witness the crime, lacked any special familiarity with defendant,
and was not qualified as experts in identification).

from his 3.850 motion, the Appellant was unable to articulate how he was prejudiced: "had she would have objected I don't know what would have happened..." (EH 31:3-4).

Appellant's attempts to cross-examine trial counsel on Claim Three to establish deficient performance proved unfruitful (EH 98-104). He never clearly and directly asked counsel why she neglected to object to law enforcement's testimony identifying him as the person in the Burger King video on the ground that it was inadmissible opinion testimony. He never questioned counsel about the decision in Ruffin v. State, 549 So. 2d 250, which was cited in Appellant's 3.850 motion. Appellant asked counsel whether her failure to object was because she did not feel "there was anything to object to as to the lack of the proper predicate by law enforcement officer" (EH 101:19-20), but he ever clarified what predicate should have been established. See e.g. Edwards v. State, 583 So. 2d 740, 741 (Fla. 1st DCA 1991) (finding error in allowing police officer to identify defendant in video absent predicate establishing familiarity with defendant or qualifications as an expert in identification). Just as in Bynum v. State, 932 So. 2d 361, 363 (Fla. 2nd DCA 2006) and Davis v. State, 499 So. 2d 24, 26 (Fla. 4th DCA 1986), cross-examination of defense counsel by appointed collateral counsel may have shown Appellant is entitled to postconviction relief.

## II.

## TRIAL COURT REVERSIBLY IN DENYING POSTCONVICTION RELIEF AFTER THE EVIDENTIARY HEARING

Appellee does not dispute Appellant's argument that the postconviction court misinterpreted Claim Three of Appellant's 3.850 wherein Appellant claimed counsel ineffectively failed to object to law enforcement's opinion based identification testimony[2]. The court never addressed the substance of Appellant's assertion that the testimony was inadmissible under <u>Ruffin</u>, *supra,* and counsel's failure to object on that basis. A trial court must make findings of fact on the claims raised in a defendant's motion for postconviction relief or the order must be reversed. See, <u>Hunter v. State</u>, 87 So. 3d 1273 (Fla. 1st DCA 2010); Florida Rules of Criminal Procedure 3.850((f)(8)(A) ("the court...shall *determine the issues*, and make findings of fact and conclusions of law with respect thereto."). Thus, this claim has not been decided on the merits[3].

---

[2]: Initially, Appellee correctly states Appellant's argument, but then **incorrectly** adds, "[s]pecifically he argued that the officer lacked a proper predicate because the video was not in evidence." See Amended Answer Brief at 10. But see (R 25-28; EH 25-27).

[3]: A judgment is normally said to have been rendered "on the merits" only if it was "delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments." <u>Johnson v. Williams</u>, 133 S.Ct. 1088, 1097 (2013). And as used in this context, the word "merits" is defined as "[t]he intrinsic rights and wrongs of a case as determined by matters of substance, in distinction from matters of form." <u>Id</u>.

Regardless of the postconviction court's failure to adjudicate the merits of Claim Three, its finding that counsel's performance was not deficient – to the extent that counsel failed to object to law enforcement's opinion based identification testimony – is not supported by competent substantial evidence.

First, counsel's motion in limine specifically requested that "Patti Smith" be prohibited from providing opinion as to identification in the Burger King video, no one else (R. 126 ¶ 1). Counsel only requested that other individuals be prohibited from providing testimony regarding the "contents" of the Burger King video (R. 126 ¶ 2). Both requests were made pursuant to the best evidence rule (R 126) and neither would have been sufficiently precise to *fairly* put the trial court on notice that law enforcement's opinion based identification testimony was inadmissible. Harrell v. State, 894 So. 2d 934, 939-40 (Fla. 2005).

Second, counsel's testimony that the motion in limine was to any identification whatsoever (EH 102) is clearly refuted by the motion itself. Counsel only moved to prohibit Patti Smith from providing opinion identification testimony, not Corporal Davis (R 126). Counsel's testimony that she objected to any identification issues (EH 101) is refuted by the postconviction court's own exhibits (R 115). The court's exhibits show counsel's objection was made during Patti Smith's testimony, not Corporal Davis' (R. 115, 140).

The record also shows that counsel's failure to object was unreasonable. The reason counsel did not object is her belief that there was not a lack of any proper predicate (EH 101-102). The evidence in the record is that Corporal Davis was not a witness to the crime, did not know the Appellant, and was not an expert (EH 25-27). Based on this unrefuted evidence, there was no predicate for the opinion based identification. Ruffin, 549 So. 2d 251; Edwards, 583 So. 2d 741. Counsel's belief that there was no lack of a proper predicate was based on a failure to understand the law. "[A] tactical or strategic decision is **unreasonable** if it is based on a failure to understand the law." Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003).

The record shows counsel's failure to object to Corporal Davis' opinion testimony identifying Appellant as the person in the Burger King video was constitutionally deficient. This issue was examined in Victorino v. State, 127 So. 3d 478, 490 (Fla. 2013), where (like this case) a lay opinion objection would have been sustained had counsel objected. It was also addressed in Wade v. State, 156 So. 3d 1004, 1023 (Fla. 2014), where (unlike this case) counsel made a reasonable strategic decision not to object because the video **was** introduced into evidence and no prejudice resulted because the *jury reviewed the tape* and was able to make a determination of whether the defendant appeared in the video. See also Smith v. State, 41 Fla. L. Weekly D85 (Fla. 5th DCA December 30, 2016) (counsel was

7

ineffective for failing to object to detective's testimony identifying the defendant as the person in the surveillance video and the still photographs).

The postconviction court's finding that the Appellant failed to establish prejudice is not supported by competent substantial evidence. The postconviction court's finding was based on three things (1) Appellant admitted that he was present at the Burger King; (2) Patti Smith identified Appellant in the Burger King video; and (3) Corporal Davis' testimony was not dispositive of the Appellant's presence at the Burger King (R. 79).

The Appellant did not testify at his trial (R 2 ¶ 3). He admitted in his postconviction motion that he was present at the Burger King (EH 31-32) but that is not evidence the jury was aware of or considered during its deliberation. It is irrelevant that Appellant conceded his presence in the Burger King after trial in a postconviction motion because it has no bearing on the ineffective assistance of counsel that Appellant received *during* his trial. The postconviction court's holding that Appellant failed to establish prejudice based on Appellant's post trial concession is unreasonable.

While Patti Smith may have identified the Appellant in the Burger King video, the postconviction court made no finding that Smith's trial testimony was credible. At best, Smith's testimony merely added to the conflicting testimony at Appellant's trial (EH 102:19-103:3). Moreover, Smith's testimony does not

8

eviscerate the prejudice caused by Corporal Davis' testimony. For example, in Evans v. State, 177 So. 3d 1219, 1231 (Fla. 2015), the court held the trial court erred in concluding detective's opinion based voice identification testimony would not be prejudicial because defendant's voice had already been identified by his stepdaughter and the victim's neighbor.

Corporal Davis' testimony was dispositive of Appellant's presence at the Burger King. Davis' status as a law enforcement officer lent an aura of expertise to the identification precisely because of her status as a law enforcement officer, adding the imprimatur of her belief in the Appellant's guilt.

> [E]rror in admitting improper testimony may be exacerbated where the testimony comes from a police officer. When a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave. There is the danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial.

Evans, 177 So. 3d at 1230 (citations and internal quotations omitted).

The record also shows that counsel's deficient performance undermines confidence in the outcome of the trial. The prosecution's case was wholly circumstantial and no direct evidence whatsoever was presented or existed (R 10). The video was not entered into evidence so the jury could not make its own determination of whether or not Appellant's image appeared in the surveillance video. The evidence on identification was conflicting (EH 102-103), but law

9

enforcement positively identified the Appellant in the Burger King video. The prosecutor made law enforcement's identification a key feature of its case and closing argument (R 27-28; EH 28). The inadmissible evidence tipped the weight of the evidence in favor of the prosecution. Without this error the jury would have entertained the reasonable doubt created by the conflicting evidence. See Florida Standard Jury Instruction (Criminal) 3.7 (a reasonable doubt as to the guilt of the defendant may arise from conflicts in the evidence or lack of evidence).

If the record does not provide a full factual basis to establish this claim of ineffective assistance of counsel, it is because Appellant was denied the appointment of counsel at the evidentiary hearing and was therefore unable to fully develop the facts to show his entitlement to relief

## CONCLUSION

This Honorable Court should reverse the order denying Roland's motion for postconviction relief.

Respectfully submitted,

Jahquez Roland, DC# L03988
Cross City Correctional Institution
568 N.E. 255th Street
Cross City, Florida 32628

Appellant, *pro se*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that this Reply Brief and a true and correct copy hereof was placed into the hands of correctional officials for delivery by U.S. Mail, postage pre-paid to: The Clerk of Court for the Fifth District Court of Appeals, 300 South Beach Street, Daytona Beach, Florida 32114, and the Office of the Attorney General, 444 Seabreeze Boulevard, Suite 500, Daytona Beach, Florida 32118, on this _14th_ day of March 2017.

<u>CERTIFICATE OF COMPLIANCE</u>

I HEREBY CERTIFY that this computer-generated brief is prepared in Times New Roman 14-point font and complies with the requirements of Fla. R App. P. 9.210(a)(2)

Jahquez Roland, DC# L03988
Cross City Correctional Institution
568 N.E. 255th Street
Cross City, Florida 32628

Appellant, *pro se*

11





PROVIDED TO
CROSS CITY C.I. ON

AUG 28 2017

FOR MAILING

IN THE DISTRICT COURT OF APPEAL, STATE OF FLORIDA

FIFTH DISTRICT

**RECEIVED**

**AUG 31 2017**

DISTRICT COURT OF APPEAL
FIFTH DISTRICT

JAHQUEZ SHAKIM ROLAND,

　　　　Appellant,

v.　　　　　　　　　　　　　　　　Case No.: 5D16-438

STATE OF FLORIDA,

　　　　Appellee.　　　　　　　／
_____

<u>**MOTION FOR REHEARING**</u>
<u>**AND REQUEST FOR A WRITTEN OPINION**</u>

COMES NOW, the *pro* se Appellant Jahquez Shakim Roland, pursuant to Florida Rule of Appellate Procedure 9.330, and respectfully moves the Court to rehear its July 17, 2017 decision affirming, without written opinion, the lower court's order denying postconviction relief and issue a written opinion. As grounds, the appellant submits the Court has overlooked or misapprehended material facts or controlling points of law as demonstrate herein below.

In Ground Three of his motion for postconviction relief the defendant made the following allegation of ineffective assistance of trial counsel:

> Trial counsel was ineffective  for failing to object to law enforcement's testimony concerning the defendant's driver license photo matching a surveillance video, in the absence of a proper predicate to allow for the inclusion of said testimony, as this identification testimony was a key feature of the prosecution's case[.]

(R. 25). The trial court misconstrued the appellant's claim as follows:

1

> In Ground Three, Defendant alleges that he received ineffective
> assistance of counsel for counsel's failure to object to Corporal Kim
> Davis's testimony that Defendant, judging from his driver's license
> photo, matched the person in the surveillance video from Burger
> King. <u>Defendant alleged that [defense counsel] had a duty to object
> because the officer lacked a proper predicate to testify regarding the
> video because the video was not in evidence.</u>

(R. 79.) (underscore added).

As argued in the initial brief at pp. 30, the postconviction court misinterpreted[1] the claim as an attack on the missing video although the appellant's claim is that counsel failed to object to law enforcement testimony offering her opinion of the appellant's identify in the video.

The court never addressed the substance of Appellant's assertion that law enforcement's testimony was inadmissible under <u>Ruffin v. State</u>, 549 So. 2d 250, 251 (Fla. 5th DCA 1989) and counsel's failure to object on that basis. In <u>Williams v. State</u>, 175 So. 3d 349, 350 (Fla. 3rd DCA 2015), the court noted that the trial court's order failed to "focus on or adjudicate the central aspect" of the defendant's claim. Its decision was reversed, as should be the trial court's order in this case.

---

[1]: "Generally speaking, pleadings are to be construed favorably to the pleader" and "liberal construction should be given to *pro se* pleadings." <u>Stokes v. Florida Department of Corrections</u>, 948 So. 2d 75, 77 (Fla. 1st DCA 2007). This "principle should be applied to effect justice and afford the indigent the advantage denied him by his lack of legal training and should not be invoked to create further disadvantage." <u>Thomas v. State</u>, 164 So. 2d 857, 857 n.1 (Fla. 2d DCA 1964).

A trial court must make findings of fact on the claims raised in a defendant's motion for postconviction relief or the order must be reversed. See, <u>Hunter v. State</u>, 87 So. 3d 1273 (Fla. 1st DCA 2010); Florida Rules of Criminal Procedure 3.850((f)(8)(A) ("the court...shall *determine the issues*, and make findings of fact and conclusions of law with respect thereto."). Thus, this claim has not been decided on the merits[2] and this court in affirming the postconviction court's decision has overlooked or misapprehending this binding authority.

Moreover, the appellant asserts that a written opinion would provide a legitimate basis for supreme court review because this court's decision is in conflict with Florida Rule of Criminal Procedure 3.850(f)(8) and the holding in <u>Hunter v. State</u>, 87 So. 3d 1273 (Fla. 1st DCA 2010).

**WHEREFORE**, based on Florida Rule of Criminal Procedure 3.850(f)(8) and <u>Hunter v. State</u>, 87 So. 3d 1273 (Fla. 1st DCA 2010), the Appellant respectfully requests this Honorable Court grant rehearing and issue a written opinion.

---

[2]: A judgment is normally said to have been rendered "on the merits" only if it was "delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments." <u>Johnson v. Williams</u>, 133 S.Ct. 1088, 1097 (2013). And as used in this context, the word "merits" is defined as "[t]he intrinsic rights and wrongs of a case as determined by matters of substance, in distinction from matters of form." <u>Id</u>. If a claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter. <u>Id</u>.

3

Respectfully submitted,

Jahquez Shakim Roland, DC# L03988
Cross City Correctional Institution
568 N.E. 255th Street
Cross City, Florida 32628

Appellant *pro se*

## OATH AND CERTIFICATE OF SERVICE

I, Jahquez Roland,  DC# L03988, declare under the penalties of perjury that I have read the foregoing Motion for Rehearing and the facts stated in it are true and correct, and

I HEREBY CERTIFY that this Motion for Rehearing and a true and correct copy hereof was provided to correctional officials for delivery by U.S. Mail, postage pre-paid to: The Clerk of Court for the Fifth District Court of Appeals, 300 South Beach Street, Daytona Beach, Florida 32114, and the Office of the Attorney General, 444 Seabreeze Boulevard, Suite 500, Daytona Beach, Florida 32118, on this 25th day of August 2017.

Jahquez Shakim Roland, DC# L03988

4



Legal Mail

Marquez Roland #L03988
Cross City Correctional Institution
10 N.E. 25S St.
(Cross city),
Fl. 32628

Mailed from
State Correctional
Institution

To:
F.fth District Court of Appeals
300 South beach St.
Daytona Bch., Fl.
32114

UNITED STATES POSTAGE
$ 000.00°
02 1P
0000905970
AUG 28 2017
MAILED FROM ZIP CODE 32628

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

JAQUEZ ROLAND,

        Appellant,

v.                               CASE NO.  5D16-0438

STATE OF FLORIDA,

        Appellee.

_____/

DATE:  September 27, 2017

**BY ORDER OF THE COURT:**

        ORDERED that Appellant's Motion for Rehearing and Request for a Written Opinion, filed August 31, 2017, is denied.

*I hereby certify that the foregoing is*
*(a true copy of) the original Court order.*



JOANNE P. SIMMONS, CLERK

Panel: Judges Cohen, Torpy, and Evander

cc:

Office of Attorney General     Allison L Morris          Jaquez Roland

P

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

JAQUEZ ROLAND,

      Appellant,

 v.                                          Case No.  5D16-438

STATE OF FLORIDA,

      Appellee.

_____/

Decision filed **July 18, 2017**

3.850 Appeal from the Circuit
Court for Flagler County,
J. David Walsh, Judge.

Jaquez Roland, Cross City, pro se.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Allison L. Morris,
Assistant Attorney General, Daytona
Beach, for Appellee.


PER CURIAM.

      AFFIRMED.

COHEN, C.J., TORPY and EVANDER, JJ., concur.

# M A N D A T E

from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

# FIFTH DISTRICT

THIS CAUSE HAVING BEEN BROUGHT TO THIS COURT BY APPEAL OR BY PETITION, AND AFTER DUE CONSIDERATION THE COURT HAVING ISSUED ITS OPINION OR DECISION;

YOU ARE HEREBY COMMANDED THAT FURTHER PROCEEDINGS AS MAY BE REQUIRED BE HAD IN SAID CAUSE IN ACCORDANCE WITH THE RULING OF THIS COURT AND WITH THE RULES OF PROCEDURE AND LAWS OF THE STATE OF FLORIDA.

WITNESS THE HONORABLE JAY P. COHEN, CHIEF JUDGE OF THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA, FIFTH DISTRICT, AND THE SEAL OF THE SAID COURT AT DAYTONA BEACH, FLORIDA ON THIS DAY.

DATE: October 16, 2017

FIFTH DCA CASE NO.: 5D 16-0438

CASE STYLE:  JAQUEZ ROLAND        v.        STATE OF FLORIDA

COUNTY OF ORIGIN: Flagler

TRIAL COURT CASE NO.:  2011-CF-1100

I hereby certify that the foregoing is
(a  true copy of) the original Court mandate.

JOANNE P. SIMMONS, CLERK

cc:

Office Of Attorney General          Allison L Morris                    Jaquez Roland
Clerk Flagler