# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

JAQUEZ SHAKIM ROLAND,

        Petitioner,

v.                                                  Case No.:    3:18-cv-790-TJC-JBT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

        Respondents.

_____/

## ORDER

### I.    Status

Petitioner, Jaquez Roland, an inmate of the Florida penal system, initiated this case by filing a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. (Doc. 1). He challenges a state court (Flagler County, Florida) conviction and sentence for armed robbery, grand theft, false imprisonment, and battery. Respondents oppose the Petition. (Doc. 9, Response; Doc. 10, App'x). Respondents filed a supplemental appendix (Doc. 21, App'x), and Petitioner filed a reply brief (Doc. 22, Reply). The case is ripe for review.

### II.   Background

The State of Florida charged Petitioner by an amended information with four counts: (1) robbery with a weapon, in violation of Florida Statutes Section 812.13(2)(b); (2) grand theft, in violation of Florida Statutes Sections 812.014(1)

1

and (2)(c); (3) false imprisonment, in violation of Florida Statutes Section 787.02(2); and (4) battery, in violation of Florida Statutes Section 784.03(1)(a). (App'x A at 31).[1] The charges stemmed from the October 30, 2011, robbery of Sharp's Discount Liquors in Flagler County, Florida. (Id.).

Before trial, Petitioner, who was represented by Regina Nunnally of the public defender's office, moved in limine to exclude testimony about the contents of a surveillance video taken from a nearby Burger King restaurant. (Id. at 33–34). Four of the State's witnesses were prepared to describe what they saw on the video, which purportedly depicted Petitioner inside the Burger King shortly after the robbery. The video itself was unavailable because Burger King failed to preserve it (App'x C at 16–17), forcing the State to rely on the witnesses' descriptions of the video. Petitioner sought to prevent witness Patti Smith from offering an "opinion as to identification from [the] Burger King video," (App'x A at 33 ¶ 1), and more broadly, to prevent witnesses Dorothy Edmunds[2], Corporal Kim Davis, Detective Roger Spires, and Patti Smith from testifying "regarding the contents of [the] Burger King video," (id. at 33 ¶ 2). After hearing argument, the trial court denied the motion because the video was unavailable based on

---

[1]     Unless otherwise indicated, record citations refer to the Bates-stamp page number at the bottom-center or upper right-hand corner of each page.

[2]     The motion in limine identifies this witness as "Dorothy Edmonds," but the correct spelling is Dorothy Edmunds. (App'x D at 114).

2

Burger King's failure to preserve the footage, which the court found was no fault of the State's. (App'x C at 19).[3]

The case went to a jury trial on May 22, 2013. (App'x D). Rebecca Crowley, an employee of Sharp's Discount Liquors, testified that she was robbed at gunpoint on October 30, 2011. (Id. at 32–33). At around 10:20 a.m., a tall African-American man entered the store wearing dark jeans, a black-and-blue backpack, gloves, and a motorcycle helmet. (Id. at 34–35). The man appeared to be talking to someone, so Ms. Crowley assumed he had a Bluetooth system inside his helmet. (Id.). Ms. Crowley assisted the man as he searched for vodka. (Id. at 36). As she returned to the counter, the man grabbed her hair, held a gun to her side, dragged her behind the counter, and demanded that she open the safe and the cash register. (Id. at 37). The man took about $1,000 cash. (See id. at 38–39, 95). He then zip-tied Crowley's hands and feet, rummaged around the manager's office, and left through the back door. (Id. at 42–45).

Thomas Bowser, who was a regular customer, happened upon the store while the robbery was in progress. He found the front door locked, and when he peered through the front window, he saw the robber dragging Crowley by her hair behind the counter. (Id. at 65–66). Bowser ran to the back of the store and saw an unoccupied car. (Id. at 67–68). Meanwhile, Crowley freed herself from

---

[3]     Patti Smith also made an out-of-court identification of Petitioner, which Petitioner moved to suppress on the ground that it resulted from an unduly suggestive identification procedure. (App'x A at 27–28). The trial court denied that motion after a hearing. (Id. at 29).

the zip ties enough to open the front door for Bowser. (Id. at 46, 58). Bowser did not witness anyone leave the store, but he saw the vehicle drive away slowly with a single occupant. (Id. at 67, 68).

Sometime between 10:00 and 10:30 a.m., an African-American man wearing a tank top and dark pants entered a nearby Burger King through an infrequently used door. (Id. at 116–17). According to Dorothy Edmunds, the general manager working that day, this individual appeared to be "out of ordinary," "antsy," and as if he had just worked out. (Id. at 116). He went to the restroom and emerged 10 to 15 minutes later, having changed out of his pants into shorts. (Id. at 117–18). The man paced back and forth inside the store and was "sweating profusely." (Id. at 118–19). The individual tried to use the restaurant's phone, asked if Patti Smith was working, and sat in the dining area without ordering any food. (Id. at 118–21). A Burger King employee later found the man's pants in the women's restroom and turned them over to the police. (Id. at 123–24).

Jacob Rodriguez, another Burger King employee, saw the suspicious person inside the restaurant. (Id. at 155). While Mr. Rodriguez was cleaning the restrooms, the individual told Mr. Rodriguez to give him money, which Mr. Rodriguez reported to the manager. (Id. at 157). Mr. Rodriguez described the individual as an African-American male who was slightly taller than he was and who appeared to be nervous. (Id. at 157, 159). Mr. Rodriguez saw the

4

individual leave with two other people – a man and a woman – but he could offer no other details. (Id. at 156, 158).

Law enforcement officers responded to the liquor store after the robbery. (Id. at 73, 167). The officers did not find a car that matched the vehicle description given by Bowser. (Id. at 73). However, they found several items along a tree line 30 to 40 yards directly behind the liquor store. (Id. at 73–81, 169–75). These included two pieces of computer equipment from the store, a jacket, a black-and-blue backpack, gloves, and a BB gun. The officers found money inside the jacket as well. (Id. at 170–71). The gun was a polymer and metal BB gun that uses a CO2 cartridge. (Id. at 174–75, 237–39). According to Corporal Eric Allen, the weapon could cause serious bodily injury if used to bludgeon someone or to shoot them in the eye. (Id. at 237–39).

While officers were investigating the robbery, a Burger King customer approached the officers and told them about the suspicious person inside the restaurant. (Id. at 100, 176). Law enforcement officers made their way to the Burger King, watched the surveillance video, and described what they saw. (Id. at 121, 148–49, 178–80). Because of a miscommunication, Burger King overwrote the surveillance tape before investigators obtained a copy. (Id. at 131–33, 150–51, 181).

Patti Smith – the Burger King employee whom the suspicious person asked for – did not speak with police right away. (Id. at 214, 215). When Ms.

Smith returned to work, the manager asked her to watch the surveillance footage and she identified the suspicious individual as "Quez." (Id. at 130, 216). Ms. Smith explained that "Quez," Petitioner, was her neighbor's boyfriend. (Id. at 217). She also identified Petitioner in a lineup. (Id. at 235).

Law enforcement officers located Petitioner and took buccal swabs from him. (See id. at 269). According to the State's DNA analyst, James Pollock, there was a mixture of DNA inside the gloves and jacket recovered from behind the liquor store, but across all three items, there was only one "major contributor" of DNA. (Id. at 266–67, 268). Before he received the buccal swabs, Pollock also determined that the DNA profile of the major contributor was the same for all three items. (Id. at 267). The buccal swabs revealed that Petitioner's DNA matched the lone major contributor of DNA inside both gloves and the jacket. (Id. at 269–70).

At the end of trial, the jury returned a verdict finding Petitioner guilty as charged. (App'x A at 39–42). The court sentenced Petitioner to a term of 30 years in prison as to Count I (robbery with a weapon), consecutive terms of 5 years in prison each as to Counts II and III (grand theft and false imprisonment), and time served as to Count IV (battery). (App'x A at 71–83 (Judgment); App'x E at 36–39). The court adjudicated Petitioner as a Prison Releasee Reoffender ("PRR") because Petitioner committed the offense within three years of being

released from a state correctional facility. (Id. at 36); see also Fla. Stat. § 775.082(9)(a)(1) (2013).

Petitioner appealed his conviction and sentence. Roland v. State, No. 5D13–2881 (Fla. 5th DCA). Petitioner's appellate counsel filed a brief under Anders v. California, 386 U.S. 738 (1967). (App'x F). The Fifth District Court of Appeal per curiam affirmed the conviction and sentence without a written opinion, and the mandate issued on May 30, 2014. (App'x G); Roland v. State, 138 So. 3d 1047 (Fla. 5th DCA 2014).

On October 22, 2014, Petitioner filed a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. (App'x H). Petitioner raised six grounds of ineffective assistance of trial counsel and one claim of cumulative error. The post-conviction court held an evidentiary hearing (App'x K), after which the court entered a written order denying the motion (App'x J).

Petitioner appealed the denial of his Rule 3.850 motion. Roland v. State, No. 5D16–0438 (Fla. 5th DCA). He argued that the post-conviction court erred by not appointing him counsel and by denying his motion for post-conviction relief. (App'x L, N). The Fifth DCA per curiam affirmed the lower court's decision without a written opinion. (App'x P). Petitioner filed a motion for rehearing, which was also denied, and the mandate issued on October 16, 2017. (App'x O, P); Roland v. State, 228 So. 3d 580 (Fla. 5th DCA 2017). This federal habeas Petition followed.

### III.   <u>Governing Legal Principles</u>

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>See</u> <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

<u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). Courts employ a two-part test when reviewing ineffective assistance of counsel claims. See Strickland, 466 U.S. at 687.

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Richter, 562 U.S. at 104 (internal citations modified).

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to

show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is afforded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at 105. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014) (internal citations modified). In other words, "[i]n addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference—this one to a state court's decision—when we are considering whether to grant federal habeas relief from a state court's decision." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting

11

Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

### C. Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.; see also 28 U.S.C. § 2254€(2). The pertinent facts are fully developed in the record. Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), it will not conduct an evidentiary hearing.

## IV.   The Adequacy of the State Court's Fact-Finding Procedure

As an initial matter, in the Petition and reply brief, Petitioner argues that the post-conviction court's fact-finding process was inadequate, and that the post-conviction court violated his right to due process, because it did not appoint counsel to represent him in his Rule 3.850 evidentiary hearing. Petition at 11, 13–14, 20, 22; Reply at 2–3. He contends that the lack of counsel prevented him from conducting adequate research or gathering evidence to support his claims.

To the extent Petitioner claims that the lack of counsel violated his right to due process under the Fourteenth Amendment, he failed to present a federal due process claim in state court. Although he moved the post-conviction court to appoint counsel (App'x S) and he raised the issue on appeal (App'x L at 19, 20–24), he did not identify the argument as one arising under any source of federal law. Instead, he framed the claim as based on <u>state</u> law. Petitioner also points to no post-AEDPA precedent that requires a state court to appoint counsel for a petitioner in a post-conviction hearing. Thus, he has waived a federal due process claim and no clearly established law supports it. <u>See Landers v. Warden, Att'y Gen. of Ala.</u>, 776 F.3d 1288, 1296–97 (11th Cir. 2015).

To the extent Petitioner claims that the lack of counsel rendered the state court's factual findings unreasonable, the Court disagrees. There is no right to counsel in post-conviction proceedings. <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987). Nor must a state court hold an evidentiary hearing for its factual findings to receive deference under AEDPA. <u>Landers</u>, 776 F.3d at 1297–99. The Eleventh Circuit has "not foreclose[d] the possibility that a state court's fact-finding procedure could be so deficient and wholly unreliable as to result in an unreasonable determination of the facts under § 2254(d)(2) and to strip its factual determinations of deference." <u>Id.</u> at 1297. But the court observed that "consistent with AEDPA's statutory scheme, 'this standard is difficult to meet ... because it was meant to be.'" <u>Id.</u> (quoting <u>Richter</u>, 562 U.S. at 102). The court

in <u>Landers</u> held that a state court's decision to resolve a credibility dispute based on dueling affidavits, without holding an evidentiary hearing, was not unreasonable where the competing affidavits bore "strikingly different indicia of reliability." <u>Id.</u>

Here, unlike in <u>Landers</u>, the post-conviction court did conduct an evidentiary hearing on Petitioner's claims. It simply did not appoint counsel to represent him at the hearing. But given that a state court is neither required to appoint counsel for a post-conviction movant, <u>Finley</u>, 481 U.S. at 555, nor is it required to hold an evidentiary hearing, <u>Landers</u>, 776 F.3d at 1297, it follows that holding an evidentiary hearing without appointing counsel is not, by itself, enough to show that the state court's fact-finding procedure was "so deficient and wholly unreliable as to result in an unreasonable determination of the facts under § 2254(d)(2) and to strip its factual determinations of deference," <u>id.</u>

Petitioner contends that the lack of counsel prevented him from researching his claims and presenting evidence. But the record refutes these assertions. Petitioner's Rule 3.850 motion was well written and well researched. (App'x H). Without the aid of counsel, Petitioner summoned his girlfriend, Ada Whites, to testify at the evidentiary hearing. (<u>See</u> App'x K at 39–54). He presented his arguments clearly (<u>id.</u> at 7–40, 54–61), questioned Ms. Whites (<u>id.</u> at 52–54), and cross-examined his trial counsel (<u>id.</u> at 75–117, 119–22). The post-conviction court remarked that Petitioner did a capable job of presenting

his position. (<u>Id.</u> at 129–30). The record does not reflect that the lack of counsel prevented Petitioner from developing his claims and evidence. While <u>federal</u> rules require the appointment of counsel if a federal court holds an evidentiary hearing, Rule 8(c), Rules Governing Section 2254 Cases, here, the lack of counsel in state court did not render the court's fact-finding procedures so inadequate as to strip its findings of deference under 28 U.S.C. § 2254(d)(2).

## V.   **<u>Petitioner's Claims and Analysis</u>**

### A. Ground One: Sufficiency of the Evidence

Petitioner first argues that the evidence was insufficient to prove that a weapon was used to commit the robbery. Petition at 6. He argues that a BB gun is not a "deadly weapon" under Florida Statutes Section 790.001(13) because, when used in the ordinary manner contemplated by its design and construction, a BB gun is not likely to cause great bodily harm, nor did Petitioner use the gun in a way that was likely to cause great bodily harm. <u>Id.</u> Petitioner says his conviction should be for simple robbery, which carries a maximum sentence of 15 years in prison, not robbery with a weapon.

At trial, Petitioner's counsel moved for judgment of acquittal (JOA), arguing (among other things) that the BB gun was not a "weapon" under the armed robbery statute. (App'x D at 293–94).[4] The State responded that it had

---

[4]     Page 292 is missing from Appendix D, but no party argues that this page is critical.

presented sufficient evidence for a jury to conclude that the BB gun was a weapon (id. at 295) and the trial court denied the motion for JOA (id. at 298). Petitioner raised the issue on direct appeal in his counseled Anders brief (App'x F at 16–17), and thereafter the Fifth DCA affirmed Petitioner's conviction and sentences, Roland, 138 So. 3d 1047.

Petitioner argues that the Fifth DCA's decision violated his right to due process under the Fourteenth Amendment, that it was contrary to Jackson v. Virginia, 443 U.S. 307 (1979), and that the decision rested on an unreasonable determination of the facts. Petition at 6. The Court disagrees.

Preliminarily, Petitioner failed to exhaust this claim in state court because he did not fairly present it as a federal constitutional claim. 28 U.S.C. § 2254(b)(1); Baldwin v. Reese, 541 U.S. 27, 29 (2004). Although "a petitioner need not use magic words or talismanic phrases," he must alert the state court to the federal nature of the claim by "including the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim as a federal one." Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 457 (11th Cir. 2015) (internal quotation marks, citation, and alterations omitted).

Petitioner did not do that here. Although he challenged the sufficiency of the evidence and appealed the denial of the motion for JOA, he did not frame the claim as arising under the Fourteenth Amendment or Jackson v. Virginia.

Instead, he framed the argument as arising only under state law. (See App'x D at 293–94; App'x F at 16–17). He did not cite any provision of the United States Constitution, any United States Supreme Court decision, or any other source of federal law, nor did he label the claim as a federal one. Petitioner therefore did not exhaust this claim in state court because he did not alert the state court to its federal nature. Preston, 785 F.3d at 458–59. The claim is now defaulted, because Petitioner would be procedurally barred if he returned to state court to exhaust it. See Jimenez v. Fla. Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007). Petitioner has not demonstrated that he can overcome the default through a showing of cause-and-prejudice or actual innocence. See Ward, 592 F.3d at 1157.

Nevertheless, the claim fails on the merits. In Jackson v. Virginia, the Supreme Court held that due process under the Fourteenth Amendment means "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." 443 U.S. at 316. The critical inquiry is "not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Id. at 318. The evidence is sufficient when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original) (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)).

In Florida, robbery is a first-degree felony if "in the course of committing the robbery the offender carried a weapon." Fla. Stat. § 812.13(2)(b). "A 'weapon' is legally defined to mean any object that could be used to cause death or inflict serious bodily harm." Dale v. State, 703 So. 2d 1045, 1047 (Fla. 1997) (citing Fla. Std. Jury Instr. (Crim.) 156(a)). Whether a BB gun is a weapon or a deadly weapon "is a factual question to be answered by the jury in each case." Id. (citing Goswick v. State, 143 So. 2d 817, 820 (Fla. 1962)). A BB gun, even if unloaded, may qualify as a "weapon" or a "deadly weapon" under the robbery statute. Id. at 1047 & nn. 3–4; Mitchell v. State, 698 So. 2d 555, 560–61 (Fla. 2d DCA 1997). Here, the State presented sufficient evidence from which a rational juror could conclude that the BB gun used in the robbery was a "weapon." At trial, Corporal Allen, an investigator for the Flagler County Sheriff's Office, described the weapon used in the robbery as a polymer and metal BB gun that uses compressed CO2 to fire a .17 caliber BB or pellet. (App'x D at 237–39). Corporal Allen testified that the weapon could cause serious bodily harm if used to shoot someone in the eye or to bludgeon them. (Id. at 238–39). Thus, there was enough evidence that a rational trier of fact could have concluded that the BB gun "could be used to cause death or inflict serious bodily harm." Dale, 703 So. 2d at 1047. As such, Relief on Ground One is due to be denied.

## B. Ground Two: Ineffective Assistance of Counsel

### *1. Subclaim One*

Petitioner, who did not testify at trial, alleges that trial counsel was ineffective because she misadvised him about his decision whether to testify. Petition at 8–11. He asserts that he told counsel before trial that he wanted to take the stand. Id. at 8. Counsel advised Petitioner not to testify, telling him that "she was a great closer and would be able to try the case without his testimony." Id. Counsel also enlisted the help of Petitioner's girlfriend to persuade him not to testify. Id. Counsel's strategy was to argue that there had been a misidentification, but Petitioner contends this strategy was flawed. Id. at 9. Petitioner says his testimony was necessary to rebut the State's DNA evidence and to refute its otherwise circumstantial case. According to Petitioner, during trial, he nodded his head to indicate to the court that he wanted to testify. Id. at 10. Counsel allegedly grabbed his arm, pulled him aside, and said to him: "They have your DNA. So when they hear you've got a burglary conviction and that you just did 10 years for it, no jury in the world would believe that you didn't rob the liquor store." Id.

Petitioner claims he did not testify because (1) counsel misadvised him that if he testified, the jury would learn the facts and nature of his prior burglary conviction and sentence, and (2) counsel failed to inform him he needed

to testify if the jury was to hear his theory of innocence. Petitioner states that

had he taken the stand, he would have testified to the following:

1. That Petitioner was at home with his brother when the robbery occurred.

2. That weeks before the robbery, Petitioner sold to someone else his dirt bike and riding gear, including the jacket and gloves used in the robbery. This would purportedly explain why Petitioner's DNA was on these items.

3. That on the day of the robbery, Petitioner received a phone call from a friend asking for a ride from the Burger King restaurant.

4. That Petitioner is 6'3" and light-skinned, which conflicts with a witness's description of the suspect as 5'9" and dark-skinned.

5. That Petitioner's car broke down on the way to the Burger King, and that he had to jog five minutes to get there, which is why he was upset, out of breath, and sweaty upon arriving at the restaurant.

6. That when Petitioner went to use the Burger King restroom, he took off his sweat-soaked pants and discarded them.

7. That Petitioner believed he dropped a $10 bill while changing in the restroom, and when he returned to the restroom to retrieve it, an employee was cleaning the restroom, so Petitioner approached the employee and asked for the money.

8. That eventually, Petitioner's friend and his friend's girlfriend picked him up from the Burger King, the three left together, returned to Petitioner's disabled vehicle, and waited for a ride.

9. That Petitioner did not know when going to meet his friend that his friend had committed a crime; that Petitioner had no knowledge the riding gear he sold to his friend would be used to commit a robbery; and that Petitioner still has no "direct knowledge" that his friend committed the robbery.

20

10. That Petitioner tried to call his own cell phone (which was allegedly at home charging), then tried to call his brother's cell phone several times, to get his brother to help him with his disabled vehicle, because Petitioner had no cell phone with him.

11. That Corporal Kim Davis visited Petitioner days after his arrest. Corporal Davis allegedly told him that she knew he did not rob the liquor store, asked Petitioner for the name of the person who did, and threatened to pin the crime on Petitioner if he did not cooperate.

12. That Corporal Davis gave Petitioner her business card and told him "to think about how it would look if he went to trial as a black man who robbed a white woman, especially with his arrest record."

Id. at 8–9. Petitioner claims he would have testified had counsel "properly advised" him that his testimony was necessary to present his "reasonable hypothesis of innocence."

Petitioner raised this claim in his Rule 3.850 motion. (App'x H at 10–18). The trial court held an evidentiary hearing (App'x K) and entered an order denying the claim (App'x J). The trial court identified Strickland's two-part standard as the governing rule. (Id. at 2–3). The court wrote:

> In Ground One, Defendant alleges that he received ineffective assistance of counsel for Ms. Nunnally's alleged misadvice that he not testify. Defendant asserts that Ms. Nunnally counseled him not to take the stand in his own defense because the jury would then have the opportunity to hear that Defendant had a prior conviction for burglary.
>
> Where a defendant alleges that he would have testified but for the advice of counsel, the first step is to analyze whether he voluntarily agreed with counsel not to take the stand. Lott v. State, 931 So. 2d 807, 818–19 (Fla. 2006). The second step is to examine whether counsel's advice to the defendant was deficient because "no reasonable attorney would have discouraged [defendant] from testifying." Id.

21

During the evidentiary hearing, Defendant admitted that he voluntarily agreed with Ms. Nunnally not to take the stand; however, he emphasized that he had advised Ms. Nunnally many times prior to trial that he wanted to testify. Defendant argued that Ms. Nunnally advised him that if he took the stand, then the jury would be able to hear about his prior conviction for burglary. Defendant wanted to testify to tell the jury that he jogged to Burger King that day to assist a friend with a broken down car, and while at Burger King, he asked to use the phone to call his brother, who then came to the Burger King to help him push a car.

Ms. Nunnally testified at the evidentiary hearing that she advised Defendant not to testify and informed him that if he did testify, the State could inquire about the number of convictions he has. She testified that she advised him that if he stated an incorrect number of convictions, then the "door was opened," and the State could inquire about the nature of those convictions. She stated that Defendant told her that something different had occurred the day of the robbery, and she had never heard about a friend, a car breaking down, or pushing the car somewhere. She said that because Defendant's main defense was misidentification, it made no sense for Defendant to testify that he was at the Burger King that day.

The Court finds Ms. Nunnally's testimony to be reliable and credible. She has worked as a public defender since September 2003, and the Court finds it credible that she would have correctly advised Defendant regarding the law. Further, the Court finds competent, substantial evidence that Defendant knowingly and voluntarily decided not to testify because of Ms. Nunnally's competent advice regarding trial strategy and the risks involved in taking the stand. Defendant fails to establish both deficient performance and prejudice. Therefore, Ground One is denied.

(App'x J at 3–5). Petitioner appealed the trial court's decision, and the Fifth DCA affirmed the denial without a written opinion. Roland, 228 So. 3d 580.

The Fifth DCA's adjudication is entitled to AEDPA deference. The state court's decision was not contrary to, or based on an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. "[T]he appropriate vehicle for claims that the

defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel under Strickland." United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992). Because the state court identified Strickland as the applicable rule, it identified and applied the correct standard.

A defendant has a constitutional right to testify in his behalf. Rock v. Arkansas, 483 U.S. 44, 51-53 (1987). That right is personal and fundamental; only the defendant can waive it, not the court or trial counsel. Teague, 953 F.2d at 1532. Indeed, the defendant is the one "who above all others may be in a position to meet the prosecution's case." Ferguson v. Georgia, 365 U.S. 570, 582 (1961). Trial counsel must "advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify." McGriff v. Dep't of Corr., 338 F.3d 1231, 1237 (11th Cir. 2003) (citing Teague, 953 F.2d at 1533). Counsel performs deficiently when he or she fails to discharge these obligations. See id. If counsel has performed deficiently, the petitioner must further establish a reasonable probability that the outcome of the proceedings would have been different but for counsel's error. Strickland, 466 U.S. at 694.

While the decision to testify is the defendant's alone, an attorney does not render ineffective assistance by strategically advising a defendant not to take the stand. "[I]f defense counsel believes that it would be unwise for the

defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." <u>Teague</u>, 953 F.2d at 1533.

First, Petitioner alleges that he did not testify because counsel misadvised him that the prosecutor could inquire about the nature of his prior burglary conviction and sentence if he testified. Petitioner contends that this advice was incorrect. Had he testified, Florida law would have permitted the prosecutor to ask Petitioner whether he had any prior convictions and how many. <u>Rogers v. State</u>, 964 So. 2d 221, 222 (Fla. 4th DCA 2007). But the prosecutor could not have asked about the nature of the convictions unless Petitioner opened the door, such as by misstating the number of convictions or engaging in "spin control" that "characterize[es] the prior convictions in a way favorable to his case at trial." <u>Id.</u> at 222–23; <u>see also</u> <u>Kenner v. State</u>, 208 So. 3d 271, 276 (Fla. 5th DCA 2016).

Ms. Nunnally testified at the evidentiary hearing that she advised Petitioner that if he took the stand, the State could ask him how many prior convictions he had, and if he misstated the number, the door would be opened for the State to probe the nature of those convictions. (App'x K at 65–66). The post-conviction court credited Ms. Nunnally's testimony and determined that such advice was an accurate statement of the law. (<u>See</u> App'x J at 4). The court explained that it is credible that Ms. Nunnally, who had been a public defender since 2003, would have correctly advised her client about the State's ability to

24

probe his criminal record if he testified. (Id.). "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review," and determinations about a witness's credibility are findings of fact that are subject to AEDPA deference. Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011). This Court finds no basis to conclude that the post-conviction court's credibility determination in favor of Ms. Nunnally was unreasonable. See 28 U.S.C. § 2254(d)(2). Nor does an attorney perform deficiently by giving her client accurate advice about the risks of testifying. See McGriff, 338 F.3d at 1237. Petitioner is not entitled to habeas relief on this theory.

Second, Petitioner contends that counsel failed to advise him that his testimony was necessary to present his "reasonable hypothesis of innocence" to the jury.[5] However, the post-conviction court reasonably found that Petitioner made a voluntary and strategic choice not to take the stand. (See App'x J at 3–5). Before the defense rested at trial, the judge asked Petitioner if he wished to testify. (App'x D at 298–99). Petitioner responded that, having had enough time to discuss the matter with counsel, he did not wish to take the stand. (Id. at 299). Petitioner also stated at his sentencing hearing that he did not testify

---

[5]    Petitioner cannot plausibly allege that he did not know he had to testify for the jury to hear his testimony. He sat through the entire trial and knew, at the moment he decided not to take the stand, what evidence had, or had not, been presented to the jury. Petitioner also contends that the post-conviction court did not address this part of his claim. Petition at 10. The Court disagrees; the post-conviction court's decision encompasses this allegation.

because it "wasn't in [his] best interest" to do so given his criminal history. (App'x E at 35). At the post-conviction evidentiary hearing, Petitioner acknowledged that he agreed with counsel not to take the stand based on her advice about his criminal record. (App'x K at 15–16). Moreover, Ms. Nunnally testified at the evidentiary hearing that Petitioner never told her his story about meeting a friend at the Burger King or a disabled vehicle. (Id. at 79–80). Ms. Nunnally learned about Petitioner's current proposed testimony only after he filed his Rule 3.850 motion. (Id. at 80). According to Ms. Nunnally, Petitioner proposed no defense other than misidentification. (Id. at 74). And, Ms. Nunnally explained, it made no sense for Petitioner to take the stand and put himself at the Burger King when his defense was misidentification. (Id. at 76–77). "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." Strickland, 466 U.S. at 691. Ms. Nunnally's testimony, together with the trial record, supports the post-conviction court's conclusion "that Defendant knowingly and voluntarily decided not to testify because of Ms. Nunnally's competent advice regarding trial strategy and the risks involved in taking the stand." (App'x J at 4). Relief on this claim is due to be denied.

### 2. Subclaim Two

Petitioner asserts that trial counsel gave ineffective assistance by failing to object when a law enforcement officer, Corporal Kim Davis, testified that she believed Petitioner was the person depicted in the Burger King surveillance video, based on a comparison between Petitioner's driver's license photo and the video (which was not in evidence). Petition at 11–16. Petitioner argues that a law enforcement officer's "opinion that a suspect's drivers license photo matched a person depicted in a video surveillance tape is not admissible and must be excluded." Id. at 12 & n.2. According to Petitioner, a law enforcement officer's opinion about a suspect's identity, based on a surveillance tape, invades the province of the jury. Id. at 12. He argues that counsel's failure to object to Corporal Davis's testimony was prejudicial because his entire trial strategy hinged on misidentification. Id. at 13.

As noted earlier, trial counsel moved in limine to exclude (1) testimony by witness Patti Smith identifying Petitioner based on the Burger King video and (2) more broadly, any testimony by Corporal Davis, Patti Smith, Dorothy Edmunds, and Detective Spires about the contents of the Burger King video. (App'x A at 33 ¶¶ 1–2). Counsel argued that Patti Smith's identification testimony would invade the province of the jury, and that none of the witnesses should describe a videotape not in evidence, absent an excuse under Florida

Statutes Section 90.954, where the video was the best evidence. The trial court denied the motion in limine, finding that such testimony was admissible because the video was unavailable based on Burger King's failure to preserve the original through no fault of the State's. (App'x A at 35; App'x C at 19); see also Fla. Stat. § 90.954(1). At trial, counsel renewed her objection to the witnesses testifying about the Burger King video, including Corporal Davis (App'x D at 179), Dorothy Edmunds (id. at 122), Detective Spires (id. at 149), and Patti Smith (id. at 216), but the court overruled each objection based on its ruling in limine. Corporal Davis testified that she believed Petitioner was the person on the video based on a comparison between the surveillance footage and Petitioner's driver's license photo. (Id. at 185). Patti Smith testified that she too identified Petitioner as the person in the video based on personal familiarity. (See id. at 216–18).

Petitioner raised substantially the same ineffective assistance claim in his Rule 3.850 motion. (App'x H at 25–28). After the evidentiary hearing, the post-conviction court denied relief, writing:

> In Ground Three, Defendant alleges that he received ineffective assistance of counsel for counsel's failure to object to Corporal Kim Davis's testimony that Defendant, judging from his driver's license photo, matched the person in the surveillance video from Burger King. Defendant alleged that Ms. Nunnally had a duty to object because the officer lacked a proper predicate to testify regarding the video because the video was not in evidence. At the evidentiary hearing, Defendant also argued that Ms. Nunnally could have objected, and by failing to do so, she also failed to preserve the issue for appeal.

During the evidentiary hearing, Ms. Nunnally testified that she filed a motion in limine prior to trial that would have excluded the video from Burger King and all testimony associated with that video because the video had been lost by Burger King. See Exhibit E. The Court denied the motion. Composite Exhibit F. The Court's decision was appealable. Further, Ms. Nunnally objected to the video during the trial. Exhibit G, Trial Transcript ("T.T.") at 216. The Court finds no deficient performance by Ms. Nunnally in attempting to exclude all evidence related to the Burger King video.

Defendant also fails to establish that he was prejudiced. During his testimony in the evidentiary hearing, Defendant admitted that he was present at the Burger King. Patti Smith, a Burger King employee who was acquainted with Defendant, also testified that she saw the video and Defendant was the person in the video. T.T. at 216. Therefore, the evidence established that Defendant was present at the Burger King the day of the robbery, and th[at] Corporal Davis's testimony was not dispositive of that fact.

Because Defendant failed to prove either deficient performance or prejudice, Ground Three is denied.

(App'x J at 6–7). The Fifth DCA affirmed the lower court's decision without a written opinion. Roland, 228 So. 3d 580.

The Fifth DCA's adjudication is entitled to AEDPA deference. The state court's decision was not contrary to, or based on an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Petitioner argues that the post-conviction court misinterpreted his claim as objecting to Corporal Davis's testimony because the video was not in evidence, when his actual argument was that Corporal Davis's identification from the video invaded the province of the jury (and counsel failed to object as such). Petition at 13. The Court does not believe that the state court misunderstood his claim. But even if it did, the record supports its observation

that counsel moved in limine to exclude any testimony based on the video, and that counsel renewed her objection to Corporal Davis's testimony at trial. The post-conviction court's decision that trial counsel did not perform deficiently was reasonable, regardless of the exact theory of ineffective assistance, because counsel did, in fact, object to Corporal Davis testifying about what she saw on the video.

Petitioner argues that counsel's motion in limine and objection to Corporal Davis's testimony were inadequate to object to Corporal Davis's testimony about Petitioner's <u>identity</u>. <u>See</u> Petition at 14. The Court disagrees. Trial counsel broadly moved to exclude any testimony by Corporal Davis regarding the contents of the Burger King video (App'x A at 33 ¶ 2), and counsel renewed her objection to any line of questioning of Corporal Davis about the contents of that video (App'x D at 179). Counsel's motion in limine and objection were broad enough to encompass an objection to Corporal Davis identifying Petitioner from the Burger King tape. Thus, counsel did not perform deficiently.

Further, the post-conviction court reasonably decided that Petitioner was not prejudiced by Corporal Davis's testimony. Aside from Corporal Davis, Patti Smith independently identified Petitioner, or "Quez," as the suspicious person on the Burger King video. (App'x D at 216–17). More important, Petitioner admitted in his Rule 3.850 motion, and under oath at the post-conviction evidentiary hearing, that he was, in fact, inside the Burger King. (App'x H at 7;

App'x K at 25, 32). Petitioner argues that his admissions in the post-conviction proceedings are immaterial because the only thing that matters is that the State failed to introduce admissible evidence putting him inside the Burger King. Petition at 15. But he offers no authority for the proposition that a habeas court must turn a blind eye to admissions made by a petitioner in post-conviction proceedings. To the contrary, courts can and do consider such admissions. See, e.g., Roper v. Sec'y, Fla. Dep't of Corr., 686 F. App'x 759, 764 (11th Cir. 2017) (rejecting petitioner's claim that counsel never informed him that delaying his Rule 3.850 motion would make his § 2254 petition untimely, based on his admissions in an objection to a report and recommendation); Williams v. Sec'y, Dep't of Corr., No. 6:12-cv-48-GAP-KRS, 2014 WL 4417851, at *6–7 (M.D. Fla. Sept. 8, 2014) (observing that petitioner admitted in his Rule 3.850 motion that he consulted with counsel about alibi witnesses, as evidence he was not incompetent to proceed to trial). For these reasons, relief on this claim is due to be denied.

### 3. Subclaim Three

Petitioner claims that counsel gave ineffective assistance by failing to object to the prosecutor's alleged misstatement of the evidence during closing argument. Petition at 16–18. Petitioner advanced a misidentification defense, which partly stemmed from discrepancies between Petitioner's skin color and the witnesses' descriptions of the robber's skin color. Witness Rebecca Crowley

testified that the witness was dark-skinned, not light-skinned or brown-skinned. (App'x D at 55). Ms. Nunnally, who is dark-skinned according to Petitioner, asked if the robber's complexion resembled hers, and Ms. Crowley answered, "Roundabout, yes." (Id.). Thomas Bowser testified that the robber "looked like a black male or a dark-skinned Mexican," but when Ms. Nunnally asked if the robber's skin was darker than hers, he answered "Oh, no, no, no, no, no." (Id. at 70). Mr. Bowser clarified on redirect that the robber had "[a] lighter complexion." (Id. at 71). The defense's closing argument emphasized that Ms. Crowley and Mr. Bowser described the robber as dark-skinned (id. at 346–47) whereas Petitioner was light-skinned. The prosecutor said on rebuttal:

> Also, Miss Nunnally wants to present, telling you that people were saying that this was a black-skinned – a dark-skinned male. You can check your own recollection on this, but I recall Mr. Bowser saying that the male that he saw was not as dark as Miss Nunnally. I don't have Miss Crowley saying that he was dark like Miss Nunnally or that – just that he was a black male.

(Id. at 375). Petitioner contends that the prosecutor's argument mischaracterized the testimony and that counsel should have objected. Petitioner further argues that the prosecutor's remark was prejudicial because it negated his only defense, which was misidentification.

Petitioner raised this argument in his Rule 3.850 motion. (App'x H at 29–34). After the evidentiary hearing, the post-conviction court denied the claim:

> In Ground Four, Defendant alleges that he received ineffective assistance of counsel for counsel's failure to object to the State[']s 'inappropriate' comments during the rebuttal closing argument. In the evidentiary

> hearing, Defendant clarified that the prosecutor's comments misstated witnesses' testimonies (the victim Rebecca Lee Crowley and eyewitness Thomas Bowser) regarding the skin color of the perpetrator, which brought into doubt Defendant's defense of misidentification.
>
> To establish prejudice for counsel's failure to object to improper prosecutorial comments, the prosecutor's comments must "either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than … it would have otherwise." Walls v. State, 926 So. 2d 1156, 1167 (Fla. 2006), quoting Spencer v. State, 645 So. 2d 377, 383 (Fla. 1994).
>
> The trial transcript shows that Mr. Bowser testified that the perpetrator had "a lighter complexion;" thus, Defendant's allegations as to Mr. Bowser are refuted by the record. T.T. at 69–71. As for the testimony of Ms. Crowley, Ms. Nunnally admitted during the evidentiary hearing that perhaps she could have objected, but she did not see the comment as a misstatement. She believed that the State had a different characterization of the evidence. Compare T.T. at 55, 346–47, 375.
>
> Regardless of whether the comment was proper, Defendant clearly was not deprived of a fair trial because of one isolated comment. Ms. Nunnally raised the defense of misidentification through cross examination of the witnesses and during closing argument. The Court finds no prejudice, and Ground Four is denied.

(App'x J at 7–8). The Fifth DCA affirmed the trial court's decision without a written opinion. Roland, 228 So. 3d 580.

The Fifth DCA's adjudication is entitled to AEDPA deference. The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. A prosecutor's remarks are improper if they misstate the evidence, inflame the jury's passions, or seek to penalize the defendant for exercising a constitutional right (such as the right to remain silent). See Darden v.

Wainwright, 477 U.S. 168, 181–82 (1986); United States v. Lopez, 590 F.3d 1238, 1255–56 (11th Cir. 2008). Florida law affords attorneys wide latitude in closing argument to draw logical inferences and to "advance all legitimate arguments." Thomas v. State, 748 So. 2d 970, 984 (Fla. 1999). The record shows that the prosecutor did not misstate Mr. Bowser's testimony, which was that the robber had a "lighter complexion." As for the prosecutor's description of Ms. Crowley's testimony, Ms. Nunnally testified at the evidentiary hearing that she did not believe an objection was warranted because she believed this was simply the State's interpretation of the evidence. (App'x K at 105–07). The prosecutor said: "I don't have Miss Crowley saying that he was dark like Miss Nunnally or that – just that he was a black male." (App'x D at 375). Ms. Crowley testified that the robber's skin complexion was "[r]oundabout" the same as Ms. Nunnally's. Ms. Nunnally could have reasonably perceived the prosecutor's argument to be a fair interpretation of Ms. Crowley's testimony. In any event, effective counsel does not have to object to every inappropriate comment a prosecutor makes in closing argument. See Devier v. Zant, 3 F.3d 1445, 1453–54 (11th Cir. 1993) (finding that defense counsel's strategic choice to maintain a "low-key" approach and not object to certain inflammatory closing arguments was reasonable).

Even if counsel performed deficiently by not objecting to the prosecutor's characterization of Ms. Crowley's testimony, the state court reasonably found

that counsel's error did not prejudice Petitioner. The disputed statement was one isolated remark, which the prosecutor prefaced by encouraging the jurors to rely on their own recollection of the evidence. Indeed, right before closing arguments, the trial court instructed the jurors that the lawyers' closing arguments were not evidence. (App'x D at 333); see also Brown v. Jones, 255 F.3d 1273, 1280 (11th Cir. 2001) ("We have stated in numerous cases … that jurors are presumed to follow the court's instructions."). The state court reasonably determined there was no reasonable likelihood the outcome of trial would have been different had counsel objected to the prosecutor's remark. See Richter, 562 U.S. at 104. Relief on this claim is due to be denied.

### 4. Subclaim Four

Petitioner contends that counsel gave ineffective assistance by failing to move for a mistrial after the jury allegedly overheard a comment by a bailiff about Petitioner's "apparent guilt." Petition at 18–20. According to Petitioner, when the bailiff opened the gate to release the jurors, he said to counsel: "You know that your client is guilty. Otherwise he couldn't have been crying when watching the tape of the robbery." Id. at 19. Petitioner argues that the jurors overheard this comment because they were standing only a few feet away. Id. He contends that counsel performed deficiently by not bringing this comment to the judge's attention, not requesting a curative instruction, or not moving for a mistrial. Id. Petitioner states that he learned about this remark after trial

through his girlfriend, Ada Whites. Id. When he confronted counsel about why she did not move for a mistrial, she informed him that the State's evidence was too strong and that the 10-day period to move for a mistrial had passed. Id. Petitioner contends that he was prejudiced because the bailiff's remark biased the jury against him. See id. at 18.

Petitioner raised this claim in his Rule 3.850 motion. (App'x H at 35–38). After the evidentiary hearing, the post-conviction court denied the claim:

> In Ground Five, Defendant alleges that he received ineffective assistance of counsel for counsel's failure to move for a mistrial after the jury heard a comment made by a bailiff regarding Defendant's "apparent guilt" when the jury was retiring for deliberation.
>
> On this ground, the Court heard testimony by Defendant; Ada Whites, Defendant's girlfriend; and Ms. Nunnally. Ms. Whites testified that she was present at the trial when she saw the officer approach Ms. Nunnally at counsel's table and make a comment from about two to three feet away. She said that the officer said that Defendant had a tear come out of his eye and that was a sign of guilt. It was unclear from the testimony whether Ms. Whites heard the comment; however, Ms. Whites claimed that the jury, in the jury box, heard the comment. She stated that during a break, she asked Ms. Nunnally, "What did he mean by that [the tear falling comment]?"
>
> Ms. Whites testified that she told Defendant about the officer's comment during a phone conversation after the verdict while he was in jail. Defendant testified that when he asked Ms. Nunnally about the officer's comment, Ms. Nunnally told him that it was too late to file for a mistrial because ten days had already passed since the verdict.
>
> Ms. Nunnally testified that Officer Mark O'Malley did approach her during trial after the State had played the video from inside the Sharp's Liquor Store at the beginning of the State's case in chief. She stated that Officer O'Malley whispered in her ear that he saw Defendant react to the video and wipe his face, and the officer was concerned that the jury may have been watching Defendant. At the time, Ms. Nunnally had no concern that the jury overheard the officer's comment. During the break,

> Ms. Nunnally told Ms. Whites about the comment. Ms. Nunnally was emphatic that Ms. Whites did not overhear the comment.
>
> The Court finds that the comments were made when the Court was going to a break, and not when the jury was retiring to deliberate. The Court further finds the testimony of Ms. Nunnally to be reliable and credible, and there is no evidence that the jury overheard the officer's comment. Therefore, a motion for mistrial would not have been granted, and Ms. Nunnally's performance was not deficient. Further, even if the jury heard the comment, the Court finds no prejudice because the result of the trial has not been rendered unreliable by Ms. Nunnally's alleged failure to file a motion for mistrial. Defendant has proven neither deficient performance nor prejudice, and Ground Five is denied.

(App'x J at 8–9). The Fifth DCA affirmed the trial court's decision without a written opinion. Roland, 228 So. 3d 580.

The Fifth DCA's adjudication is entitled to AEDPA deference. The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Ms. Nunnally testified that the bailiff whispered a comment into her ear about Petitioner reacting to a video of the robbery, which the bailiff was concerned the jury could see. (App'x K at 72, 117–18). Ms. Nunnally testified that the bailiff approached her, whispered the comment in a low voice, and that the jury would not have overheard it. (Id. at 73, 111, 118–20). Ms. Nunnally further testified that Ms. Whites could not have heard the comment either, as she was in the audience when the bailiff whispered it in her ear. (Id. at 72–73). Petitioner argues that the post-conviction court's ruling rested on an unreasonable determination of the facts because it said, "there is no evidence

that the jury overheard the officer's comment," (App'x J at 9). Petition at 19. In saying so, he claims the court ignored Ms. Whites's testimony that the jury might have heard the comment. (See App'x K at 47–52). However, the post-conviction court acknowledged Ms. Whites's testimony (App'x J at 8) but found Ms. Nunnally's testimony to be more credible (id. at 9). The post-conviction court did not unreasonably determine the facts in crediting Ms. Nunnally's testimony over Ms. Whites's. See Consalvo, 664 F.3d at 845 (determinations about a witness's credibility are entitled to deference under AEDPA). Having found that Petitioner failed to show that the jury overheard the bailiff's comment, the post-conviction court reasonably applied clearly established federal law in determining that counsel did not perform deficiently by not moving for a mistrial. Nor did the post-conviction court unreasonably determine that Petitioner was not prejudiced by counsel's failure to move for a mistrial. Thus, relief on this claim is due to be denied.

### 5. Subclaim Five

Finally, Petitioner alleges that counsel gave ineffective assistance by failing to investigate or call an alibi witness – his brother and roommate, Caleb Barker. Petition at 20–22. Petitioner claims his brother would have testified that on the morning of October 30, 2011, Petitioner was still at home when the robbery occurred, id. at 20, and that Petitioner did not leave their apartment until "well after 10:00 [a.m.]," id. at 21. Mr. Barker allegedly could have

corroborated Petitioner's story about a friend's car breaking down, Petitioner leaving for Burger King to pick up the friend, Petitioner's own car breaking down, and Petitioner trying to call his brother for help while he was asleep at home. Id. at 21. Petitioner also claims his brother could have corroborated his assertion that he sold his dirt bike gear, including a jacket and gloves, to someone else weeks before the robbery. Id. According to Petitioner, he told counsel about this alibi witness, but counsel declined to investigate him because the jury would not believe his brother's testimony. Id. Petitioner contends that his brother was willing to testify and that he was prejudiced by the lack of his brother's testimony. Id. at 22.

Petitioner raised this claim in his Rule 3.850 motion. (App'x H at 19–24). Following an evidentiary hearing, the trial court denied the claim, writing:

> In Ground Two, Defendant alleges that he received ineffective assistance of counsel because Ms. Nunnally failed to investigate and present an alibi witness. Defendant testified during the evidentiary hearing that his brother, Caleb Tafari Barker, could have testified to Defendant's version of events the day of the robbery: both he and his brother were home when Defendant received a call, his brother was asleep, Defendant left the home to help a friend, his car broke down, and Defendant ran to the Burger King to call his brother who came and helped him push the car. Defendant questioned why Ms. Nunnally did not depose his brother.
>
> Ms. Nunnally testified that she attempted to contact Mr. Barker through an investigator. The investigation referral and investigator's report were introduced as State's Composite Exhibit 1. Ms. Nunnally pointed out that the investigation referral had two phone numbers and an address for Mr. Barker. The investigator's report showed that he tried to contact Mr. Barker "several times." Normally, her investigator would leave his contact information, and she testified that she did not receive a call from Mr. Barker at any time. She questioned why Defendant did not tell his

brother, with whom he was in contact, that his counsel would like to speak with him. Ms. Nunnally was unequivocal about the fact that she does not depose defense witnesses for tactical reasons. Therefore, the Court finds no deficient performance by Ms. Nunnally because she attempted to locate Mr. Barker, but was unable to do so.

In addition, based upon the testimony she heard at the evidentiary hearing, Ms. Nunnally doubted that Mr. Barker was an alibi witness because he was asleep and could not have testified as to where Defendant was that day. The Court agrees and finds that Defendant has not established prejudice. Therefore, the Court finds that Defendant has not established either deficient performance or prejudice, and Ground Two is denied.

(App'x J at 5–6). The Fifth DCA affirmed the trial court's decision without a written opinion. Roland, 228 So. 3d 580.

The Fifth DCA's adjudication is entitled to AEDPA deference. The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. "The mere fact that other witnesses might have been available ... is not a sufficient ground to prove ineffectiveness of counsel." Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (citation omitted). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Id. at 1512. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575

40

F.2d 515, 521 (5th Cir. 1978).[6] Even if counsel's failure to call a witness "appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." Dingle v. Sec'y, Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007) (quotation marks omitted). Additionally, "evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991) (cited by Estiven v. Sec'y, Dep't of Corr., No. 16-14056-D, 2017 WL 6606915, at *4 (11th Cir. Sept. 28, 2017) (denying COA)).

The post-conviction court reasonably determined that trial counsel did not perform deficiently. Ms. Nunnally testified that her investigator tried several times to contact Mr. Barker but was unable to do so. (App'x K at 66–67, 81–82, 84–85). Despite the investigator leaving his contact information for Mr. Barker, he never responded to the investigator. (Id. at 85). Ms. Nunnally also explained that she deposes only State witnesses, but not defense witnesses, because she must disclose information about witness depositions to the State. (Id. at 82, 97). Besides, counsel explained that based on what Petitioner had

---

[6]     Decisions issued by the former Fifth Circuit Court of Appeals on or before September 30, 1981 are binding in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981).

told her, Mr. Barker was not an alibi witness because he was asleep the morning of the robbery, and so could not have attested to Petitioner's whereabouts. (Id. at 84, 88–89). See Strickland, 466 U.S. at 691 (strategic decisions are properly based on the information a defendant provides to counsel).

Petitioner submits no affidavit, declaration, or other statement by Mr. Barker corroborating his availability as a witness or what his testimony would have been. Nor does it appear that Petitioner submitted such an affidavit, declaration, or other statement in the post-conviction proceedings. And, while Petitioner was able to secure the testimony of his girlfriend, Ada Whites, Mr. Barker did not testify at the post-conviction evidentiary hearing. Petitioner's unsubstantiated "speculation that [Mr. Barker's testimony] would have been helpful" "is 'insufficient to carry the burden of a habeas corpus petitioner.'" Johnson v. Alabama, 256 F.3d 1156, 1187 (11th Cir. 2001) (quoting Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir. 1985)). Because Petitioner's "self-serving speculation" that his brother's testimony would have been favorable "will not sustain an ineffective assistance claim," Ashimi, 932 F.2d at 650, he has not shown that counsel's failure to call or question Mr. Barker was prejudicial under Strickland. As such, relief on this claim is due to be denied.

## VI. Conclusion

The Court has reviewed each of Petitioner's claims and concludes, based on the record, that none merits relief under 28 U.S.C. § 2254. Accordingly, it is

42

hereby **ORDERED:**

1. Petitioner Jaquez Shakim Roland's Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Doc. 1) is **DENIED** and this case is **DISMISSED WITH PREJUDICE.**

2. The Clerk shall enter judgment accordingly, terminate any pending motions, and close the file.

3. If Petitioner appeals this Order, the Court denies a certificate of appealability (COA). Because the Court has determined that a COA is not warranted, the **Clerk** will terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed. Such termination will serve as a denial of the motion.[7]

**DONE AND ORDERED** at Jacksonville, Florida this 19th day of August, 2021.



TIMOTHY J. CORRIGAN
United States District Judge

---

[7]      The Court should issue a COA only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). After consideration of the record as a whole, the Court will deny a COA.

lc 19
<u>Copies</u>:
Parties and counsel of record